**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (to be admitted *pro hac vice*)
Kristina Mentone (to be admitted *pro hac vice*)
Gregory Potrepka (to be admitted *pro hac vice*)
Andrew Rocco (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: kmentone@zlk.com
Email: gpotrepka@zlk.com
Email: arocco@zlk.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

*Attorneys for Plaintiff John P. Norton,*
  *On behalf of the Norton Family Living Trust*
  *UAD 11/15/2002, and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN P. NORTON, ON BEHALF OF THE NORTON FAMILY LIVING TRUST UAD 11/15/2002, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NUTANIX, INC., DHEERAJ PANDEY, and DUSTON M. WILLIAMS,<br><br>Defendants. | Case No.   3:21-cv-4080<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

i

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................2

II.   JURISDICTION AND VENUE ........................................................10

III.  PARTIES ........................................................................................10

IV.   RELEVANT NON-PARTIES ..........................................................12

V.    STATEMENT OF FACTS ...............................................................14

     A.    Nutanix Company Background.................................................14

        1.   Nutanix's "Core" Hyperconverged Infrastructure (HCI) Technology ......15

        2.   In Response to Competitive Pressures and Rapidly Changing Technology, Nutanix Shifts Focus to Become a Software-Only, Subscription Based Company and Accelerates the Development of its Public Cloud Product.17

     B.    Nutanix's Sales Pipeline and Revenue Growth are Dependent Upon Effective Sales Productivity ................................................................20

        1.   Lead Generation is One of Two Critical Components of Sales Productivity ................................................................21

        2.   Sales Personnel is the Second Critical Component of Sales Productivity.25

     C.    Nutanix's Sales Pipeline Declines in FY2018 and FY2019 Due to Lack of Sales Productivity and Increased Competition............................27

        1.   Defendants Admit They Decided "During the Planning Process" for FY2018 and FY2019 to Keep Critical Lead Generation Spending "Flat," Causing Nutanix's Sales Pipeline to Decline...............................27

        2.   Nutanix's Sales Pipeline Further Declines Due to Insufficient Salesforce Resources, Inadequate Sales Messaging and Disorganization ..................30

        3.   Demoralized Sales Personnel Leave Nutanix in Droves Unable to Meet the Unrealistic Sales Quotas Set By Defendants ...............................33

        4.   Starting in January 2018, Dell Focuses on Sales of VMware Over Nutanix, Causing Nutanix to Lose Valuable Market Share to Competitors............38

     D.    Nutanix Surreptitiously Compensates for Its Withering Sales and Sales Pipeline by Pulling in Sales to Meet Quarterly Forecasts....................39

     E.    Due to an Insufficient Lead Generation Spend and High Sales Force Attrition, Nutanix's Sales Pipeline Becomes Substantially Depleted by April or May 2018 ................................................................43

     F.    Defendants Were Aware of Nutanix's Sales Productivity Issues and Declining Pipeline Through Internal Salesforce.com Reports and Company Meetings........44

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

G.      Defendants Concealed Their Decision to Keep Lead Generation Spending Flat and "Massive" Salesforce Attrition By Burying it in the Company's Financial Statements and Failing to Disclose Material Facts ................................................47

VI.      MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .........49

A.      Materially False and Misleading Statements on the November 30, 2017 Call......49

B.      Materially False and Misleading Statements in the December 2017 Form 10-Q..50

C.      Materially False and Misleading Statements on the March 1, 2018 Conference Call................................................................................................................54

D.      Materially False and Misleading Statements at the March 12, 2018 Analyst Day 55

E.      Materially False and Misleading Statements in the March 15, 2018 Form 10-Q..56

F.      Materially False and Misleading Statements in the May 24, 2018 Press Release .60

G.      Materially False and Misleading Statements During the May 24, 2018 Conference Call................................................................................................................61

H.      Materially False and Misleading Statements in the June 12, 2018 Form 10-Q.....64

I.      Materially False and Misleading Statements on the August 30, 2018 Conference Call................................................................................................................68

J.      Materially False and Misleading Statements in the September 24, 2018 Form 10-K................................................................................................................70

K.      Materially False and Misleading Statements in the December 10, 2018 Form 10-Q ................................................................................................................74

VII.      THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES .....................78

A.      The February 28, 2019 Press Release Partially Disclosing the Truth...................78

B.      Continued Materially False and Misleading Statements in the February 28 Call .84

C.      Second Partial Disclosure in the May 30, 2019 Press Release .............................85

VIII.      ADDITIONAL SCIENTER ALLEGATIONS ................................................................87

A.      The Individual Defendants' Knowledge and/or Recklessness..............................87

1.      Defendants' Admissions That Nutanix Secretly Decided to Keep Lead Generation Spending Flat and Divert Monies to R&D and New Product Development for Six Quarters ................................................................87

2.      Defendants' Admissions That Nutanix Had Not Kept Pace with the Company's Internal Sales Hiring Goals "For Several Quarters"...............88

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.    Defendants' Admissions That Nutanix Sales Personnel Were Not Properly Trained to Sell the Company's Products, Resulting in a Depleting Sales Pipeline as Defendants Purposefully "*Let Chaos Reign*" .......................... 89

4.    Defendants' Knowledge of Declining Sales and Sales Pipeline and Attrition Issues from Internal Company Reports and Meetings ............... 89

5.    Defendant Pandey Directed Sales Personnel to Engage in the Unsustainable Practice of "Pulling-in" Sales from Future Quarters to Make Quarterly Forecasts Throughout the Class Period .......................... 91

6.    Defendants Were Aware that Keeping Lead Generation Spending Flat Would Have a Devastating Effect on Nutanix's Pipeline and Sales Because They Had Done the Same Thing in FY2016, Which Caused the Company's Pipeline to Become Depleted ................................... 93

7.    Defendants Were Aware that Nutanix's Pipeline Was Materially Declining Throughout the Class Period Because They Closely Monitored New Customer Additions and Growth as one of their Annual Performance Goals ................................................................. 93

8.    That the Individual Defendants Spoke in Detail About the Specific Number of Customers and Sales Personnel Added Each Quarter Supports their Knowledge of Nutanix's Salesforce Attrition and Declining Sales Pipeline ................................................................. 95

9.    Defendant Pandey Was Aware that Nutanix's Pipeline Was Materially Declining throughout the Class Period Because He Was a Very "Hands On" CEO, As Confirmed by Nutanix Employees and the Analyst Community ................................................................. 95

10.    Executive Terminations Support A Strong Inference of Scienter ............ 96

11.    Maintaining A Sufficient Pipeline Was Critical to Nutanix's Future Viability ................................................................. 97

B.    Defendants Had Motive to Make Fraudulent Representations .............................. 97

1.    Defendants Were Motivated to Inflate Nutanix's Stock Price to Use the Company's Stock as Currency for Acquisitions ........................................ 97

2.    Defendants Were Motivated to Inflate Nutanix's Securities Prices to Conduct Public Offerings of Nutanix Securities ...................................... 99

IX.    LOSS CAUSATION ............................................................................ 100

X.    NO SAFE HARBOR ............................................................................ 102

XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET ............................................................................ 103

XII.    CLASS ACTION ALLEGATIONS ........................................................ 104

COUNT I ............................................................................ 106

iv

COUNT II ...................................................................................................................108

PRAYER FOR RELIEF .............................................................................................109

JURY DEMAND .........................................................................................................109

GLOSSARY OF TERMS USED IN THE COMPLAINT .........................................111

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff John P. Norton, on behalf of the Norton Family Living Trust UAD 11/15/2002 ("Plaintiff") brings this action against Nutanix, Inc. ("Nutanix" or the "Company"), Chief Executive Officer Dheeraj Pandey ("Pandey"), and Chief Financial Officer Duston M. Williams ("Williams") pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of Plaintiff and all other persons or entities similarly situated who transacted in publicly traded call options and/or put options of Nutanix during the period from November 30, 2017 and May 30, 2019, inclusive (the "Class Period"), and were damaged thereby. In this complaint, Pandey and Williams are referred to as the "Individual Defendants." Nutanix and the Individual Defendants are referred to as "Defendants."

On March 29, 2019, a related securities class action, that is still pending and bearing the caption *In re Nutanix, Inc. Securities Litigation*, No. 3:19-cv-01651-WHO (the "Scheller Action"), was filed by Plaintiff Ryan Scheller in this District against the same Defendants, asserting claims arising out of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

On April 17, 2020, plaintiffs in the Scheller Action filed a Second Amended Complaint For Violations of the Federal Securities Laws. On September 11, 2020, the Court in the Scheller Action denied the Defendants' motion to dismiss the Second Amended Complaint For Violations of the Federal Securities Laws (the "Scheller MTD Order"), holding that the plaintiffs adequately pleaded falsity and scienter as to certain of the alleged false statements, but not as to others.

The Scheller MTD Order was interlocutory, as that case has not, as of the filing of this action, proceeded to final judgment with respect to the Exchange Act allegations that were found to be insufficiently pled at the pleadings stage of the Scheller Action. Accordingly, Plaintiff hereby asserts Exchange Act claims predicated upon the same false and/or misleading statements and schemes alleged in the Scheller Action to preserve Plaintiff's appellate rights of review.

Plaintiff files this complaint to preserve his individual claims, the claims of all other persons or entities similarly situated, and his ability to serve as a class representative. *See* 28 U.S.C. Code §

1658(b)(1) (setting statute of limitations for Exchange Act claims involving fraud at "2 years after the discovery of the facts constituting the violation").[1]

Plaintiff alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of Plaintiff's undersigned counsel, which included, among other things, review and analysis of: (i) Nutanix's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Nutanix's other public statements, including press releases and investor conference calls; (iii) interviews with former employees of Nutanix; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Nutanix and the industry in which it operates; and (v) court filings. Plaintiff's counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiff believes that conclusive evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.    NATURE OF THE ACTION[2]

1.    Nutanix purports to be a cloud computing software company headquartered in San Jose, California known for pioneering its "core" hyper-converged infrastructure ("HCI") software technology, which combines the components of data center computing (server, storage, and virtualization) into a single scalable machine through software.

2.    This securities fraud class action arises from Defendants' Class Period misrepresentations and omissions intended to conceal from investors Nutanix's rapidly declining sales pipeline and revenue. A sales pipeline is the set of stages a prospective customer moves through as they progress from a sales lead to a customer who purchases the product. Nutanix's sales pipeline was its

---

[1] Plaintiff also files this complaint to preserve the claims of similarly situated persons or entities in the event that the Court in the Scheller Action holds that persons or entities such as Plaintiff who purchased and/or acquired Nutanix common stock pursuant to the assignment and/or exercise of put or call options on Nutanix common stock are excluded from the class definition in the Scheller Action, currently defined as "all other persons similarly situated who purchased or otherwise acquired Nutanix securities between November 30, 2017 and May 30, 2019, inclusive (the 'Class Period'), and were damaged thereby." Scheller Action at Dkt. No. 124, pp. 1.

[2] All emphasis herein is added unless otherwise indicated.

2

sole source of revenue and vital to Defendants' ability to manage and forecast sales growth. According to Defendants, Nutanix "probably need[s] about 3x the pipeline" for it to deliver on its sales forecast.

3.     Nutanix operates in a very competitive environment and it is imperative that the Company actively engage in lead generation activities to promote its products and generate qualified sales leads to fill the pipeline and increase sales. Lead generation[3] is the process of identifying and cultivating potential customers to purchase a business's products or services. According to Defendants' public statements, lead generation activities include "digital marketing," activities "through web traffic," "executed campaigns," "brand awareness, promotions, trade shows and partner programs" and "all sorts of events" including promotional "meetings." Defendant Williams confirmed that "[l]ead generation spending is a *key* component to building pipeline, which ultimately significantly impacts bookings, billings and revenue."

4.     Strapped for cash, Defendants made the undisclosed and conscious "decision" during their "planning process" for FY2018[4] and FY2019 to keep critical spending for lead generation activities "flat" so that Nutanix could divert those funds to the research and development ("R&D") of its public cloud product, Xi.

5.     Prior to the Class Period, cloud computing technology was shifting from hardware to software, prompting consumers to switch to a less expensive and easier to maintain public cloud product accessible through the internet. While Nutanix could offer customers *private* cloud networks through operating systems that run on privately-owned hardware, the Company did not yet have a public cloud product. Therefore, it was unable to compete with its top competitors, such as Amazon Web Services ("AWS") and Microsoft's Azure that offered such public cloud products.

---

[3] Throughout the Class Period to the present, Defendants used the terms lead generation, "lead gen," demand generation, "demand gen," pipeline generation and "pipeline gen," interchangeably as all meaning the same thing.

[4] Nutanix utilizes an unconventional fiscal calendar, such that: Q1 extends from August 1 through October 31, Q2 extends from November 1 through January 31, Q3 extends from February 1 through April 30, and Q4 extends from May 1 through July 31. Throughout this complaint, Plaintiff identifies certain time periods or quarters as "fiscal" to refer to Nutanix's fiscal calendar. Where Plaintiff identifies other time periods or quarters as "calendar" they mean time periods or quarters as would ordinarily occur in a calendar beginning on January 1 and ending on December 31.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6.    At the start of the Class Period, Nutanix was in the process of developing Xi to compete with rival competitors. Already behind the competition, Nutanix needed to quickly bring Xi to market as potential customers had already been migrating to the public cloud. Indeed, analysts recognized in early 2018 that introducing a cloud-based product "w[ould] be critical to Nutanix's long-run success."

7.    Defendants knew and expected that cutting lead generation spending would decimate their sales pipeline from prior experience having cut lead generation in FY2016 and then having to raise lead generation spending in FY2017 by 75% to correct their mistake. Nevertheless, Defendants chose to divert lead generation funds to R&D without telling the market.

8.    To compensate for the anticipated decline in the sales pipeline as a result of cutting necessary lead generation funds and diverting them to R&D, Defendants secretly changed the Company's sales strategy in FY2018 to focus on selling Nutanix products to *existing* Enterprise customers (larger customers with higher dollar value sales), rather than smaller Commercial and mid-market *new* accounts because it was far less expensive to generate sales leads from existing customers who had already been educated on Nutanix products. Although potential new mid-size and Commercial accounts were far greater in number than existing Enterprise accounts, the size of such Enterprise accounts was intended to permit Nutanix to present the façade of a healthy pipeline and increasing revenue—investors none the wiser.

9.    At the same time Defendants were secretly keeping lead generation spending "flat" and focusing on sales to *existing* customers, they falsely told investors the opposite, stating that Nutanix purportedly "continually *increase*d our marketing activities related to brand awareness, promotions, trade shows and partner programs" (*e.g.*, lead generation activities),[5] had "strong growth in spending," resulting in a "record number of *new* customers" and "year-over-year growth accelerated" for new customers,  while flatly denying to analysts that new customer growth had slowed stating: "No, I don't think [customer growth is] impacted."

---

[5] Lead generation is distinguishable from "marketing" because it is a subset of marketing. Lead generation activities comprise approximately 70% of total marketing expense with the rest of marketing expense made up of salaries and travel. Marketing expense comprises approximately one-third of Nutanix's total "Sales and Marketing Expense" as reported in the Company's financial statements. The other two-thirds of "Sales and Marketing Expense" relates to sales expense, which is primarily made up of salaries for sales representatives and their bonuses/commissions.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10.     The problem for Defendants, however, was that there is a limited amount of sales that can be pulled in from existing customers before sales dry up. While Xi was fraught with defects causing delays in getting it to market, the inevitable happened—Nutanix's pipeline declined as sales to existing customers dried up while Nutanix was not generating many sales leads for new customers.

11.     Confidential witnesses ("CW") confirmed and corroborated that by April or May 2018, the sales pipeline was at least 20-30% below the Company's internal targets and it was "very obvious" that the pipeline was "pretty dry." One witness recounted Nutanix's annual sales kickoff meeting ("SKO") for FY2018 held in Las Vegas in early August 2018 attended by Defendants Pandey and Williams where Defendants announced on stage that only 50% of the salesforce Company-wide had made their quota for FY2018 and, thus, the sales pipeline was suffering and in serious trouble.

12.     According to CWs, at the same time Defendants were secretly diverting lead generation spending to R&D, sales representatives Company-wide were leaving Nutanix in droves throughout the Class Period—typically after only one year of employment (as compared to competitors such as VMware whose average employment term was 2.2 years)—demoralized by unachievable sales quotas and the lack of resources needed to close deals. Defendants concealed the Company's salesforce attrition problems from investors, touting every quarter that Nutanix had "significantly increased our sales and marketing personnel" and purported "strong success in our hiring in the quarter that positions us to deliver on our future growth plans." Defendants' statements gave investors the false impression that Nutanix was meeting its internal sales hiring goals necessary to achieve forecasted revenue growth when, in fact, it was not.

13.     Defendants knowingly concealed from investors that Nutanix's purported strong sales hiring was woefully inadequate because a large portion of the Company's hiring ended up replacing the sales representatives who were leaving, rather than growing the sales force needed to achieve targeted revenue growth.  Indeed, as Defendants ultimately admitted at the end of the Class Period, "over the past few quarters, [Nutanix has] not kept pace with our bullish sales hiring goals," which "plays a role in our sales pipeline development" and, thus Nutanix was impacted "by a shortage of sales reps in the first half of the fiscal year, resulting in an under-spend by several million dollars."

14.     Nutanix's inadequate investment in lead generation and pervasive sales attrition throughout the Class Period caused a massive decline in sales productivity—the rate at which a sales representative is able to turn sales leads in the pipeline into revenue—which, in turn, caused revenue to decline. According to Defendant Pandey, the key "inputs [of sales productivity] are salespeople and pipeline spend, the demand gen spend." Thus, as the two key inputs to successful sales productivity—lead generation and salespeople—were kept flat or declining, it was no surprise to Defendants that sales were declining. Yet, throughout the Class Period as sales productivity was continuing to suffer, Defendants, again, told investors the opposite—that Nutanix had "experienced record sales productivity."

15.     To hide its dwindling pipeline and declining sales from investors, Nutanix engaged in the undisclosed and unsustainable practice of pulling into the current quarter, sales from existing customers expected to close in the next quarter to meet quarterly forecasts. As one witness explained, by pulling future orders into the present quarter, ensuing quarters would be depleted of expected orders in the pipeline. Thus, to allow Nutanix to continue increasing its revenue forecasts every quarter, Defendants had to repeat their deceptive pull-in practice in the following quarter. Nutanix sales personnel referred to this practice as "draining the swamp."

16.     Nutanix's pull-in scheme, however, was not sustainable because Defendants were not engaging in lead generation activities to increase business from *new* customers. Inevitably, Nutanix hit the point in February 2019 when the Company's existing customers were "over-procured" and there was no more pipeline left to pull in.

17.     Confidential witnesses confirmed and corroborated that Nutanix's depleted pipeline was reflected in the Company's internal Salesforce.com system, which includes "all prospective deals," whether they are a lead or a new customer, the status of the opportunity, whether a proposal had been extended, whether the customer had made a commitment, whether the deal had closed, or if a deal had been lost. The CWs characterized Salesforce.com as the "source of truth" and the "Bible" for sales pipeline reporting, recalling that everything put into Salesforce.com had to be complete and accurate or "you would hear about it" from Defendant Pandey.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

18.     The Individual Defendants had direct access to the pipeline reports in Salesforce.com. Multiple witnesses confirmed that Defendant Pandey accessed the Salesforce.com pipeline reports daily on his computer desktop through a Dashboard report created for him that contained real-time sales and pipeline data. Witnesses also confirmed that it was widely known throughout the Company that Pandey was the single-highest user of Salesforce.com. Nutanix's former Director of Business Operations also attended meetings with Defendants Pandey, Williams and other executives after the end of each quarter where they discussed that revenue was declining in 2018.

19.     Defendants' knowledge of the Company's sales issues is also evidenced by other statements they made at the August 2018 SKO meeting. For example, Defendants identified and raised Nutanix's depleted pipeline, as well as the fact that the Company's salespeople had been missing their quotas. Thus, Defendants knew by April or May 2018 (and likely much sooner) that Nutanix's sales pipeline was materially depleted.

20.     Defendants were ultimately forced to reveal the truth in two partially corrective disclosures. First, on February 28, 2019, Nutanix announced fiscal Q2 2019 results and provided weak Q3 2019 guidance. In explaining the reason for the weak Q3 guidance, Defendants admitted that Nutanix "*miss[ed] our pipeline targets*" for the second quarter of FY2019 because "*in fiscal 2018, we reallocated some of our lead generation spending to other priorities. As a result, there was a four quarter period from Q4 2017 to Q3 2018 that we basically kept lead generation spend flat*" and that in FY2019 "*we again reallocated capital away from lead generation spend during our planning process.*" According to Defendant Williams, "[t]he magnitude of the shift is in *the few tens of millions*."

21.     Defendants further admitted on February 28, 2019 that "*over the past few quarters, [Nutanix has] not kept pace with our bullish sales hiring goals*," which "plays a role in our sales pipeline development" and, thus Nutanix was impacted "by a shortage of sales reps in the first half of the fiscal year, resulting in an under-spend by several million dollars" and that Nutanix suffered from poor sales execution due to insufficient staffing and sales training.

22.     Defendants also came clean that, contrary to their public statements touting Nutanix's purported "new" customer growth, the Company had actually been focusing its efforts on "existing" larger customers because they were "easier" sales to make:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Now, looking back at it, we probably **_over rotated a bit to the existing customer base_** and large customers there, where those efficiency dollars are easier to get and probably underspent a little bit on new customers, which those efficiencies are little tougher to get on new customers.

23.    Upon the news, Nutanix's stock dropped from a closing price of $50.09 on February 28, 2019 to a closing price of $33.70 per share on March 1, 2019, on usually high trading volume.

24.    As eventually disclosed in the Company's 2019 Definitive Proxy Statement filed on October 30, 2019, Defendants missed their targeted number of new customer additions in the Company's FY2019 operating budget—which was adopted and approved in advance of the fiscal year by the Company and its Board of Directors—by over 30%, adding only 67.9% of the total new customers targeted in the Company's budget.

25.    Analysts did not buy Defendants' story that Nutanix's sales execution issues just popped up out of nowhere in the second quarter, concluding that the Company's issues must have "been building up for several quarters" and finally "came to a head" in Q2 FY2019. Indeed, William Blair stated in its March 1, 2019 report that "we believe these events have to some extent **_overwhelmed the salesforce_**, **_impacting productivity and efficiency and impairing new customer acquisition_**. **_We believe these issues must have been building up for several quarters_**, and in this past quarter they came to a head, as seen by the dramatically reduced pipeline."

26.    The Company's poor performance was immediately followed by the sudden departures of Nutanix's top sales management. During the February 28, 2019 conference call, Pandey announced that Chris Kaddaras, the current head of the Company's European sales, would be taking over the Americas region to "improve our sales execution," replacing Sherry Lautenbach, Senior Vice President of American Sales.

27.    Then, on March 6, 2019, Louis Attanasio ("Attanasio"), Nutanix's Chief Revenue Officer, to whom Lautenbach reported, notified Nutanix that he would be leaving Nutanix effective March 8, 2019 "to pursue other opportunities." Attanasio's departure was not before he **_liquidated his entire holdings of Nutanix stock_** on December 19, 2018—the purported same month defendant Pandey admitted Nutanix "realized that we actually have a pipeline problem" and right before the truth was revealed, selling 134,499 shares for proceeds of more than $5.5 million.

8

28.     Finally, on May 30, 2019, Defendants revealed that Nutanix had missed revenue and billing targets due to continuing sales execution issues that were far worse than what Defendants had previously represented on February 28, 2019.

29.     Upon the news, Nutanix's stock dropped from a closing price of $32.67 per share on May 30, 2019 to $28.07 on May 31, 2019, on unusually high trading volume.

30.     Commenting on another bad quarter, William Blair analyst Jason Ader described Nutanix's situation as "definitely worse than we expected," while Raymond James analyst Simon Leopold reported "[w]e think it could take *several quarters* for Nutanix to return to double digit year-over-year growth," as opposed to the "*quarter or two*" Defendants previously claimed. Moreover, Piper Jaffray analyst Andrew Nowinski reported "[i]t is clear that this model is unsustainable, requiring *massive* amounts of spending just to support modest revenue growth, which we believe is attributable to competition."

31.     That same day the Company also reported that Sunil Potti, Nutanix's Chief Product Officer, was leaving the Company.

32.     Defendants benefited from Nutanix's inflated stock price by using the Company's stock as currency to make key acquisitions to enable Nutanix to accelerate its race to the public cloud, while also maintaining compliance with the "Rule of 40" metric considered by Defendants and industry analysts as a key metric in evaluating the Company's performance. The Rule of 40 says that the revenue growth rate of a company plus the company's profits as a percent of revenue over the same period should equal at least 40. For Rule of 40 purposes, the measure of profit used by tech firms in Nutanix's space, including Nutanix, is free cash flow. Defendants repeatedly touted Nutanix's compliance with the Rule of 40 during quarterly investor calls. Moreover, a portion of Defendant Pandey's and Williams' annual performance bonuses for FY2019 was tied to the Company's compliance with the Rule of 40.

33.     By making the following stock acquisitions using the Company's inflated stock price, rather than with cash, Defendants were able to conserve cash flow and maintain compliance with the rule of 40 (or otherwise avert hostile scrutiny regarding the Rule of 40), while getting public cloud products to market through acquisitions: (i) Netsil Inc., which closed on March 22, 2018 for $67.5 million, of which $63.8 million was *financed using Nutanix stock* to launch "Flow," a software-defined

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

network solution designed to provide application-centric micro-segment security services to protect against threats not protected by traditional network firewalls; and (ii) Mainframe2, Inc. ("Frame"), which closed on August 8, 2018 for $130 million, of which ***$103.0 million was financed using Nutanix stock***, to launch a cloud-based Windows desktop and application delivery service that competes directly with Citrix and VMware.

34.     Had Defendants used cash to make these acquisitions, Nutanix would have had negative free cash flows and not met the Rule of 40 or faced extreme scrutiny from analysts about the Company's cash flow and its compliance with the Rule of 40 at the same time that the Company was concealing an impeding cash flow disaster from its barren pipeline.

35.     As a result of the fraud alleged herein, Plaintiff and the putative Class have suffered significant harm.

## II.   JURISDICTION AND VENUE

36.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

37.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

38.     Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b) because Nutanix maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the law complained of herein occurred in this District.

39.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

40.     Plaintiff John P. Norton, on behalf of the Norton Family Living Trust UAD 11/15/2002, transacted in Nutanix securities during the Class Period, as set forth in the certification filed herewith as Exhibit A, incorporated by reference herein, and was damaged thereby.

41.     Defendant Nutanix is an enterprise cloud platform provider incorporated in the state of Delaware in September 2009 and headquartered in San Jose, California. Nutanix common stock trades under the ticker "NTNX" on the NASDAQ, an efficient market.

42.     Defendant Dheeraj Pandey ("Pandey") co-founded the Company and is, and was during the Class Period, Chief Executive Officer ("CEO") and Chairman of the Board of Nutanix. Pandey was previously the President of Nutanix from September 2009 until February 2016. According to the Company's Annual Reports on Form 10-K for the fiscal years ending July 31, 2018 and July 31, 2019 (the "Fiscal 2018 Form 10-K" and "Fiscal 2019 Form 10-K," respectively), Nutanix's "chief operating decision maker is a group which is comprised of our Chief Executive Officer and Chief Financial Officer."

43.     Defendant Duston M. Williams ("Williams") is, and was during the Class Period, Chief Financial Officer ("CFO") of Nutanix. As noted above, according to the Fiscal 2018 and Fiscal 2019 Forms 10-K, Williams was a "chief operating decision maker" at Nutanix.

44.     Defendants Pandey and Williams are collectively referred to herein as the "Individual Defendants." As chief operating decision makers, Pandey and Williams admittedly allocated resources and assed financial performance based upon discrete financial information.

45.     The Individual Defendants, by virtue of their high-level positions at Nutanix, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at its highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

46.     As senior executives at a publicly held company, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Nutanix's publicly traded securities would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

11

47.     As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the SEC filings, press releases, and other public statements issued by Nutanix during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed in this complaint.

48.     As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about Nutanix's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Nutanix materially false and misleading.

## IV.     RELEVANT NON-PARTIES

49.     CW1 was a former Nutanix Commercial Account Manager[6] for the Midwest region from December 2016 to January 2019 reporting to a district manager. CW1 was responsible for managing customer relationships, educating and selling Nutanix products to existing customers and liaising between sales and marketing and engineering.

50.     CW2 was a former Nutanix executive in Worldwide Support Business Operations from February 2016 to late 2016 and then an executive of the Company's Customer Success program from late 2016 until March 2018.  As an executive of the Customer Success program, CW2 reported to the Executive Vice President of Customer Success, Indir Sidhu, who reported to Defendant Pandey.  In the role as executive of the Customer Success Program, CW2 was responsible for overseeing the Company's customer success program in which customers paid a fee for receiving support for Nutanix products.

51.     CW3 was a former Nutanix Commercial Account Manager from May 2018 to July 2019 reporting to Alex Garwood up until December 2018 and then to another individual named Brian until the end of this witnesses' employment. Both Garwood and Brian reported to Sherry Lautenbach

---

[6] The title of "account manager" at Nutanix refers to a sales representative. These terms are used interchangeably herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

("Lautenbach"), Senior Vice President of American Sales until March 2019. In this role, CW3 was responsible for educating potential customer on Nutanix customers and closing sales deals for the northern California and the Pacific Northwest region, including Alaska.

52. CW4 was the former Director of Digital Marketing at Nutanix from January 2018 until May 2019 reporting to the Vice President of Growth and Demand Marketing, Gleb Brichko, who reported to the Senior VP of Corporate Marketing, Julie O'Brien. Julie O'Brien reported to Ben Gibson, Nutanix's Chief Marketing Officer, who reported to Defendant Pandey. In this role, CW4 was responsible for developing lead generation strategies using digital and website marketing.

53. CW5 was a former Nutanix Global Account Manager from December 2017 to June 2019 reporting initially to Robert Stroud until July or August 2018 when Stroud was replaced by Roman Kochanowsky, both of whom were Sales Directors for Nutanix's Northeastern region reporting to Anton Granic who reported to Lautenbach. In this role, CW5 was responsible for handling larger potential customer accounts, including account planning, strategizing and pursing potential customers, educating them on Nutanix technology and ultimately selling to them.

54. CW6 was a former Nutanix Senior Product Manager from June 2018 to June 2019 reporting to a Director at Nutanix who reported to a VP who reported to the Company's Chief Operating Officer, David Sangster. In this role, CW6 was responsible for hardware and software service support.

55. CW7 was a former Nutanix Account Manager from September 2015 to July 2017 and a former Nutanix Global Account Manager from August 2017 to August 2018 in the San Francisco "Bay area." In CW7's role as an Account Manager, CW7 was responsible for managing relationships with customers for between twenty and fifty accounts across many types of customers. In CW7's role as a Global Account Manager, CW7 managed fewer but larger customer and more strategically significant customer accounts. CW7 (like all of Nutanix's other sales staff) sold the "entire suite" of Nutanix products, acting as a "resource broker" for any marketing or engineering support, and being available to provide answers to any other types of questions that customers may have.

56. CW8 was a former Director of Business Operations and Project Management and Services from January 2017 until June 2018 responsible for leading the globally disbursed program management and business operations team, including directing the management of projects ranging up

to two million dollars, managing the profit and loss for such projects, ensuring efficient delivery of Nutanix products and services, developing and managing long-range forecasts and financial plans for Nutanix, driving operations and process improvements and managing and improving NetSuite and Salesforce.com systems.

57. CW9 was a former Regional Sales Director in California during the second half of the Class Period responsible for overseeing the Southern California Commercial sales team. CW9 reported to Elaine Yee who reported to Lautenbach.

58. CW10 was a former Senior Manager, Strategy and Marketing Analytics from June 2018 to March 2019 responsible for tracking the marketing spend against the budget, including for the marketing department headcount, overhead costs and demand generation activities. Prior to that, CW10 worked in Finance as a Senior Financial Analyst from approximately December 2013 to June 2018. After March 2019, CW10 returned to the Finance group as a Senior Financial Analyst from April 2019 until CW10 left Nutanix in September 2019.

59. CW11 was a former Account Executive on the West Coast from March 2018 to February 2019 responsible for Commercial sales in CW11's territory and who reported to a Regional Sales Director.

60. CW12 was a former Territory Account Manager in the "TOLA" region comprised of Dallas/Fort Worth, Texas, Oklahoma and Louisiana from August 2017 to July 2019 responsible for Commercial customer account sales.

V.    STATEMENT OF FACTS

A.    Nutanix Company Background

61. Founded in 2009 by a group including Defendant Pandey, Nutanix describes itself as "provid[ing] a leading enterprise cloud platform that powers many of the world's business applications and end user services by providing software solutions that digitize traditional silos of enterprise computing."

62. Nutanix's products and services are sold to end customers through distributors, resellers, and original equipment manufacturers ("OEM"). Nutanix's OEM partners include Dell, Lenovo Group Ltd. ("Lenovo"), International Business Machines Corporation and Fujitsu Technology Solutions

GmbH ("Fujitsu"). Although the Company historically delivered its solutions on an appliance, beginning in the first quarter of FY2018 the Company began its transition to only selling software. Under this model, more customers began buying appliances from third-party OEMs and configuring such appliances with Nutanix software. Alternatively, customers bought appliances directly from OEMs with the Company's software pre-installed. OEMs offered these appliances in a range of configurations and sold associated support offerings that Nutanix jointly supported.

63.    Nutanix's major competitors fall into four categories: (1) software providers, such as Red Hat, Inc. and VMware, that offer a broad range of virtualization, infrastructure and management products to build and operate enterprise clouds; (2) traditional IT systems vendors, such as Cisco Systems, Inc. ("Cisco"), Dell, Hewlett Packard Enterprise Company ("HPE"), Hitachi Data Systems ("Hitachi"), IBM, and Lenovo, that offer integrated systems that include bundles of servers, storage and networking solutions, as well as a broad range of standalone server and storage products; (3) traditional storage array vendors, such as Dell, Hitachi, and NetApp, Inc. ("NetApp"), which typically sell centralized storage products; and (4) providers of public cloud infrastructure and services, such as Amazon.com, Inc., Google Inc., and Microsoft Corporation.

64.    Some of these competitors are also vendors for Nutanix's hyperconverged infrastructure and software-defined storage products, including Cisco, Dell, and HPE.

65.    As discussed below, throughout the Class Period, Nutanix offered its "core" hyper-converged infrastructure (HCI) appliance product and software defined storage. However, in order to stay competitive, Nutanix also had to quickly get a public cloud product to market. Strapped for cash, during the Company's "planning process" for FY2018, Defendants secretly diverted funds allocated for lead generation to R&D so Nutanix could accelerate the development of its desperately-needed public cloud-based products, all the while falsely telling investors Nutanix was purportedly "increasing" its spending on lead generation activities resulting in a strong, healthy sales pipeline and sales.

### 1.    Nutanix's "Core" Hyperconverged Infrastructure (HCI) Technology

66.    In response to evolving technology, Nutanix pioneered its "core" hyper-converged infrastructure (HCI) appliance product and software defined storage. According to the Company's public filings, Nutanix's HCI solution allows customers "to virtualize various clouds – private, public,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and edge – into one seamless cloud enabling enterprises to choose the right cloud for the right application." Nutanix boasts that its "cloud platform converges compute, virtualization, storage, networking, desktop, governance and security services in one integrated simple to consume solution delivered through software."

67.    Nutanix's "core" HCI platform is a hypervisor solution called "Acropolis" that purportedly starts with hyperconvergence, then adds native virtualization, enterprise storage, virtual networking, and platform services, including application mobility and security, into a single turnkey platform. The goal of hyperconverged infrastructure is to simplify workload management in enterprise data centers by combining everything necessary for data center computing (server, storage, and virtualization software) into a single machine. HCI at its core enables the building up and scaling of systems using servers as building blocks.

68.    Nutanix customers have the option to either buy the Company's HCI enterprise software and deploy it on a variety of qualified hardware platforms, or to purchase the software pre-installed on hardware through one of the Company's original equipment manufacturer ("OEM") partners or on the Nutanix-branded "NX" hardware line.  Nutanix outsources production of the NX hardware to Super Micro Computer, Inc. and Flextronics Systems Limited. Software delivered on configured to-order appliances is not portable to other appliances and has a term equal to the life of the associated appliance, while separately purchased software typically has a term of one to five years.  HCI technology at its core enables the building up and scaling out of systems using servers as building blocks without the need for individual specialists.

69.    Prior to and throughout the Class Period, Nutanix's main competitor in the HCI market was VMware. According to CW1, after Dell, Inc. acquired VMware in September 2016, VMware made significant improvements to the VX Rail product, including patching that could be done in fifteen minutes across multiple applications making them much less cumbersome. As a result of these improvements, CW1 stated that Nutanix no longer had a competitive advantage over VMware.

16

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2.      **In Response to Competitive Pressures and Rapidly Changing Technology, Nutanix Shifts Focus to Become a Software-Only, Subscription Based Company and Accelerates the Development of its Public Cloud Product**

70.    Leading up to the start of the Class Period, Nutanix was facing increasing competitive pressures as more products and companies entered the HCI market. As the rise of consumerization led the tech industry to fundamentally shift from hardware to software, beginning in the first quarter of fiscal 2018, Nutanix began transitioning its business to focus on software-only products (as opposed to hardware) and to a subscription-based model (as opposed to licensing model). This software-based model allows consumers the flexibility to transfer their software-only entitlements to another qualified third-party platform.

71.    During calendar 2018, Nutanix introduced three cloud-based products: Beam, Frame (which service was possible through Nutanix's acquisition of Mainframe2, Inc.) and Xi Cloud Services. Xi Cloud Services is Nutanix's first public-cloud product. According to CW2, Nutanix needed a cloud solution in order to compete because the majority of Nutanix's customers were moving to the cloud. Potential customers at the Company's .NEXT 2017 conference were reportedly already starting the move to the public cloud. Thus, analysts noted that "new offerings (like Calm and Xi) will be critical to Nutanix's long-run success."

72.    At Nutanix's June 29, 2017 .NEXT 2017 conference, Defendants announced plans to launch XI Cloud Services in "*early* 2018." While Nutanix had previously developed private cloud networks through operating systems that run on a customer's own hardware, Xi was targeted to rival AWS and Microsoft's Azure on the public cloud.

73.    Although Xi Cloud Services was originally slated to be released in early 2018, during a November 20, 2017 conference call immediately prior to the start of the Class Period, Defendants revealed that the Xi launch would be delayed at least another six months until mid-2018 because of delays with the release of its operating software update, AOS 5.5, as well as engineering issues:

**Katy Huberty**

And then at the user conference in June, I think, you talked about Xi launching early 2018 today you talked about middle of the year. Is that just a function of early release versus GA, or is the timing different? And then maybe you can comment on when you think the memory market loosens, how that's been a factor on the gross margins. Thank you.

**Dheeraj Pandey**

17

I think one of the things, Katy, that we talked about in our overall engineering culture is how this release *that we're actually doing in 5.5 took us a little bit longer to come out with, in terms of general availability. And that pushes a few of the things out as well. So there is, I would say, three months' worth of victim in Xi,* because we have to keep the lights on with on-prem customers as well. ***And we do expect to actually change the way we do engineering.*** In these two pizza teams, like really thinking about cloud engineering, what does it mean to have a platoon of developers who are independently releasing code and becoming a company that's more DevOps like, so that's the transition that the company is going through to actually improve our overall fidelity of releases as well.

74.    By April 2018, the launch of Xi, again, was called into doubt as the Company continued to experience engineering issues causing it to delay the launch until the end of 2018 or potentially early 2019. In an April 27, 2018 report published by Bloomberg, Defendants revealed that the Company was continuing to have engineering issues and challenges. Defendant Pandey claimed that adopting engineering for cloud computer was a "harder problem than we thought," explaining:

It was less to do with products, but it's the 'how' of engineering. How do you break things down, how do you do smaller releases, how do you have multiple parallel streams of engineering going on at the same time?[7]

75.    Jennifer Massaro, a spokeswoman for Nutanix, was cited in an April 27, 2018 Bloomberg article as stating in an email that: "We have extended the timeline and ***have added teams to do it right***. We are taking the truer but longer path to Xi."[8] According to CW6, the execution for Xi Cloud Services product development was lacking and the product development team did not have the resources to meet the timelines for developing the product.

76.    In August 2018, Nutanix announced it hired Ben Ravani as SVP of Xi Reliability Engineering, indicating there were significant problems that needed attention before Xi would be released. Ultimately, it was not until November 28, 2018, nearly one year after the original launch date, that Xi was released, but only as "general[ly] availabl[e]." By the time Nutanix finally launched Xi, according to CW7, this witnesses' large accounts with Apple and Salesforce.com had already decided to go with AWS because Nutanix had not had a properly functioning cloud solution alternative.

77.    To compensate for the delays in launching Xi, Nutanix acquired Minjar, Inc. on March 16, 2018 for $19.3 million to launch "Beam," Nutanix's first software-as-a-service offering to

---

[7] Nico Grant, "Nutanix's Amazon Cloud Rival Delayed By Engineering issues" BLOOMBERG (April 27, 2018), available at https://www.bloomberg.com/news/articles/2018-04-27/nutanix-s-amazon-cloud-killer-delayed-by-engineering-problems
[8] *Id.*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

purportedly provide customers with visibility and analysis of their cloud consumption patterns, along with one-click optimization across cloud environments.

78.    On March 12, 2018, Nutanix announced an agreement to acquire Netsil, of which "between 85% and 100% of the consideration" would be paid in stock. The Netsil acquisition closed on March 22, 2018, for $67.5 million, of which $63.8 million was financed using Nutanix stock, to launch "Flow," a software-defined network solution designed to provide application-centric micro-segment security services to protect against threats not protected by traditional network firewalls. Then August 2, 2019, Nutanix announced an agreement to acquire Frame, a cloud-based Windows desktop and application delivery service, which would be paid in a mix of cash and stock. The Frame acquisition closed on August 24, 2018 for $130 million, of which $103 million was financed using Nutanix stock, to purportedly provide desktop-as-a-service that combines web-scale design of cloud applications with the functionality of traditional virtual desktop applications. Nutanix also offered other new software products such as Calm and Flow.

79.    The market, and even the Company itself, observed that launching Xi and related public cloud products was overwhelming Nutanix's research and development. At the May 2018 .NEXT conference, Sunil Potti, Nutanix's Chief Product and Development Officer, commented that Nutanix "went from a few products just 12 months ago to over 10 products within a span of a year." By August 30, 2018, analyst Jason Ader commented during the investor call that "it's hard to keep up with all the new products, honestly. You have a laundry list right now."

80.    According to CW11, Nutanix's 2018 acquisitions were made too quickly and "all making fluff" so Nutanix could claim it had cloud products to keep up with VMware, AWS and others.  In reality, however, these new products did not work except in a small number of instances. CW11 stated that Nutanix tried to do too much too soon: while it took VMware upwards of five years to build its cloud solution, Nutanix tried to do it in one year resulting in an ineffective product. Thus, CW11 described Xi and Nutanix's other cloud-based products as "vaporware" during CW11's tenure that only served to further confuse the salesforce about Nutanix's products.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**B.    Nutanix's Sales Pipeline and Revenue Growth are Dependent Upon Effective Sales Productivity**

81.    In order to obtain new customers and sell new products to existing customers, a company like Nutanix must first start by identifying sales leads. A sales lead is a person or business who may eventually become a customer and purchase the company's products or services.[9]

82.    According to CW1 and CW5, Nutanix inputs all sales leads into a sales "pipeline." CW1 explained that the sales pipeline is a set of stages that a prospective customer (a new customer or an existing customer who may buy a new product) moves through as they progress from a new "unqualified" lead to a "qualified" lead[10] and then a customer. The term pipeline comes from the concept of deals traveling along a predefined path from initial contact, to consideration, to close.[11] This predefined path is known within a company as the sales process, and is a prerequisite for building and tracking a sales pipeline.

83.    The rate at which sales representatives are able to turn a sales lead into revenue is called "sales productivity."[12] According to Defendant Pandey, the key "inputs [of sales productivity] are salespeople and pipeline spend, the demand gen spend."[13]

---

[9]         *See*                https://www.investopedia.com/terms/s/sales-lead.asp; https://en.wikipedia.org/wiki/Lead_generation.

[10] "A sales qualified lead (SQL) is a prospect created by the marketing department and vetted by the sales team. After initial contact from marketing, sales continues the interaction exploring their interest and capability to purchase. If sales adds them in their queue, the lead is deemed "qualified" as a viable prospect…." https://www.salesfusion.com/resource/qualified-vs-unqualified-leads/

[11] *See* https://datahug.com/blog/sales-101-what-is-a-sales-pipeline/.

[12] https://enspark.io/sales-productivity-defined/

[13] In their public statements, Defendants use the term "lead generation" interchangeably with the terms "demand generation" and "pipeline generation" indicating these terms all have synonymous meanings. During the Q&A portion of the Q2 FY2019 earnings call, Pandey equated the two terms "*pipeline* spend, the *demand* gen spend *that we've talked about earlier*" in the same sentence. Moreover, the reference to the "spend that we've talked about earlier" was unequivocally referring to "lead generation spending" because that was the term Pandey and Williams used in their prepared statements—they did not use "pipeline spend" or "demand gen spend" in their prepared statements. Defendants equated these terms when responding to analyst questioning during the Q2 FY2019 earnings call: Analyst Roderick B. Hall from Goldman Sachs Group asked about "this lead generation issue" where Williams responded by discussing "demand dollar spend" and "demand gen," and Pandey immediately followed up Williams' comments with addition comments regarding "demand gen." *See also* May 30, 2019 Nutanix Conference Call ("[W]e made significant progress with . . . our pipeline generation for the quarter"); *Id.* ("The other area of great focus during the quarter was leveraging our incremental lead generation spending into increased pipeline build."). Plaintiff interprets all these admittedly synonymous terms, "lead generation," "demand generation," and "pipeline generation," to mean the same thing.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

84. Despite that lead generation spending and sales people are admittedly the two "key" inputs of sales productivity, as discussed below, "during the planning process" for FY2018 and FY2019, Defendants secretly decided to keep lead generation spending "flat" and failed to keep pace with necessary internal sales personnel hiring goals due to significant undisclosed salesforce attrition.

### 1. Lead Generation is One of Two Critical Components of Sales Productivity

85. Given the competitive environment in which Nutanix operates, it is imperative that the Company actively promote its products in order to generate qualified sales leads to fill its pipeline and increase sales. As Nutanix stated in its public filings, a "[k]ey element to [Nutanix's] growth strategy" is to "[i]nvest to acquire *new* end customers" by "increasing our investment in sales and marketing" to create market awareness and educate customers about Nutanix products. In fact, Nutanix admits that "*[t]he majority of our sales and marketing investment is used to educate our end customers about the benefits our solution*, particularly as we continue to pursue large enterprises . . . ." In other words, the "majority" of the Company's sales and marketing investment is to generate sales leads.

86. According to CW2, the marketing group must engage in lead generation activities and without such activities, the pipeline for new customers will not materialize.

87. Businesses like Nutanix obtain sales leads for new and existing customers through lead generation activities. According to Defendants' public statements, lead generation activities include "digital marketing," activities "through web traffic," "executed campaigns,"[14] "brand awareness, promotions, trade shows and partner programs"[15] and "all sorts of events" and "meetings."[16] Analysts such as JMP Securities similarly understood that lead generation activities and included "CIO events, digital marketing, branding campaigns, and seminars."

88. CW4 recalled that lead generation activities at Nutanix were performed by several distinct groups: Digital Marketing, Events, Program Teams, Account-Based Marketing ("ABM"), and Public Relations. The Digital Marketing group of which CW4 was a part, developed leads by email marketing and promoting visits to Nutanix's website. The Events group generated leads through field

---

[14] *See* March 20, 2019 Investor Day ("You have marketing-sourced pipeline, that's all about leads that are qualified, they come in through digital, through web, traffic, through executed campaigns, through channel leverage activities and the like….").
[15] *See, e.g.*, ¶248 (Q2 FY2018 Form 10-Q); ¶276; (Q3 FY2018 Form 10-Q).
[16] *See* Nutanix February 28, 2019 conference call transcript.

marketing events, such as Nutanix-sponsored trips to baseball games for prospective customers, group events in which Nutanix rented an entire movie theater to host the employees of a prospective customer or setting up booths at various events such as VM World and Cisco Live.  CW4 stated that events like VM World and Cisco Live were a "big source of demand generation" for Nutanix.

89.     The Public Relations group, CW4 said, was important because it dealt with "brand awareness," particularly with respect to dealing with analysts such as Gartner, Inc. and Forrester Research. If Nutanix was ranked high in the Gartner ratings, it was used as a major demand generation tool, including in digital marketing where CW4 worked.  Account-based Marketing, which was created in the last few months of CW4's employment, was dedicated to large targeted accounts from which Nutanix wanted to win business and used demand generation marketing efforts geared towards the particular targeted customer.

90.     According to CW1 and CW10, lead generation activities at Nutanix included any activity designed to land a new customer or sell additional products to existing customers. CW1 and CW10 confirmed that lead generation activities included advertising, trade shows, direct mailings, events, digital marketing, branding campaigns, and conferences or seminars. CW1 recalled a couple of lead generation events during CW1's employment that involved sending branded cupcakes to customers and a "Brew"tanix event where Nutanix rented out a private room and served food and beer to generate business from new and potential customers. CW11 similarly recalled that in CW11's region there was a dedicated marketing person responsible for identifying sales leads, which were obtained from Nutanix-sponsored trade shows and other events.

91.     Likewise, CW9 explained that sales leads were generated from various sources, such as when a prospective customer downloaded something from the Nutanix website or was added to a mailing list or attended a marketing event. At that point, the potential customer would "get turned into a lead" and sent to a sales representative at which time the lead went into "nurture status."  The sales representative then tried to create some kind of an actionable event with that lead, which was typically to arrange a meeting.  If and when a meeting was scheduled, then the prospective customer was counted as a "real," or "qualified lead."

92.    Defendant Pandey likewise described the Company's lead generation activities to include "all sorts of events" and "meetings."[17]

93.    Analysts such as JMP Securities also understood that "[p]ipeline generation activities" were synonymous with lead generation activities and included "CIO events, digital marketing, branding campaigns, and seminars."[18]

94.    CW4 stated that after the marketing team generates a lead for a new customer, the prospective customer is "kicked over" to sales and it is up to the sales force to sell them on Nutanix's products. Benjamin Gibson, the Company's Chief Marketing Officer confirmed CW4's account stating that "[y]ou have marketing-sourced pipeline, that's all about leads that are qualified they come in . . . generate new lead, qualify it, set the meeting, hold the meeting, we hand it off to Chris's sales organization, they close."

95.    At Nutanix, the sales pipeline and every stage of the sales process was tracked in the Company's internal Salesforce.com and Clari systems.

96.    CW1, CW2, CW3, CW5, CW7, CW8 and CW11 recalled that sales personnel report and track every single update to Nutanix's pipeline in Salesforce.com. CW1 and CW5 explained that Salesforece.com was Nutanix's internal software used to manage both existing and prospective accounts, as well as customer leads. According to CW1, information about every customer at any point in the sales cycle was entered into the Salesforce.com system, including whether a customer was potentially interested in buying from Nutanix, customers that had already purchased from Nutanix (and whom Nutanix wanted to sell more products to) and "all prospective deals." Salesforce.com used "a special methodology" to categorize customers, i.e., whether they were a lead or a new customer, whether there was an opportunity with the customer and the status of that opportunity, including whether the opportunity was in "the discovery stage," if a proof of concept was being done, whether a proposal had

---

[17] *See* February 28, 2019 conference call transcript.

[18] *See* JMP Securities Report (March 1, 2019). Based on the context and timing of the JMP Securities report, which was issued the day after Nutanix disclosed its pipeline had not met internal forecasts due in part to inadequate lead generation activities, JMP's use of "pipeline generation" is clearly designed to mean "lead generation" as used by Nutanix and Defendant Pandey on the Q2 fiscal 2019 earnings call, and Plaintiff understands it as such.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

been extended, if the deal was in negotiations, whether the customer had made a commitment, whether the deal had closed, or if a deal had been lost.

97.    CW5 similarly recalled that Nutanix used Salesforce.com to track its sales pipeline, including percentage of likelihood a deal would close and when it would close. CW2 stated that Salesforce.com was used for sales pipeline reporting and it was how the pipeline was managed. CW3 recalled that the progress of a potential deal in the pipeline was also tracked in Salesforce.com including meetings that had occurred with prospective customers. According to CW3, it was "tribal knowledge" that if a customer seemed interested and there was a possibility of a deal closing in the following 12 to 18 months, the potential deal should be entered into Salesforce.com as part of the pipeline.

98.    According to CW8, the first Dashboard Nutanix employees see when they log into Salesforce.com is the pipeline report.

99.    CW1 and CW2 characterized Salesforce.com as the "source of truth" and the "single source of truth," respectively, with regard to the state of the Company's pipeline. Similarly, CW8 stated that Salesforce.com was the "Bible" for sales pipeline reporting and that everything put into Salesforce.com had to be complete and accurate or "you would hear about it" from Defendant Pandey. According to CW1, if the potential deal was not in Salesforce.com, it did not exist.

100.    According to CW1, Nutanix also used a system called Clari to track the sales pipeline and the "health" of the pipeline. CW1 stated that Clari extracted data from Salesforce.com and then rated the deals in various ways. For example, CW1 stated some deals might go from green status to yellow, or from yellow to red, if a deal had stayed in the pipeline for too long or the value of the deal had declined. CW1 updated this witness' Clari forecast weekly and is sure that Nutanix's senior executives were given Clari reports.

101.    According to CW1, you need to have a sales pipeline that is at least 2 to 2.5 times the projected sales for a given period to account for the fact that not all sales in the pipeline will close during a given reporting period and some may never close. CW2 confirmed that a company like Nutanix typically likes to have 2.5 to 3 times the amount of prospective deals in the pipeline to make quarterly targets because only a percentage of deals will actually close during the period. Likewise, CW6 recalled that companies like to have 3 to 4 times the amount of prospective deals as needed in the pipeline in any

24

given quarter. Defendant Williams confirmed the CW accounts stating at the March 20, 2019 Investor Day that Nutanix historically has needed approximately "3x the pipeline" of its sales projections to meet forecasts.

102.    Defendants knowingly concealed from investors that, despite the critical importance of investing in lead generation, prior to the Class Period they admittedly decided during the "planning process" for FY2018 and FY2019 to keep lead generation spending "flat" and rely on less expensive means to sell products to *existing* customers, while simultaneously telling investors the opposite—that Nutanix was increasing its spending on lead generation activities and, as a result, was seeing purported "accelerated" *new* customer growth.

### 2.    Sales Personnel is the Second Critical Component of Sales Productivity

103.    According to Defendants, the second critical component of sales productivity is sales personnel.

104.    In connection with the Company's purported transition to an all-software company, Nutanix hired Attanasio as the new Chief Revenue Officer in November 2017, who reported to Defendant Pandey.  Nutanix also replaced Craig Bumpus, Senior Vice President of North American sales, in December of 2017 with Lautenbach, a former IBM employee of 23 years.

105.    CW1 recalled that throughout CW1's employment, Nutanix's sales personnel were organized into five regions (Southeast, Northeast, Northwest and California, Southwest and Central/Midwest). Sales representatives such as CW1 reported to a district manager who reported to a regional manager that reported to Lautenbach. Lautenbach then reported to Attanasio who reported to Pandey.

106.    CW4 recalled that significant training is required for new sales hires and it usually takes sales team members until the start of their fourth quarter to fully ramp up and become productive. Nutanix confirmed in its public disclosures that it takes on average about "four quarters," or an entire year, for a new sales representative to ramp up and become fully productive.

107.    Moreover, according to CW1, the average sales cycle is approximately six to nine months, meaning it takes six to nine months from when a lead is generated to close a deal. CW2 and

CW3 corroborated CW1's account stating that the typical sales cycle from the time a lead is identified to when a deal is closed is on average approximately six months.

108.    CW1 stated that sales representatives were accountable to accurately forecast sales for Nutanix and that the forecasts Nutanix issues to the market were supposed to be based on the forecasts input into the Salesforce.com system. CW1 provided quarterly forecasts to CW1's manager who provided them to CW1's boss, who then reported them to Lautenbach.

109.    According to CW1, in FY2018 Nutanix reorganized its sales group into three main sales teams—Enterprise and Global customers (large accounts),  Commercial customers and Inside Sales—with the Company's focus being mainly on Enterprise customers. CW3 also recalled that Nutanix's sales organization was organized into three groups—small accounts, Commercial accounts and Enterprise accounts.  CW11 confirmed that Nutanix had two primary salesforce segments: Commercial and Enterprise sales teams. Defendant Pandey confirmed Nutanix's restructuring of the salesforce to focus on Enterprise customers stating: "[t]he focus is on global accounts and enterprise accounts strategic accounts."

110.    CW1 stated that Nutanix defined Enterprise customers to be the Company's largest clients, such as Fortune 500 companies, that typically generated more revenue.

111.    As investors would eventually learn, however, the real but undisclosed reason for Nutanix's aggressive focus on *existing*, rather than "new" customers, was because Defendants had secretly decided to keep lead generation spending flat so they could divert those funds towards R&D to accelerate the launch of the Company's cloud-based products. It was far less expensive to generate sales leads from existing customers because those customers had already been educated on Nutanix products. The problem for Defendants, however, was that there is a limited amount of sales that can be obtained from existing customers.

112.    Accordingly, Defendants' focus on existing customers inevitably could not generate sufficient long-term sales growth to meet sales projections and Nutanix's pipeline declined throughout the Class Period because the Company had not been investing in generating "new" customers. To cover up its barren pipeline, Nutanix engaged in the unsustainable practice of pulling in sales expected to close in future quarters to meet forecasts. *See* Section V.D., *infra*. Meanwhile, Defendants told investors

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

throughout the Class Period that they were *increasing* spending on lead generation activities, which resulted in obtaining record numbers of "new" customers and meeting or exceeding revenue goals. Defendants knew none of that was true.

113.    Defendants gambled that by mainly focusing on larger *existing* customers with higher-dollar sales that were cheaper to get, that would carry the day long enough for Nutanix to get its cloud-based technology to market with investors none the wiser. Defendants were wrong as they were eventually forced to admit in February 2019 that this undisclosed strategy failed and that, as a result, Nutanix "miss[ed] our pipeline targets" because of an "inadequate marketing spending for pipeline generation" and "over rotated[ing] a bit to the existing customer base and large customers there, where those efficiency dollars are easier to get," which "ultimately significantly impacts bookings, billings and revenue."

114.    As discussed below, the sales personnel component of sales productivity also suffered throughout the Class Period due to "massive" concealed attrition resulting from a lack of sufficient sales resources to execute and close deals, unreasonable and unrealistic sales quotas, mixed messages to customers due to confusion relating to Nutanix's introduction of too many new products, and general disorganization—all of which contributed to a further decline in Nutanix's sales pipeline.

C.    **Nutanix's Sales Pipeline Declines in FY2018 and FY2019 Due to Lack of Sales Productivity and Increased Competition**

1.    **Defendants Admit They Decided "During the Planning Process" for FY2018 and FY2019 to Keep Critical Lead Generation Spending "Flat," Causing Nutanix's Sales Pipeline to Decline**

115.    According to Defendant Pandey, "in 2016 [Nutanix] had slowed down quite a bit in demand spending" until Defendants "woke up in 2017" when they realized that Nutanix's pipeline was severely depleted and had to increase lead generation spending by 75% in FY2017. Defendant Williams later confirmed that "[l]ead generation spending is a key component to building pipeline, which ultimately significantly impacts bookings, billings and revenue." Thus, by Defendants' own admissions and past experience, they knew lead generation spending was the driver of pipeline growth.

116.    Apparently not learning from the Company's prior mistakes, Defendants ***admitted*** that "during our planning process" they "made a decision" for FY2018 and FY2019 to keep "lead generation

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

spend flat." According to Defendants, "a lot [of the reallocated lead generation money] went to engineering" to fund the development of the Xi Cloud Services product and/or acquire new products so that Nutanix could accelerate its efforts to enter the public cloud market.

117.   Defendants did not disclose to investors their decision to keep lead generation spending flat. Rather, they falsely told the market throughout the Class Period that, among other false statements, Nutanix had "continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs" (*e.g.*, "demand" or "lead" generation activities) and the resulting "increase in product revenue . . . reflects increased domestic and international ***demand*** for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities," thereby creating a duty to disclose their decision to keep demand generation spending flat.

118.   CW2 recalled that during this witnesses' employment in 2018, Nutanix was making "quite a bit" of investment in research and development, so much so that Nutanix became "overinvested" in R&D. CW2 recalled that in calendar 2018, Nutanix was also making acquisitions for new software products (*e.g.*, Frame) that were not generating revenue.

119.   Other former Nutanix employees confirmed Nutanix did not increase critical lead generation spending in FY2018 or the first quarter of FY2019. According to CW4, the money allocated to Digital Marketing had dipped in FY2018 where $830,000 had been allocated for Digital Marketing in Q3 FY2018 when this witness first began working at Nutanix. This amount remained consistent until the beginning of January 2019, when it became clear that the quarter was not going to be good. At that time, management allocated another $2-3 million towards the Digital Marketing budget for the remainder of fiscal Q2 2019 and another $2-3 million for the following quarter. The amount that was reallocated of ***more than three times*** the prior spending was indisputably significant. Defendants admit that the spending for lead generation was simply "inadequate" and material. According to Williams, "[i]ts important to note that all this shifting of spend back to lead generation is ***not an insignificant amount***. The magnitude of the shift is in a few tens of millions."

120.   CW3 similarly recalled that spending on lead generation appeared to be non-existent. Indeed, by the time CW3 started at Nutanix in May 2018, this witness recalled there were not many sales leads and leads were "pretty dry." According to CW3, throughout CW3's tenure, this witness'

colleagues on the Commercial Northwest team complained that they were not "getting help from the demand generation" group because Nutanix did not sponsor many events in CW3's territory.

121.    Likewise, CW5 stated that Nutanix did not properly invest in the development of sales accounts and most of Nutanix's sales were driven from *existing* accounts. Defendants knew that every quarter, shareholders would expect an update from Nutanix as to its pipeline.  In light of Nutanix's woefully depleted pipeline and abysmal sales execution during the Class Period, Defendants faced the uncomfortable reality that investors might learn the truth, i.e., that Nutanix's *new*-customer growth fell fall short of the rate that Defendants knew the market would expect.

122.    Rather than disclose actual *new* customer growth, which would have informed investors about the true health of the Company's pipeline, Nutanix misrepresented new sales from existing customers as new customer sales in their public statements. This was possible because when Defendants spoke about customer growth in their statements, they referred to them as "end customers" in some statements and then referred to the same customers as "new" customers in other statements.[19] According to the Company's public statements "[a] single organization or customer may represent multiple end customers for separate divisions, segments or subsidiaries." Thus, when Defendants spoke to investors they frequently did so in a way that deceptively conflated existing end customers as new ones leading investors to believe the Company's pipeline was strong and consistently achieving Nutanix's internal goals.

123.    Confidential witnesses confirmed this. CW1 corroborated CW5's account that by the summer of calendar 2018, approximately 80% of Nutanix's sales came from 15% of customers, which were mainly *existing* accounts. CW9 confirmed CWs 1, 3, 4 and 5's accounts recalling that during CW9's employment, demand generation spending had been reduced, resulting in fewer sales leads being available for the sales team to try and develop into customers.

124.    As defendant Williams would ultimately admit, the Company "over-rotated" toward "the existing customer base" whereas Nutanix "underspent" on "new customers." Moreover, in the

---

[19] *Compare* March 2018 Investor Call for FYQ2 2018 ("Q2 also saw us add a record number of *new* customers, bringing our total number to 8,870") with March 1, 2018 Press Release ("Nutanix ended the second quarter of fiscal 2018 with 8,870 end-customers, adding a record 1,057 new end-customers during the quarter").

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company's Definitive Proxy Statement signed by Defendant Pandey and filed with the SEC on form DEF 14A on October 30, 2019 (the "2019 Proxy Statement"), the Company's Directors (including Defendant Pandey) admitted that Nutanix fell far short of its new customer goals.

125.    The 2019 Proxy Statement contains information relating to the Company's executive compensation for FY2019, including information relating to bonuses for attaining certain performance measures. One such performance measure for Defendants to achieve was an undisclosed Plan Target of "New Customer Adds," defined as the "total *new* logos added in the period and is measured against our annual operating plan."[20] According to the 2019 Proxy Statement, Defendants only achieved *67.9%* of their "New Customer Adds" Plan Target for Fiscal 2019.

## 2.    Nutanix's Sales Pipeline Further Declines Due to Insufficient Salesforce Resources, Inadequate Sales Messaging and Disorganization

126.    Once Attanasio and Lautenbach took over, CW1, CW3, CW5 and CW12, who represent four of the Company's five sales regions (Northeast, Southwest, Central/Midwest and Northwest) explained that a large number of sales and other personnel left the Company in FY2018 and FY2019 due to insufficient resources, customer account assignments that did not make sense, unreasonable sales quotas and general disorganization among the sales group.

127.    CW1 recalled that after Nutanix reorganized its sales group in FY2018 and began primarily focusing on Enterprise customers, CW1 was moved to the Commercial. In connection with that move, CW1's customer base went from approximately 80 customers to about 30 customers.

128.    According to CW1, Nutanix put all of its focus on Enterprise customers at the expense of Commercial customers.  In this regard, Nutanix focused heavily on staffing up sales personnel for Enterprise customers only.  For example, CW1 recalled that the Enterprise customers had a one-to-one ratio of pre-sales engineer ("SE") to sales representative, while the Commercial customers were staffed with one SE to every two to three sales representatives.

---

[20] Defendants used the same definition for "New Customer Adds" in Nutanix's Definitive Proxy Statement signed by Defendant Pandey and filed with the SEC on form DEF 14A on November 5, 2018 (the "2018 Proxy Statement")

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

129.    An SE's job is to understand the customer's technical needs and provide that to the sales representative in the form of a proposed configuration that would then be included in the customer proposal. The sales representative's job was to set up customer meetings and close the deal.

130.    Not only were the SEs for Commercial customers spread too thin, they were often located in a different state from the sales representative. Further, Nutanix was unable to retain qualified SE's and thus, was forced to hire inexperienced junior personnel for the SE position that did not understand Nutanix's products or sales practices.

131.    CW1 recalled one instance where CW1's SE scheduled a web-ex meeting with a customer but forgot to invite the customer to the meeting. This occurred two or three times with the same customer. The SE told CW1 that it was not her fault because "I'm new. I don't know."

132.    CW1 also recalled difficulty getting a Subject Matter Expert ("SME") because they were all dedicated to the Enterprise group.[21] Thus, the Commercial sales team was told to rely on their reseller partner's resources. The problem with that was two-fold: the reseller engineers did not know Nutanix products nearly as well as Nutanix employees and were otherwise reluctant to use their own resources for Nutanix's benefit.

133.    CW1 recalled two specific examples during the first six months of calendar 2018 where CW1 used a reseller in place of an SME and the reseller engineer lost a potential deal. In the first example, CW1 recalled the reseller erroneously gave the customer a quote that was twice as expensive as Dell's quote. In another instance, it took three weeks for Nutanix to get the product up and running for the customer because the reseller engineer did not fully understand the product.  Through word of mouth, these pervasive issues got out to competitors who swooped in and took deals from Nutanix.

134.    CW12 corroborated CW1's account that it was difficult to get sufficient competent resources for Commercial accounts. CW12 recalled it was difficult to get approval for monies to go after small to medium-sized accounts and Commercial accounts because Nutanix had dedicated most of its resources towards pursuing Enterprise-level deals and the Company "left behind mid-market" customers. As CW12 put it, Nutanix focused too much on "only trying to catch whales, not fish." CW5

---

[21] An SME is a "person who is an authority in a particular area or topic. https://en.wikipedia.org/wiki/Subject-matter_expert.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

also recalled that Nutanix did not properly invest in the development of sales accounts in terms of team sizes.

135.    In addition, CW1 recalled that Enterprise customers received first priority at marketing events. CW12 confirmed CW1's account, stating that the only way a Commercial account manager could get some of their customers to be able to attend a marketing event was if the Enterprise-level sales representative could not completely fill the event.

136.    Another issue in the sales organization that CW1 recalled was that the customer account assignments to the sales representatives "did not make sense" because sales representatives were assigned customers in different states from where they were located. This was particularly problematic because customers often ignore attempts to set up meetings and then when they are ready, expect the sales representatives to jump up and be there the same day. CW3 corroborated CW1's account, stating Nutanix had a "very poorly defined channel program" and customers assignments did not make sense and were given based on who was "better friends" with Nutanix management, rather than the best sales representative to handle the account.

137.    Likewise, CW12 recalled that the way Commercial customer accounts were assigned to account managers exacerbated Nutanix's sales execution problems. This included reassigning accounts between account managers. CW1, CW3 and CW12 all expressed frustration with the fact that Nutanix inexplicably took many of their accounts away and gave them to other sales representatives.  CW1 started with approximately 80 accounts and ended up with only 30 after the rest had been reassigned to other sales representatives.  CW3 similarly recalled that about 80% of CW3's accounts were taken away from CW3 and reassigned, even as management was increasing CW3's quotas. Likewise, CW12 started with about 500 accounts that CW12 could try to sell to and ended up over the course of CW12's tenure with only 80 accounts.

138.    All of these issues made it difficult to close deals, especially given the competition from others such as HP and Dell that had extensive sales resources.

139.    CW1 spoke to colleague sales representatives in California and Washington D.C. in the Commercial group who complained of similar resource issues and lack of experienced and competent SEs, lack of access to SMEs, and lack of adequate financial and personnel support in FY2018 and

FY2019. CW1 also knew from the conversations with other Nutanix salespeople that these same issues in the Commercial group were occurring across the Company in all sales regions.

140.   CW1 spoke to CW1's manager about the issues and CW1's manager agreed that lack of sufficient and qualified resources was a major problem for Nutanix, describing the Company's sales organization as a "hot mess."

### 3. Demoralized Sales Personnel Leave Nutanix in Droves Unable to Meet the Unrealistic Sales Quotas Set By Defendants

141.   Confidential sources (CW1, CW2, CW5, CW7, CW9, CW11 and CW12) who are from four of Nutanix's five sales regions (Northeast, Southwest, Central/Midwest and Northwest) stated that Nutanix experienced severe attrition in the salesforce Company-wide throughout the Class Period due to inadequate resources and unrealistically high sales quotas. According to CW1, there was a lot of turnover throughout CW1's employment at Nutanix. CW1 recalled that sales personnel were leaving Nutanix after only six months to a year of employment. During CW1's employment, between 20% and 50% of sales representatives left after six to twelve months of employment.

142.   According to a Business Insider, Nutanix was ranked the tech Company with the highest percentage of dissatisfied employees,[22] with 76% of employees surveyed saying they were "not happy." Thus, it is no surprise that the average length of employment at Nutanix is significantly less than competitors.[23] According to one article, the average length of employment at Nutanix is .6 years as compared to VmWare of 2.2 years

143.   CW1 was aware that the high sales attrition rate was occurring across all of the Company's sales regions from specific discussions with CW1's peers from D.C. and California, quarterly Company All-Hands meetings and through internal conversations with Nutanix salespeople.

144.   At every quarterly all-hands meeting in FY2018 and FY2019 during CW1's employment, which were always attended by Defendants Pandey and Williams, Attanasio discussed open positions the Company was trying to fill. At these quarterly All-Hands meetings, Attanasio would state that there are "x" open sales positions and stress that Nutanix was not filling them fast enough.

---

[22]   *See*   https://www.businessinsider.com/companies-with-the-least-happy-employees-wework-jp-morgan-2020-1#1-nutanix-is-a-cloud-computing-company-based-in-san-jose-california-15
[23] *See* https://www.zippia.com/nutanix-careers-8356/

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

145.    CW1 recalled that salesforce attrition was so bad that Nutanix could not hire salespeople fast enough to replace those who had left. CW2 similarly recalled that turnover in the sales department was an issue at Nutanix during CW2's employment.

146.    CW7 confirmed CW1 and CW2's accounts stating that throughout this witness' tenure at Nutanix, turnover was chronic and systemic throughout the Company, at every level from senior leadership down to the sales engineer. CW7 recalled that there were as many as three different VPs in charge of the Bay Area from December 2017 to August 2018 and that during CW7's tenure at Nutanix, CW7 experienced "two generations" of sales personnel. According to CW7, the average tenure at Nutanix for a salesperson was approximately 14 months, which was much lower than the average tenure of sales personnel at other tech companies. CW7 further stated that the Company's attrition problems during Attanasio's and Lautenbach's employment directly contributed to Nutanix's sales execution problems and while competition is a problem, "attrition is the killer."

147.    Likewise, CW9 recalled that Nutanix was experiencing unusually large turnover in calendar 2018, including of sales directors and above. CW9 stated that Nutanix's fundamental problem is that it suffered from a lack of sales execution as reflected in the departures of numerous Director-level and above sales personnel over the course of CW9's tenure. For example, in the five quarters that CW9 worked at Nutanix, CW9 had two different direct reports and there was at least one change in CW9's reporting hierarchy every quarter.

148.    Likewise, CW11 recalled that Nutanix's problems came from poor sales execution caused by "massive turnover" in the salesforce, which required Nutanix to have to increase beyond the norm, its sales hiring all at once. The problem was that Nutanix lost experienced salespeople who were productive and closing deals and had to replace them with new people who took up to a year to ramp up and become fully productive. This meant it took the new salespeople up to a year to learn Nutanix's business, products, systems and customer needs and requirements before they could effectively pitch and sell the Company's products.

149.    Moreover, as CW4 recalled, the marketing department did not have enough personnel in the digital marketing group to spend even the smaller amount of money that was allocated to it. CW5 similarly recalled that Nutanix did not properly invest in the development of sales accounts in terms of

team sizes. For example, while a Global account teams at Nutanix would typically include CW5 and one engineer, that same account at Cisco or Dell would be staffed with eight to twelve people.

150.    According to CW1, Nutanix could not retain its sales personnel because the sales quotas management set for them were way too high based on what was achievable, particularly given the lack of adequate and competent resources, nonsensical account assignments and general disorganization in the sales group, as well as the super competitive environment in which Nutanix operates. During CW1's employment, Dell had gained significant market share through its VMware acquisition and started winning more deals.

151.    According to CW1, sales quotas were proposed by Attanasio and Lautenbach and approved by Pandey. The sales goals were distributed shortly after the annual SKO.

152.    CW1 recalled that CW1 only met this witnesses' quota during the first two quarters of CW1's employment, prior to being switched over to the Commercial group. CW5 similarly recalled that during CW5's tenure, the quotas set for CW5 were unrealistically high. For example, according to CW5, it typically takes 24 to 36 months to close a deal on a large Global account. Yet management set the expectation of CW5 having a "run rate business," which was just not realistically achievable.

153.    CW5 was generally aware of how other account managers were performing on their quotas because Nutanix did a "stack-ranking" of how sales personnel were performing and successful personnel were highlighted during Company meetings.

154.    CW3 corroborated CW5's account stating it was widely felt and discussed amongst the salesforce that sales representatives were having difficulty achieving the sales quotas imposed on them. CW3's region, the Commercial Northwest, had not made its cumulative quota for at least six consecutive quarters prior to when CW3 left Nutanix. In spite of not meeting the sales quotas, management continued to increase the Commercial Northwest team's quarterly sales quota every quarter.

155.    Likewise, CW11 recalled that the salesforce attrition was in large part due unachievable sales quotas, resulting in the salesforce for the entire Company only achieving 30% to 40% of their sales quota during CW11's tenure.  CW11 recalled that when this witness left in February 2019, "senior management" told CW11 that only 27% of the salesforce had made its quota for the prior quarter ending January 31, 2019. CW11 believed the reason sales goals were set at unrealistic levels was due to

Pandey's obsession with becoming a $4 billion company within ten years of its founding. Thus, CW11 said the quotas, which came from the "top-down" as opposed to what the salespeople were actually forecasting in Salesforce.com, were "arbitrary" and "not based on market dynamics or realistic targets."

156.    CW11 understands the process of deriving the quarterly quotas as there was "some big number" derived for North America that would then be divvied up amongst the sales regions and further allocated to the salespeople within that region. CW11's sales quotas changed over CW11's employment. In FY2018, even though Nutanix had changed to a software-only Company, the quotas set were based on old metrics that included a hardware component and, thus, a higher projected sales amount. By the time CW11 was fully ramped up in CW11's fourth quarter of being at Nutanix, CW11's quota was $1 million per quarter.

157.    CW11's boss told CW11 that she had become "fed-up" with the quotas and said they were double what she had sent to management as to what was achievable.

158.    CW12 also recalled being unable to meet sales quotas. When CW12 began, CW12's quota was $700,000 for the quarter for both hardware and software. Then when Nutanix switched to a software-only model, CW12's quota stayed the same, despite no longer getting credit for hardware sales. It was at that point that CW12 could no longer meet CW12's sales quotas. In fact, CW12's entire TOLA region team consisting of eight salespeople could not meet their sales quota from at least October 2018 until when CW12 left Nutanix. CW12 believed that they could not meet their sales goals because the majority of marketing monies were being spent on Enterprise customers and the sales goals were unrealistically high.

159.    According to CW9, one of Nutanix's sales execution problems was the arbitrary nature by which the sales quotas were imposed on the salesforce. CW9 stated that such sales goals and quotas were not based on historical data or reasonable growth projections.  Nutanix's unattainable sales goals, CW9 stated, contributed to the high attrition of sales personnel throughout CW9's tenure. In CW9's opinion, Nutanix had "no formula to deliver results and retain people."

160.    Thus, throughout the Class Period, employee departures acted as a prevalent and undisclosed headwind to sales execution. Despite the Company's pervasive salesforce attrition, throughout the Class Period, Defendants misleadingly touted that the Company purportedly had

"significantly increased our sales and marketing personnel," had "strong success in our hiring in the quarter that positions us to deliver on our future growth plans" and executed "flawless[]" hiring.

161.     As Defendant Williams would later admit on February 28, 2019, however, unbeknownst to investors, Nutanix was impacted "by a shortage of sales reps in the first half of the fiscal year, *resulting in an under-spend by several million dollars*" and "*over the past few quarters*," the Company had "not kept pace with our bullish sales hiring goals."

162.     The sales attrition problems at Nutanix were reflected in the quality of the Company's sales representatives. According to CW4, Nutanix's sales teams were inadequately prepared to sell some of Nutanix's products due, in part, to having too many products on the market. According to CW4, Nutanix's sales team was simply "not built to handle the pipeline" and was inadequately prepared to sell the Company's products: "General sales readiness was poor." CW4 recalled being in meetings with the salesforce during which they indicated they could not close deals. CW5 similarly recalled that Nutanix's salesforce struggled because of an inexperienced salesforce.

163.     Defendant Pandey ultimately confirmed the above CW accounts on February 28, 2019 when he admitted during the quarterly conference call that Nutanix "took too much on in terms of new products in 2018" and the "sales force in the channel being a little bit confused" which hurt the Company's overall sales and pipeline. In a subsequent May 30, 2019 statement in a CRN news article, titled "*Nutanix Blames Revenue, Earnings Miss on Transition to Subscription Model*,"[24] Defendant Williams admitted the Company's sales representatives had still not received the necessary training to adequately explain and promote the Company's new subscription model: "Nutanix is also experiencing a slowdown in its sales cycle as the company's reps, along with its distributors, channel partners, and customers will require education on the new [subscription] model, although that will change as subscription pricing becomes the norm."

---

[24]     https://www.crn.com/news/data-center/nutanix-blames-revenue-earnings-miss-on-transition-to-subscription-model.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4.    **Starting in January 2018, Dell Focuses on Sales of VMware Over Nutanix, Causing Nutanix to Lose Valuable Market Share to Competitors**

164.    According to CW1, Prior to and during the Class Period, Dell was Nutanix's "largest OEM by far" and Dell accounted for "a huge chunk of revenue" for Nutanix. CW1 recalled that at the start of the Class Period, Dell generated approximately 40% of Nutanix's overall sales leads.

165.    The Nutanix/Dell OEM partnership quickly deteriorated once Dell acquired VMware in September 2016 because Dell and VMware began steering potential new customers towards VMware instead of Nutanix resulting in the loss of a significant amount of sales leads for Nutanix.

166.    According to CW1, beginning around the summer of 2017, Dell began "really pushing" VMware on its customers and was providing customers with quotes for VMware products, rather than Nutanix products. CW1 recalled that in January 2018, Dell changed its compensation structure to reward Dell sales personnel for promoting VMware products instead of Nutanix products. At some point in calendar 2018, CW1 recalled that Dell's salesforce was not compensated at all if they sold Nutanix products.

167.    CW1 was aware of the change in Dell's compensation structure because it was discussed at quarterly Nutanix All-Hands meetings in calendar 2018 attended by Defendants Pandey and Williams during which Nutanix alliance partners responded to questions from Nutanix's salesforce about how their Dell counterparts got paid and what incentives they had to sell Nutanix's products.[25] During the quarterly All-Hands Meetings, Defendant Pandey also discussed the specific percentage of Dell sales for the quarter.

168.    CW5 confirmed that the large global accounts this witness was chasing during CW5's employment had been primarily using Dell, VMware and EMC (an affiliate of Dell and VMware).

169.    After Dell began compensating its salesforce to promote VMware products instead of Nutanix products, Nutanix did not receive any new sales leads from Dell. Thus, according to CW1, tensions in the Dell/Nutanix relationship rose throughout 2018 as Dell had been promoting VMware

---

[25] Nutanix alliance partners were Nutanix employees who worked on deals with partner companies to promote and develop joint ventures. In the context of OEMs, Nutanix alliance partners worked with such companies to arrange for Nutanix software solutions to be pre-installed for customers on the OEMs' hardware products.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

first to all new customers and would only promote Nutanix products if the prospective customer used Microsoft Hyper-V, which represented less than 5% of the market.

170. By April 2018, according to CW1, Nutanix alliance partners assigned to manage the Company's partnerships with Dell and other OEMs, were moved off the Dell account to manage relationships with Lenovo instead. CW1 recalled one instance at this time where this witness had gotten a deal registered with a customer involving Lenovo as partner. When CW1 needed approval for a larger discount than what was originally quoted by the Lenovo reseller, CW1 got a response from someone whom CW1 knew had been on the Nutanix/Dell alliance team. This individual explained to CW1 that he had moved to Nutanix's Lenovo alliance team because Nutanix's relationship with Dell was "really ugly" and his boss had also moved from the Dell to the Lenovo alliance team.

171. An April 3, 2019 CRN.com article later confirmed that Dell had been favoring VMware over Nutanix for quite some time. According to a CEO for one of Dell's partners quoted in the article, Dell was favoring VMware: "I'm not being told by Dell channel reps that I should be selling more [Nutanix] XC, I'm being told and pushed to sell VxRail." Similarly, on April 29, 2019, Dell's Vice Chairman of Products and Operations, Jeff Clarke, stated during Dell Technologies Word, "[t]here is no question about what we lead with. It's our own IP [intellectual property]. If customers want choice, we have choice. We will provide servers [for Nutanix software], *but we will lead with VMware*."

### D. Nutanix Surreptitiously Compensates for Its Withering Sales and Sales Pipeline by Pulling in Sales to Meet Quarterly Forecasts

172. According to CW1, throughout this witnesses' employment, Nutanix routinely "pulled in" sales orders from future periods in order to meet projected sales numbers for the current quarter. By pulling in orders, it meant that future periods were depleted of orders in the pipeline so that the same thing would have to be done in the next period. These short-run tactics were self-defeating over time because pull-in sales cannibalized future sales in the present quarter. CW1 stated that by pulling in orders, a company would inevitably hit a point when all the company's customers have "over-procured" and have bought more than they thought they needed and therefore could not buy anymore. Thus, at some point, there would be no more orders to "pull in." CW1 referred to this practice as "draining the swamp."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

173.    Confidential sources (CW1, CW2, CW7, CW8 and CW11) from three of Nutanix's five sales regions (Southwest, Central/Midwest and Northwest) confirmed Nutanix routinely pulled in sales and that this practice occurred Company-wide throughout the Class Period.

174.    CW1 confirmed that up until Nutanix switched to become a software-only company in FY2018, Nutanix pulled in both hardware and software sales. After the Company switched to a software-only company, only software sales were pulled in. CW1 recalled that sales were pulled in for all types of customers, including Commercial, Global and Enterprise customers, and it was communicated by Nutanix that no deal was considered "too small."

175.    CW1 stated that Nutanix estimated every quarter what the Company needed to close in sales to meet its projections and this would then be allocated to each of the Company's five regions (Southeast, Northeast, Northwest and California, Southwest and Central/Midwest). In this regard, CW1 stated that throughout CW1's employment, every quarter prior to quarter end, sales representatives from each sales region received an email for their region from the Regional VP of Sales copying the Director of Revenue (Attanasio during the Class Period) or the Senior Vice President of American Sales (Lautenbach during the Class Period). These regional sales emails encouraged salespersons in that region to pull in "x" amount of revenue for the quarter so that the Company could achieve its sales target. Salespeople were then asked to look at their individual accounts that they were working on expected to close in the following two to three months and see what could be pulled into the present quarter to meet the forecasted sales for their region.

176.    CW1 recalled that in FY2018, the amount of "x" that each sales rep was asked to pull in for a given quarter ranged from $100k to $300k. CW1's region employed 35 to 40 sales representatives during FY2018.  Thus, sales representatives in CW1's region were asked to pull in approximately $3.5 million to $12 million in sales in any given quarter during FY2018. CW1 recalled that for two quarters in FY2018, this witness' managers told CW1 that the Company overall was "significantly behind" on achieving the necessary revenue goals and it was going to be necessary for CW1's region to pull in $3.8 million of orders before quarter end.

177.    CW1 also recalled that prior to the end of each quarter in FY2018, Attanasio and Lautenbach sent emails to the entire sales organization at Nutanix, copying defendant Pandey,

encouraging sales representatives to "get creative" and bring any deal forward to the War Room that quarter. Nutanix held War Room meetings at the end of every quarter, attended by Pandey to discuss big and/or complex deals to be pulled in.  By bringing a deal forward to the War Room that quarter, the sales representative was expected to bring the deal in as a sale for the current quarter.

178.    CW8 similarly confirmed that Nutanix routinely pulled in sales in every quarter of CW8's employment.  According to CW8, Nutanix's SVP of Sales determined the amount of sales needed to be pulled in each quarter and Defendant Pandey approved the amount. CW1 similarly confirmed that the directive to pull in sales came from Craig Bumpus and Lou Attanasio who replaced Bumpus at the end of calendar 2017 and that Defendant Pandey was "definitely aware of it."

179.    Likewise, CW2 also confirmed the Company's practice of pulling-in future sales to the current quarter to meet quarterly forecasts. According to CW2, pulling in sales from future quarters was going on at Nutanix throughout CW2's employment.

180.    According to CW7, in August 2018 after the end of the fourth quarter, CW7 received a telephone call from a Senior Director, Consulting Services at Nutanix with whom CW7 had worked who told CW7 that Nutanix was making its sales projections based on "a shell game" and while Nutanix had reported year-over-year growth of 40% and quarter-to-quarter growth of 30%, in fact the growth was only about 10%.  The Senior Director further told CW7 that Nutanix would "run out of that backlog" that they were using to make quarterly sales forecasts.

181.    CW11 also recalled that Nutanix routinely pulled-in sales in this witnesses' region in order to meet sales quotas.

182.    In addition, according to CW11, potential deals were pulled in from future periods to inflate the pipeline. CW11 stated that it would have been clear to anyone analyzing those deals that there was no way they would close in the quarter in which they were recorded as potential sales. CW11 stated that in the Clari systems, it showed specific activity engaged in by sales representatives relating to specific prospective customers such as meetings and other interactions. So, for example, if there were deals in Clari that said the customer had committed to a deal, yet the sales representative had not spoken with the customer for three or four weeks, it was unlikely the deal would close in the current quarter.

41

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Thus, CW11 recalled that there were many deals that senior management "absolutely had to know" had "no hope of closing in the period."

183.     According to CW1, during CW1's employment it was routinely communicated by upper management "loud and clear" that Nutanix needed more revenue and senior sales management would be reviewing every prospective deal that had been entered into the Salesforce.com system to report on what deals could be pulled in. Indeed, according to CW1, this witness had been told that Nutanix's National Sales Manager, Craig Bumpus, whom CW1 referred to as "Bump," would be reviewing every deal in Salesforce.com on a quarterly basis and then personally call the sales representative about the status of the deals. CW1 stated that this was an extraordinarily high level of involvement by such a senior executive (who reported directly to defendant Pandey) to be looking at individual deals, indicating the severity of management's revenue and pipeline concerns.

184.     CW1 stated that throughout calendar 2018, the need for revenue was "presented as a pending disaster every quarter" at Nutanix. CW5 confirmed that Nutanix was "always under the gun" to make revenue numbers.

185.     CW1 explained that while the practice of pulling-in sales may be okay for a large, well-established company with a robust pipeline that could make up for the pulled in sales in the next quarter, the problem for a young company like Nutanix was that it did not have a robust pipeline and reached the point where there were no sales to pull in.

186.     In order to get customers to take products early so that sales could be pulled in, the Company offered customers steep discounts to buy Nutanix products and close deals early.

187.     According to CW6, Nutanix had both standard deal pricing and non-standard deal pricing and it was "all over the place." Nutanix would do whatever was necessary pricing-wise to get deals including extreme discounting. CW6 recalled that Nutanix discounted deals as much as 75-80% on hardware and 90% on software. CW11 corroborated CW6's account recalling that in order to get customers to close deals early, Nutanix would offer extra products at no cost. For example, if the customer ordered six nodes, Nutanix would offer two additional nodes, for a total of eight, at no cost. Likewise, CW7 recalled that Nutanix "super high" discounts to entice customers to close the deal in an earlier quarter.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

188.    As discussed below, by April or May 2018, Nutanix's sales pipeline was significantly depleted and by August 2018 there was barely anything left to pull in.

189.    Defendants were aware of the Company's pipeline issues from quarterly All Hands meetings, the SKO meetings and reports generated from the Salesforce.com and Clari systems. *See* Section V.F. and VIII.A.4, *infra*.

**E.    Due to an Insufficient Lead Generation Spend and High Sales Force Attrition, Nutanix's Sales Pipeline Becomes Substantially Depleted by April or May 2018**

190.    CW1 recalled that the Commercial account pipeline was essentially non-existent when CW1 was first moved there in January 2018. Any potential leads were "maybes" and the salesforce was left to go find its own leads.

191.    But by April or May 2018, according to CW1, it was "very obvious" that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline was at least 25-30% below the Company's targets. CW3 similarly recalled that by May 2018, the pipeline was "pretty dry." Likewise, CW8 recalled that the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.

192.    CW11 stated that by November 2018, the pipeline "would have looked bad." CW11 knew this not only from looking at CW11's own pipeline but from participating in weekly calls with the sales people from CW11's region where they discussed all prospective deals and their respective statuses. Prior to the weekly meetings, all prospective deals were distributed to call participants in an email containing all potential deals. CW11 stated there were also emergency calls with CW9 and Yee for the entire Western Region throughout every quarter to discuss how the quarter was shaping up in terms of sales.

193.    CW1 recalled that Nutanix has its annual sales kickoff meeting (SKO) in early August after the fiscal year-end on July 31. CW1 recalled that the August 2018 SKO meeting was held in Las Vegas and Attanasio, Lautenbach, Pandey, Williams, Sudheesh Nair (the Company's President), and others attended this SKO. During the 2018 SKO, while Attanasio was on stage, he told the entire Nutanix sales organization that only 50% of the salesforce had made their quota for FY2018 and, thus, the sales pipeline was suffering and in serious trouble.  Indeed, CW1 stated that by August 2018, the funnel was

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"way too low" and Nutanix had no way to fix it due to its disorganized and inept sales organization and lack of new leads, particularly in Commercial. CW1 described the depleted pipeline as a "big problem" for Nutanix.

194.    At the August 2018 SKO, Attanasio and Lautenbach announced on stage that they were going to put programs in place in an attempt to replenish the pipeline and assign more reasonable quotas to salespeople. The new programs Attanasio and Lautenbach implemented consisted of having all salespeople performing daily "call blitz's" where they were assigned five *existing* customer accounts to call that day to try to sell them add-on products. The goal, CW1 recalled, was to get two viable leads out of this. In CW1's view, this "smelled like desperation."

195.    According to CW1, these programs that Attanasio and Lautenbach instituted were not effective because Nutanix did not use the right metrics, accounts were not properly assigned to the sales representatives (e.g., accounts assigned were in different states) and the sales organization was in a general state of disarray (*e.g.*, high turnover, insufficient resources, inexperience). In many instances, Nutanix wanted sales representatives to sell add-ons to existing customers but it turned out that the customer often already had what salespeople were supposed to try and sell them.

**F.    Defendants Were Aware of Nutanix's Sales Productivity Issues and Declining Pipeline Through Internal Salesforce.com Reports and Company Meetings**

196.    Throughout the Class Period, Defendants were aware of Nutanix's declining sales productivity and the resulting decline in the Company's sales pipeline from their own decisions to keep lead generation flat, as well as from detailed reports from Salesforce.com and Clari and regular quarterly All-Hands and War Room meetings and other sales meetings throughout the quarters.

197.    As an initial matter, the Individual Defendants admittedly comprise Nutanix's "chief operating decision maker [which] . . . allocates resources and assesses financial performance[.]" Indeed, CW1 described Defendant Pandey as a "very hands-on CEO" that undoubtedly would have been very informed about the status of Nutanix's sales pipeline. CW8, similarly described Pandey as a micro-manager and very hands on.

198.    CW5 echoed this sentiment, explaining that this witness had, in fact, regularly met with Defendant Pandey about this witnesses' pipeline relating to new customers and sales leads for Global

accounts. During these customer meetings, CW5 briefed Pandey on the status of prospective financial institutional customers, which included an "executive briefing" presentation. The presentation included virtually anything CW5 considered relevant for a likely meeting between Pandey and the prospective new customer, such as details regarding the customer representative, the strategic relationship Nutanix was trying to achieve with the customer, details of what the customer was trying to achieve and how Nutanix could help accomplish this, whether a deal was in development or had advanced to a proof of concept being submitted and what kinds of conversations had occurred with the customer, among other things. The purpose of CW5's meetings with Pandey was to facilitate an "executive alignment" (i.e., between the customer and Pandey), so that the customer would feel taken care of and that Nutanix was "100% behind them." According to CW5, Defendant Williams was sometimes present for such customer meetings. CW5 said "absolutely" Defendant Pandey would have similarly accompanied other sales personnel to visit non-Global Accounts, because it was always a goal at Nutanix to get senior executives in front of customer executives.

199.    In addition, according to CW1 and CW8, the Individual Defendants had access to pipeline reports in Salesforce.com, which could be run on a Company-level, by region and even by individual salesperson.

200.    CW8 stated that Pandey accessed Salesforce.com every day through a pipeline Dashboard report on Pandey's computer desktop that contained up-to-the minute sales pipeline data. According to CW8, it was widely known throughout the Company that Pandey was the single-highest user of Salesforce.com.

201.    CW1 similarly recalled that Pandey followed Nutanix's sales growth goals very closely using a Dashboard on Pandey's computer created for him that reported on the sales pipeline and forecasts, real-time. According to CW1, to access the Dashboard, which is launched on a web browser, all you need to do is click on the icon, log in and the Dashboard pops up. The Dashboard automatically refreshes at least daily.

202.    CW5 recalled that at Nutanix, it was "a never-ending drill" when it came to the sales pipeline and it seemed that "every other day" there were communications and calls with the sales management teams related to the pipeline. It was CW5's perception that Nutanix's sales management

were "fixed on metrics" related to the sales pipeline. At the end of every quarter, CW5 participated in daily deal review calls to discussing the status of deals.

203.    According to CW1, CW3 and CW8, the Salesforce.com pipeline report would have showed Nutanix's sales pipeline declining prior to and throughout the Class Period. Specifically, CW1 recalled that by April or May 2018, it would have been "pretty obvious" from the pipeline reports that Nutanix's pipeline was drying up and in trouble because it was clear there were not as many good leads coming in that would create opportunities to close sales and the forecast was much smaller. CW1 further recalled that by August 2018, it was discussed at the SKO meeting that the pipeline was "way too low" by, what CW1 recalled being about 25-30%.

204.    CW3 similarly recalled Nutanix's sales pipeline was "pretty dry" by May 2018, which would have been reflected in the Salesforce.com pipeline reports. Likewise, CW8 recalled that Salesforce.com would have reflected that the pipeline was 20-30% below target as of March or April 2018.

205.    According to CW1, the decrease in sales pipeline, sales attrition problems and the lack of new Dell sales leads were discussed during quarterly All-Hands meetings in calendar 2018 attended by Defendants Pandey and Williams, CW1 and Company employees. During the All-Hands meetings, CW1 recalled that Defendant Pandey stated the percentage of Nutanix revenue and sales leads received from Dell and the Dell alliance partners employed by Nutanix discussed that Dell was not providing any new leads and was compensating its salesforce to sell VMware instead of Nutanix products.

206.    Also at these Quarterly All Hands meetings in calendar 2018, Nutanix account managers expressed concerns about the lack of sales leads and the difficulties they were having closing deals. Specifically, CW1 recalled it being discussed at these All-Hands meetings that there were not enough new deals in the Salesforce.com system, there was an inadequate number of new leads or opportunities in the system and that the new opportunities that were in Salesforce.com were not of sufficient monetary value to meet the Company's objectives and thus, these areas needed to be improved.

207.    As discussed above, CW1 further recalled that Attanasio discussed the Company's need to hire more salespeople at the 2018 Quarterly All-Hands meetings. CW1 also recalled that at the August 2017 SKO meeting held in Las Vegas, Sudheesh Nair talked about quarterly War Room meetings while

he was on stage presenting to the Nutanix sales team. According to CW1, Nair stated that Nutanix held War Room meetings at the end of every quarter attended by Pandey to discuss big and/or complex deals to be pulled in. Pandey attended every SKO and was, thus, present when Nair informed the Company's salespeople about the War Room meeting discussions concerning pull ins.

208.    In addition to the Quarterly All-Hands meetings, throughout CW8's tenure, CW8 attended quarterly meetings with Defendants Pandey, Williams and other executives after the quarter end where they discussed revenue targets, among other things. CW8 recalled that revenue was declining in 2018, however, not as much as the pipeline was declining because Nutanix had a backlog, which would have been discussed at these quarterly meetings.

209.    Finally, as discussed above, the fact that 50% of Nutanix's account managers had not met their sales quotas and the Company's sales pipeline was in serious trouble and depleted by 20-30% by August 2018 was specifically discussed at the August 2018 SKO.

210.    Thus, Defendants were aware of Nutanix's declining sales pipeline throughout the Class Period.

### G.    Defendants Concealed Their Decision to Keep Lead Generation Spending Flat and "Massive" Salesforce Attrition By Burying it in the Company's Financial Statements and Failing to Disclose Material Facts

211.    Nutanix reports to investors on a quarterly and annual basis, the Company's sales expense and marketing expense as one collective line item in the financial statements called "Sales & Marketing Expense." Defendants have confirmed in their public statements that lead generation spending is a key component of marketing expense. According to CW8 and CW10, the marketing expense component of Sales and Marketing Expense is mainly comprised of lead generation expenses, salaries and travel, with lead generation comprising approximately 70% of total marketing expense.

212.    CW8 stated that sales-related expenses were reported in the Sales and Marketing Expense line item in the Company's income statement. According to CW10, sales expense makes up a significantly higher portion of the overall Sales and Marketing Expense reported in the Company's income statement because the sales group's headcount is so much higher than the marketing group's headcount. In particular, CW10 recalled that sales expense comprised the majority, or more than 60% of total Sales and Marketing Expense during the Class Period.

47

213.   According to the Company's public filings, throughout the Class Period Nutanix spent a "significant" amount of money on sales hiring.  Nutanix's salesforce hiring throughout the Class Period, caused the Company's overall sales expense to increase every quarter in terms of whole dollars.  However, Defendants prevented investors from knowing that, despite the Company's purported "significant" sales hiring, Nutanix was still way behind in meeting its internal sales goals due to "massive" salesforce attrition.  Thus, while Defendants told investors that Nutanix had increased salesforce headcount by between 30% and 40% every quarter, they concealed from investors that a large chunk of their sales hiring actually went towards replacing sales representatives who had left Nutanix after just twelve months, on average, of being on the job.

214.   As demonstrated in the chart below, Nutanix's salesforce hiring caused its Sales and Marketing Expense reported in the Company's financial statements to increase in whole dollars throughout the Class Period even though Nutanix had kept lead generation spending flat and the Company was still woefully under on its internal sales hiring goals necessary to support the Company's touted growth:

|  | FY2016 | FY2017 | FY2018 | FY2019 |
|---|---|---|---|---|
| **Sales & Marketing Expense (in millions)[26]** | **$280** | **$422** | **$584** | **$800** |
| **% of Revenue** | **63%** | **50%** | **51%** | **65%** |

215.   As Defendant Williams would later admit on February 28, 2019, Nutanix was impacted "by a shortage of sales reps in the first half of the fiscal year, ***resulting in an under-spend by several million dollars***."

216.   When Sales and Marketing Expense is viewed as a percentage of total sales, it remained flat during the Class Period. It was not until after the Class Period in FY2019 after the Company's pipeline was severely depleted that Defendants finally "woke up" and increased their spending on lead generation and ramped up the salesforce hiring.

---

[26] This figure is net of stock-based compensation and amortization of intangible assets.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    **VI.    MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS**[27]

2         217.    In order to conceal the Company's true financial condition from investors throughout the

3    Class Period, Defendants issued a series of material misstatements and omitted material facts in the

4    Company's public filings, press releases, and other documents concerning Nutanix's: (1) sales

5    productivity; (2) lead generation spending; (3) sales personnel hiring; and (4) revenue and customer

6    growth.

7         218.    These material misstatements and omissions gave the false impression to investors that

8    Nutanix was purportedly increasing its investment in the sales pipeline by hiring sufficient sales

9    personnel and increasing lead generation activities when, in fact, Nutanix was experiencing

10   unprecedented salesforce attrition and had kept its spending on lead generation flat while Defendants

11   redirected such funds to engineering to focus on the development of the Company's lagging public

12   cloud-based products.

13        **A.    Materially False and Misleading Statements on the November 30, 2017 Call**

14        219.    The Class Period starts on November 30, 2017 when, after market close, the Individual

15   Defendants held an investor conference call with analysts to discuss the Company's first quarter 2018

16   financial results ("November 2017 Call").  During the November 2017 Call, despite admittedly keeping

17   lead generation spending flat and focusing on "existing" large customers, Defendant Pandey dismissed

18   the decline in "new" customer growth as immaterial and blamed it on seasonality:

19        **Param Singh**

20        So firstly, I was wondering, what was your average billing per customer in the
          quarter how has that trended. It also looks like the number of new customers that
21        came into your installed base was lower than the past few quarters, so maybe you
          could comment on that as well. Thank you.

22        **Dheeraj Pandey**

23
          . . . **On the customer account, I wouldn't look too much into that. Q1 is always**
24        **little softer from a customer perspective, but we added a decent amount of**
          **customers [there] and Q2 will pop up naturally, which it usually does quite a**
25        **bit from the Q1 level**.

26

27

28
---
[27] The alleged materially false and misleading statements and omissions are bolded and underlined. Non-
bolded statements are included for context.

49

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

220.    The above statements were also materially false and misleading when made because: (i) according to CW1, CW2, CW7, and CW8 Nutanix was employing the unsustainable practice of pulling in sales from future quarters predicated on extreme discounting and, thus, Nutanix was only able to report the purported "increased" customers by engaging in the pull-in practice which cannibalized future sales; (ii) Defendant Pandey knew that his statements that "Q2 will pop up naturally" and that Nutanix "added" customers were false and misleading because, as Defendants admitted, "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and was focusing on large *existing* Enterprise accounts, rather than "new" customers;  (iii) the statements deceptively misattributed Nutanix's poor new customer growth to benign factors such as seasonality when, in reality, Defendant Pandey knew the he and Defendant Williams had made the "decision" in the "planning process" for the fiscal year to keep investment in the generation of new leads "flat;" and (iv) it gave the misleading impression that Nutanix's pipeline was increasing and long-term growth was on track when, in fact, it had been decreasing in FY2018 because Defendants had diverted critical lead generation spending to engineering and Dell was providing the Company with fewer new sales leads.

221.    On this news the price for Nutanix common shares increased from a closing price of $32.80 per share on November 30, 2017 to a closing price of $36.06 per share on December 1, 2017, an increase of approximately 9.04% on unusually heavy trading volume. Accordingly, Defendants' false and misleading statements artificially inflated the price of Nutanix's stock and/or caused Nutanix's stock price to maintain artificial inflation.

**B.    Materially False and Misleading Statements in the December 2017 Form 10-Q**

222.    On December 13, 2017 Nutanix filed with the SEC, its quarterly report on Form 10-Q for the period ended October 31, 2017 (the "December 2017 10-Q"), signed by Defendants Pandey and Williams.

223.    In the December 2017 10-Q, Defendants falsely represented that Nutanix was *increasing* spending on its marketing activities related to *lead generation*:

> Additionally, as part of our efforts to penetrate and expand in global markets, **we have continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs**.

224.    The statement above was materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018, Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to engineering. Thus, Nutanix had not "continually *increased*" the self-described lead generation activities, as Defendants represented. CW2 and CW5 confirmed that in FY2018 and as of the filing of the December 2017 10-Q, Nutanix's spending on lead generation was inadequate and Nutanix overinvested in R&D: (i) CW2—stated that in FY2018, Nutanix was making "quite a bit" of investment in research and development, so much so that Nutanix became "overinvested" in R&D; (ii) CW5—stated that during CW5's tenure (December 2017 to June 2019), Nutanix did not properly invest in the development of new sales accounts and most of Nutanix's sales were driven from *existing* accounts.

225.    A reasonable investor would have understood the stated marketing activities—brand awareness, promotions, trade shows and partner programs—were lead generation activities because they are the same marketing activities Nutanix described as lead generation in its public filings and what Pandey described during the February 2019 Call as lead generation activities stating "pipeline generation" includes "all sorts of events" and "meetings." CWs 1, 4, 9 and 10 confirmed the stated activities were understood at Nutanix to be lead generation activities and were recorded as lead generation activities within the Sales and Marketing Expense line item in the Company's financial statements.  Analysts too understand these activities were lead generation activities. As JMP Securities analysts stated: "Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars have been underfunded." Further, a common sense understanding of the terminology lead and generation, as defined by well-known websites such as Investopedia and Wikipedia, consider such activities as lead generation activities.

226.    In the December 2017 10-Q, Defendants also misleadingly touted that Nutanix purportedly "significantly increased" its sales and marketing personnel:

***Investment in Growth***

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value. **We have significantly increased our sales and marketing personnel, which grew by 32% from October 31, 2016 to October 31, 2017.** We estimate, based on past experience, that sales team members typically become fully ramped around the time of the start of their fourth quarter of employment with us, and as our newer employees

ramp up, we expect their increased productivity to contribute to our revenue growth. As of October 31, 2017, we considered 63% of our global sales team members to be fully productive, **while the remaining 37% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team**. We are focused on actively managing this realignment, **and expect continuing improvement over the coming quarters**. We intend to continue to grow our global sales and marketing team to acquire new end-customers and to increase sales to existing end-customers

227.    The above statements touting the purported increase in sales personnel were materially misleading when made because they gave the false impression that the Company was on track to meet its internal sales hiring goals needed to achieve the its internal pipeline and revenue goals when, in fact, as Defendants *admitted* on February 28, 2019, "*over the past few quarters*, we have not kept pace with our bullish sales hiring goals."

228.    The above statements were also materially misleading because they failed to disclose that: (1) according to CWs 1, 2, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 12-14 months—as compared to competitors such as VMware whose average employment term was 2.2 years; (2) due to the significant sales force attrition, Nutanix was admittedly not keeping pace with the Company's internal hiring goals; (3) the purported reason that 37% of sales people were still ramping up was not due to the change in focus to Enterprise accounts (e.g., "major accounts and large deals") but because Nutanix was experiencing "massive" attrition of its salesforce across all regions at all levels; and, thus (4) Nutanix's sales productivity and, the resulting sales and pipeline were substantially declining. Indeed, CW1, CW2, CW5 and CW7 confirmed that as of the filing of the December 2017 10-Q, Nutanix had high salesforce attrition and/or insufficient sales staff:

- CW1—stated there was an unusually large amount of turnover throughout CW1's employment at Nutanix (12/16-6/18) and approximately 20% to 50% of sales personnel were leaving after only six to twelve months of employment.
- CW2—stated turnover in the sales department was an issue at Nutanix during CW2's employment.
- CW5—stated that throughout CW5's employment (12/17-6/19), Nutanix did not properly invest in the development of new sales accounts in terms of team sizes where a Global account team at Nutanix typically included CW5 and one engineer as compared to Cisco or Dell who staffed their global accounts with eight to twelve people.
- CW7—stated throughout CW7's tenure at Nutanix (9/15-8/18), turnover was chronic and systemic throughout the Nutanix organization, at every level from

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

senior leadership down to sales engineer where there were three different VPs in charge of the Bay Area from December 2017 to August 2018 and during CW7's three-year tenure at Nutanix, CW7 experienced "two generations" of sales personnel. CW7 stated the average tenure at Nutanix for a salesperson was approximately 12 to 16 months

229.   The December 2017 10-Q further represented that, as a result of Nutanix's purported increased focus on sales and marketing, these efforts were being reflected in the Company's increased demand and product revenue

**The increase in product revenue for the three months ended October 31, 2017 reflects increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities. Our total end-customer count increased from 4,473 as of October 31, 2016 to 7,813 as of October 31, 2017.**

230.   The statements above were materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for the following year and reallocated lead generation spending to engineering. Thus, Nutanix had not "*increased*" its "sales and marketing activities" as Defendants represented. Given that lead generation activities comprised approximately 70% of marketing, a reasonable investor would have understood a purported increase in marketing activities to be synonymous with an increase in lead generation activities. Moreover, Defendants' statements specifically correlate their false "increase" in "marketing activities" to "increased domestic and international ***demand***[.]" As stated above, at all relevant times and in this statement, Defendants equated "leads" with "demand," thus, a reasonable investor would understand that Defendants' statements above concerning "marketing activities" are explicitly referring to activities designed to generate new leads.

231.   CWs 1 and 5 confirmed that throughout their employment during the Class Period as of the filing of the December 2017 10-Q, Nutanix's spending on lead generation was inadequate and CW2 confirmed that Nutanix was overinvested in R&D.

232.   The above statements were also materially false and misleading when made because, according to CW1, CW2, CW7, and CW8 Nutanix was employing the unsustainable practice of pulling in every quarter sales from future quarters predicated on extreme discounting. Thus, Nutanix was only able to report the purported "increased" revenue and "demand" by engaging in the pull-in practice which

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

cannibalized future sales and was not actually experiencing "increased" leads, i.e., "demand," as Defendants claimed.

233.    Further, Defendants' statement above touting the purported increase in "end-customers" was materially misleading because, when read in context with the statements regarding "*increased* domestic and international *demand*," "*penetrat*[ing] and *expand*[ing] into global markets" and "*increased*" lead generation activities, it gives the false impression that Nutanix was adding *new* customers when, in fact, according to CW1 and CW5, and as Defendants later admitted, most of Nutanix's sales were driven from *existing* accounts. Nutanix was unable to obtain new customers due to Defendants' "decision" to keep lead generation "flat" and salesforce attrition.

234.    On this news in the December 2017 10-Q, Nutanix's stock price increased from a closing price of $35.34 per share on December 13, 2017 to $35.45 per share on December 14, 2017. Accordingly, Defendants' false and misleading statements artificially inflated the price of Nutanix's stock and/or caused Nutanix's stock price to maintain artificial inflation.

**C.    Materially False and Misleading Statements on the March 1, 2018 Conference Call**

235.    On March 1, 2018, after market close, the Individual Defendants held an investor conference call with analysts to discuss the Company's second quarter 2018 financial results ("March 2018 Call"). During the March 2018 Call, Defendant Williams touted Nutanix's purported "record sales productivity:"

> Performance across all of our geographic regions were outstanding with all three regions recording record performances. EMEA and APAC were especially strong. EMEA's results exceeded its previous best quarter by well over 50%, while APAC exceeded its previous best quarter by over 35%. **Both of these regions also experienced record sales productivity in the quarter.** Bookings from international regions were 49% of total bookings in Q2 2018 versus 48% in Q2 2017.

236.    During the March 2018 Call, Defendant Pandey also touted the Company's purported "record number of new customers:"

> Q2 was yet another strong quarter for Nutanix with billings, revenue, gross margin and EPS all better than our guidance and consensus. **Q2 also saw us add a record number of new customers, bringing our total number to 8,870**.
>
> *        *        *
>
> Q2 2018 was a fantastic quarter for our business overall, **increasing our number of Global 2000 or G2K customers by 34 in the quarter ending with 642**.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

237.    In response to analyst Wamsi Mohan's comment that Nutanix's purported "incremental new customer add was very strong" and when asked "what drove that strength," Defendant Pandey attributed it to purported "**huge contribution to overall mid market customer acquisition**."

238.    The above statements were also materially false and misleading because: (i) according to CW1, CW2, CW7, and CW8, Nutanix was employing the unsustainable practice of pulling in sales from future quarters predicated on extreme discounting and, thus, Nutanix was only able to report the purported "record number of new customers" by engaging in the pull-in practice which cannibalized future sales; and (ii) it gave the misleading impression that Nutanix's pipeline was increasing when, in fact, it had been decreasing in FY2018 because Defendants had diverted critical lead generation spending to R&D, Nutanix was experiencing significant undisclosed salesforce attrition and Dell was providing the Company with fewer new sales leads.

239.    As Defendants would admit at the end of the Class Period, Nutanix was actually focusing on "existing" larger customers, rather than "new" customers, because those "dollars are easier to get" and Nutanix "probably underspent a little bit on new customers."

240.    On this news from the March 2018 Call, Nutanix stock increased from a closing price of $36.20 per share on March 1, 2018 to $38.87 per share on March 2, 2018. Accordingly, Defendants' false and misleading statements artificially inflated the price of Nutanix's stock and/or caused Nutanix's stock price to maintain artificial inflation.

### D.    Materially False and Misleading Statements at the March 12, 2018 Analyst Day

241.    On March 12, 2018, Defendants held an Analyst Day for analysts and investors. At the March 12 Analyst Day, Nutanix touted a purported milestone of achieving over 1,000 "new" customers in the quarter:

> **And there's a milestone that we did this last quarter. And that said we had over 1,000 new clients, brand-new clients in the last quarter**.

242.    Defendant Williams echoed those statements:

> But you step back, you take your calculator out and you do 22.5 minus this 8.2, divided by 14, and that's about 1,000 customers – new customers per quarter. **We just did over 1,000 in Q2**.

243.    The above statements were also materially false and misleading when made because: (i) according to CW1, CW2, CW7, and CW8 Nutanix was employing the unsustainable practice of pulling in sales from future quarters predicated on extreme discounting and, thus, Nutanix was only able to report the purported 1,000 new customers by engaging in the pull-in practice which cannibalized future sales; and (ii) it gave the misleading impression that Nutanix's pipeline was increasing when, in fact, it had been decreasing in FY2018 because Defendants had diverted critical lead generation spending to R&D, Nutanix was experiencing significant undisclosed salesforce attrition and Dell was providing the Company with fewer new sales leads.

244.    As Defendants would admit at the end of the Class Period, Nutanix was actually focusing on "existing" larger customers, rather than "new" customers, because those "dollars are easier to get" and Nutanix "probably underspent a little bit on new customers."

245.    On this news, Nutanix stock increased from a closing price of $49.10 per share on March 9, 2018 to $51.48 per share at market close on March 12, 2018. Accordingly, Defendants' false and misleading statements artificially inflated the price of Nutanix's stock and/or caused Nutanix's stock price to maintain artificial inflation.

### E.    Materially False and Misleading Statements in the March 15, 2018 Form 10-Q

246.    On March 15, 2018, Nutanix filed its quarterly report on Form 10-Q for the period ended January 31, 2018 (March 2018 10-Q) with the SEC, signed by Defendants Pandey and Williams.

247.    In the March 2018 10-Q, Nutanix represented that the Company was increasing marketing activities relating to lead generation:

> Additionally, as part of our efforts to penetrate and expand in global markets, **we have continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs**.

248.    The statement above was materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to R&D. Thus, Nutanix had not "continually *increased*" the self-described lead generation activities, as Defendants represented. CWs 2, 4 and 5 confirmed that as of the filing of the March 2018 10-Q, Nutanix's spending on lead generation was inadequate and CW2 confirmed that Nutanix was overinvested in R&D:

56

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- CW2—stated that in FY2018, Nutanix was making "quite a bit" of investment in research and development, so much so that Nutanix became "overinvested" in R&D;
- CW4—stated the during CW4's tenure (January 2018 to May 2019), the Digital Marketing group did not have enough personnel to spend even the smaller amount of money that was allocated to it and that Digital Marketing was only allocated $830,000 per quarter in FY2018, which was increased to $2.3 million in January 2019 when it became clear that the quarter was not going to be good.
- CW5—stated that during CW5's tenure (December 2017 to June 2019), Nutanix did not properly invest in the development of new sales accounts and most of Nutanix's sales were driven from *existing* accounts.

249.    A reasonable investor would have understood the stated marketing activities—brand awareness, promotions, trade shows and partner programs—were lead generation activities because they are the same marketing activities Nutanix described as lead generation in its public filings and what Pandey described during the February 2019 Call as lead generation activities stating "pipeline generation" includes "all sorts of events" and "meetings." CWs 1, 4, 9 and 10 confirmed the stated activities were understood at Nutanix to be lead generation activities and were recorded as lead generation activities within the Sales and Marketing Expense line item in the Company's financial statements.  Analysts too understand these activities were lead generation activities. As JMP Securities analysts stated: "Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars have been underfunded." Further, a common sense understanding of the terminology lead and generation, as defined by well-known websites such as Investopedia and Wikipedia, consider such activities as lead generation activities.

250.    In the March 2018 10-Q, Defendants also misleadingly touted that the Company purported "significantly increased" its sales and marketing personnel:

***Investment in Growth***

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value. **We have significantly increased our sales and marketing personnel, which grew by approximately 30% from January 31, 2017 to January 31, 2018**. We estimate, based on past experience, that sales team members typically become fully ramped around the time of the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of January 31, 2018, we considered approximately 65% of our global sales team members to be fully productive, **while the remaining approximately 35% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team**. We are focused on actively managing this realignment, **and expect continuing improvement over the**

57

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**coming quarters**. We intend to continue to grow our global sales and marketing team to acquire new end-customers and to increase sales to existing end-customers.

251.    The above statements touting the purported increase in sales personnel were materially misleading when made because they gave the false impression that the Company was on track to meet its internal sales hiring goals needed to achieve the Company's internal pipeline and revenue goals when, in fact, as Defendants **admitted** on February 28, 2019, "**over the past few quarters**, we have not kept pace with our bullish sales hiring goals."

252.    The above statements were also materially misleading because they failed to disclose that: (1) according to CWs 1, 2, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 14 months—just as they were becoming fully productive—as compared to competitors such as VMware whose average employment term was 2.2 years; (2) due to the significant sales force attrition, Nutanix was admittedly not keeping pace with the Company's internal hiring goals; (3) the purported reason that 35% of sales people were still ramping up was not due to the change in focus to Enterprise accounts (e.g., "major accounts and large deals") but because Nutanix was experiencing "massive" attrition of its sales force across all regions amongst all levels; and, thus (4) Nutanix's sales productivity and, the resulting sales and pipeline were substantially declining. Indeed, CW1, CW2, CW4, CW5, CW7 and CW11 confirmed that as of the filing of the March 2018 10-Q, Nutanix had high sales force attrition and/or insufficient sales staff:

- CW1—stated there was an unusually large amount of turnover throughout CW1's employment at Nutanix (12/16-6/18) and approximately 20% to 50% of sales personnel were leaving after only six to twelve months of employment.
- CW2—stated turnover in the sales department was an issue at Nutanix during CW2's employment.
- CW4—stated that throughout CW4's tenure (1/18-5/19) the marketing department did not have enough personnel in the digital marketing group to spend even the smaller amount of money that was allocated to it during CW4's employment.
- CW5—stated that throughout CW5's employment (12/17-6/19), Nutanix did not properly invest in the development of sales accounts in terms of team sizes where a Global account team at Nutanix typically included CW5 and one engineer as compared to Cisco or Dell who staffed their global accounts with eight to twelve people.
- CW7—stated throughout CW7's tenure at Nutanix (9/15-8/18), turnover was chronic and systemic throughout the Nutanix organization, at every level from senior leadership down to sales engineer where there were three different VPs in charge of the Bay Area from December 2017 to August 2018 and during CW7's three-year tenure at Nutanix, CW7 experienced "two generations" of sales personnel. CW7 stated the average tenure at Nutanix for a salesperson was approximately 14 months

58

- CW11—stated that throughout CW11's employment (3/18-2/19) Nutanix had "massive turnover" in the salesforce, which required it to have to increase beyond the norm its sales hiring all at once, resulting in Nutanix having to replace productive, experienced sales people with new people who took a year to ramp up and become fully productive.

253.     The March 2018 10-Q further represented that, as a result of Nutanix's purported increased focus on sales and marketing, these efforts were being reflected in the Company's increased demand and product revenue:

**The increase in product revenue for the three months ended January 31, 2018 reflects increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities. Our total end-customer count increased from over 5,300 as of January 31, 2017 to over 8,800 as of January 31, 2018.**

254.     The statements above were materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to engineering. Thus, Nutanix had not "*increased*" its "sales and marketing activities" as Defendants represented. Given that lead generation activities comprised approximately 70% of marketing, a reasonable investor would have understood a purported increase in marketing activities to be synonymous with an increase in lead generation activities. Moreover, Defendants' statements specifically correlate their false "increase" in "marketing activities" to "increased domestic and international ***demand***[.]" As stated above, at all relevant times Defendants equated "leads" with "demand," thus, a reasonable investor would understand that Defendants' statements above concerning "marketing activities" are explicitly referring to activities designed to generate new leads.

255.     CWs 2, 4, and 5 all confirmed that throughout their employment during the Class Period and as of the filing of the March 2018 10-Q, Nutanix's spending on lead generation was inadequate and CW2 confirmed that Nutanix was overinvested in R&D.

256.     The above statements were also materially false and misleading because, according to CW1, CW2, CW7, and CW8 Nutanix was employing the unsustainable practice of pulling in every quarter sales from future quarters predicated on extreme discounting. Thus, Nutanix was only able to report the purported "increased" revenue and "demand" by engaging in the pull-in practice which

cannibalized future sales and was not actually experiencing "increased" leads, i.e., "demand," as Defendants claimed.

257.    In addition, Defendants' statement above touting the purported increase in "end-customers" was materially misleading because, when read in context with the statements regarding "*increased* domestic and international *demand*," "*penetrat*[ing] and *expand*[ing] into global markets" and "*increased*" lead generation activities, it gives the false impression that Nutanix was adding *new* customers when, in fact, according to CW1 and CW5, most of Nutanix's sales were driven from *existing* accounts. Nutanix was unable to obtain new customers due to Defendants' "decision" to keep lead generation "flat" and salesforce attrition.

258.    The above statements confirmed nearly identical misstatements made in the December 2017 10-Q and served to maintain the artificial inflation in Nutanix's stock price.

###    F.    Materially False and Misleading Statements in the May 24, 2018 Press Release

259.    On May 24, 2018, after market close, Nutanix issued a press release, also attached to a Form 8-K filed with the SEC and signed by Defendant Williams on May 24, 2018, announcing the Company's financial results for its third fiscal quarter ended April 30, 2018 (the "May 24 Press Release").

260.    The May 24 Press Release touted the Company's purported "**strong success in [ ] hiring**" as driving Nutanix's purported growth and success:

> "**Demand for our solutions remains strong as we saw 67 percent growth in software and support billings and 55 percent growth in software and support revenue. We had strong success in our hiring in the quarter that positions us to deliver on our future growth plans**, as we outlined at our March Investor Day*," said Duston Williams, CFO of Nutanix. "The **continued growth in our software and support billings** and gross margin expansion in the quarter demonstrates we are successfully executing on our transition to a software-defined business model."

261.    These above statements were materially false and misleading when made because, according to CW1, CW2, CW7, and CW8, Nutanix was employing the unsustainable practice of pulling in every quarter sales from future quarters. Thus, Nutanix was only able to report purported "strong" "demand" and revenue growth by employing the unsustainable practice of pulling in sales from future quarters, predicated on extreme discounting, which cannibalized future sales. In addition, Defendants' statement that Nutanix had "strong success in hiring in the quarter" to "position [Nutanix] to deliver on

future growth plans" gave investors the false impression that the Company was on track with its internal sales hiring goals needed to meet the Company's growth targets when, in fact, it was not. As Defendants ultimately *admitted* on February 28, 2019, "*over the past few quarters*, we have not kept pace with our bullish sales hiring goals."

262.   Unbeknownst to investors, according to CWs 1, 2, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period and as of the May 2018 Press Release, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 12-14 months, as compared to competitors such as VMware whose average employment term was 2.2 years; Indeed, CW1, CW2, CW4, CW5, CW7 and CW11 confirmed that as of the May 2018 Press Release, Nutanix had high sales force attrition and/or insufficient sales staff throughout the Class Period.

263.   Accordingly, Defendants' false and misleading statements caused Nutanix's stock price to maintain artificial inflation.

**G.   Materially False and Misleading Statements During the May 24, 2018 Conference Call**

1.

264.   On May 24, 2018, after market close, the Individual Defendants held an investor conference call with analysts to discuss the Company's third quarter 2018 financial results ("May 2018 Call").

265.   During the May 2018 Call, Defendant Williams falsely represented to investors that Nutanix was hiring Company-wide at record breaking numbers:

Last quarter I mentioned we had fallen behind in our hiring and that we would and I quote here have a full court press on hiring in the second half of the fiscal year to try to make up for this headcount shortfall. **Well we executed this full-court press flawlessly and ended up hiring more new employees in Q3 than in any previous quarter by a wide margin**. **During the quarter, we added over 60 new sales teams, which is critical to our planned growth for future periods**. We were very pleased with our higher performance in the quarter and although not yet at our planned headcount we did significantly exceed what we thought was possible when guiding Q3.

266.   These above statements were materially false and misleading when made because it gave investors the false impression that, while Nutanix had not yet achieved its planned headcount, the Company was on track to meet its hiring goals needed to achieve "our planned growth" when it was not. Defendants *admitted* on February 28, 2019 that they knew "*over the past few quarters*" Nutanix was not keeping pace with its "bullish sales hiring goals."

267.    Indeed, unbeknownst to investors, according to CWs 1, 2, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period and as of the May 2018 Call, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 12-14 months—just as they were becoming fully productive—as compared to competitors such as VMware whose average employment term was 2.2 years.  Thus, Nutanix was not close to being on track to meet its hiring goals.

268.    During the May 2018 Call, when questioned about new customer acquisitions, Defendants falsely claimed Nutanix was focused on advertising and generating pipeline from *new* customers:

**Wamsi Mohan**

Yes, thank you. One for Duston, one for Dheeraj. Duston the new customer acquisition pace has slow down to about 4% year-on-year and that's been decelerating, but you also noted like increasing traction with the last several quarters on larger deals and even including software only. <u>So has there been a change in focus towards larger deals versus new customer footprint?</u> <u>And your ramp and sales teams that you alluded to in this quarter, how should we expect that recurring going into next quarter</u> as well? I have a follow-up for Dheeraj.

**Duston Williams**

Sure. Now if anything we are focusing a lot of things and **<u>we've actually had a renewed focus with the channel on new customer logos</u>**. Actually we've got a rebate program in place now and …

**Dheeraj Pandey**

For the first time in the history of the company.

**Duston Williams**

… for the first time in the history of the company and we're really excited actually now this have to obviously get into actual bookings. **<u>But really excited about what's happening in the channel with the pipeline for new logos and things like that. So there has been -- if anything in acceleration or focus there from a new customer</u>**….

269.    The above statements were materially false and misleading when made because Nutanix was not seeing a "renewed" or an "acceleration" of focus from new customers. In fact, according to CW1, Nutanix was mainly closing sales with "existing" customers, rather than "new" customers, such that by August 2018, approximately 80% of Nutanix's sales came from 15% of its customers who were all existing customers and according to CW5, most of Nutanix's sales were driven from *existing* accounts. Moreover, new customers had been decreasing over the Class Period such that, according to

CWs, by March or April of 2018, the sales pipeline was so depleted it was at least 20-30% below the

Company's internal targets:

- CW1—stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline was drying up and in trouble.
- CW3—stated that by May 2018, the pipeline was "pretty dry."
- CW8—stated the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.

270.    When asked about whether the Company's shift to software-only products may have

negatively impacted smaller customer growth, Defendants falsely stated the answer was no:

**Andrew Nowinski**

Great. Thanks for taking the question. So I just have maybe a follow-up on your new customer growth. So I understand the quarterly seasonality with Q1 and Q3 being the weakest, but if I go back to your Analyst Day, I think $1.8 billion of that $3 billion target was expected to come from non-Global 2000 customers, implying net add about a thousand per quarter. So I guess, while the transition to software-only certainly has led a larger deal sizes, are you concerned with the shift may have negatively impacted your smaller customer growth? And are you still comfortable with that $3 billion target?

*        *        *

**Dheeraj Pandey**

And it's an average over 3.5 year period, we are doing some really -- as I said, cool stuff in the channel with new logos. **I don't think anything suffered because of success in larger deals and things like that. So we're comfortable that's going to bounce around.** Let's see what happens in Q4, and then we will have a discussion.

**Andrew Nowinski**

Well, I guess, that was more focused on the software transition element. Has that had any impact on large customer versus small customer growth?

**Dheeraj Pandey**

**We don't think.**

**Duston Williams**

**No, I don't think its impacted.** Again, the customer can have anything they want. If they want an appliance they're going to get an appliance. **So there's no reason why that should impact smaller customers or smaller deals.**

271.    The statements above were materially false and misleading when made because, contrary

to Defendants' representations that "no," smaller Commercial accounts had not suffered and there was

"no reason why [Nutanix's] shift to a software-only company] should impact smaller customers or

smaller deals,"  according to CW1, CW3 and CW12, as a result of Nutanix focusing all of its resources

on large existing Enterprise customers, there were barely any sales leads for smaller Commercial accounts starting in January 2018. Thus, smaller customers had, contrary to Defendants' statements, suffered and were negatively impacted by the Company's shift. Indeed, according to CWs 1, 3 and 12, because sales representatives in charge of small Commercial customers did not have the necessary tools and resources to close deals, they were unable to meet sales quotas in FY2018 and FY2019.

272. As Defendants ultimately admitted on the February 2019 Call, Nutanix "*over rotated a bit to the existing customer base and large customers* there, where those efficiency dollars are easier to get and probably *underspent a little bit on new customers*, which those efficiencies are little tougher to get on new customers."

273. The above statements in the May 24 Press Release and the May 2018 Call confirmed prior misstatements concerning, among others, Nutanix's purported strong hiring and customer growth and served to maintain the artificial inflation in the Nutanix's stock price.

**H.    Materially False and Misleading Statements in the June 12, 2018 Form 10-Q**

274. On June 12, 2018, Nutanix filed its quarterly report on Form 10-Q for the period ended April 30, 2018 (the "June 2018 10-Q") with the SEC, signed by Defendants Pandey and Williams.

275. In the June 2018 10-Q, Defendants falsely represented Nutanix was increasing marketing activities relating to lead generation:

> Additionally, as part of our efforts to penetrate and expand in global markets, **we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs.**

276. The statement above was materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to R&D. Thus, Nutanix had not "continually *increased*" the self-described lead generation activities, as Defendants represented. CWs 3, 4 and 5 confirmed that throughout their employment during the Class Period as of the filing of the June 2018 10-Q, Nutanix's spending on lead generation was inadequate:

- CW3—stated that when CW3 started at Nutanix in May 2018, there were not many sales leads and leads were "pretty dry" and that throughout CW3's tenure (May 2018 to July 2019), this witnesses' colleagues on the Commercial Northwest team complained that they were not "getting help from the demand generation" group because Nutanix did not sponsor many events in CW3's territory.
- CW4—stated the during CW4's tenure (January 2018 to May 2019), the Digital Marketing group did not have enough personnel to spend even the smaller amount

of money that was allocated to it and that Digital Marketing was only allocated $830,000 per quarter in FY2018, which was increased to $2.3 million in January 2019 when it became clear that the quarter was not going to be good.

- CW5—stated that during CW5's tenure (December 2017 to June 2019), Nutanix did not properly invest in the development of new sales accounts and most of Nutanix's sales were driven from *existing* accounts.

277.    A reasonable investor would have understood the stated marketing activities—brand awareness, promotions, trade shows and partner programs—were lead generation activities because they are the same marketing activities Nutanix described as lead generation in its public filings and what Pandey described during the February 2019 Call as lead generation activities stating "pipeline generation" includes "all sorts of events" and "meetings." CWs 1, 4, 9 and 10 confirmed the stated activities were understood at Nutanix to be lead generation activities and were recorded as lead generation activities within the Sales and Marketing Expense line item in the Company's financial statements.  Analysts too understand these activities were lead generation activities. As JMP Securities analysts stated: "Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars have been underfunded." Further, a common sense understanding of the terminology lead and generation, as defined by well-known websites such as Investopedia and Wikipedia, consider such activities as lead generation activities.

278.    Defendants further misrepresented in the June 2018 10-Q that Nutanix was purportedly "significantly" increasing its hiring of sales and marketing personnel, giving investors the false impression that the Company was on track to meet its necessary hiring goals:

> We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value. **We have significantly increased our sales and marketing personnel, which grew by approximately 40% from April 30, 2017 to April 30, 2018.** We estimate, based on past experience, that sales team members typically become fully ramped up around the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of April 30, 2018, we considered approximately 57% of our global sales team members to be fully ramped, **while the remaining approximately 43% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team**. We are focused on actively managing this realignment and **expect continuing improvement over the coming quarters**. We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers.

65

279.    The above statements touting the purported increase in sales personnel were materially misleading when made because they gave the false impression that the Company was on track to meet its internal sales hiring goals needed to achieve the Company's internal pipeline and revenue goals when, in fact, as Defendants **admitted** on February 28, 2019, "***over the past few quarters***, we have not kept pace with our bullish sales hiring goals."

280.    The above statements were also materially misleading when made because they failed to disclose that: (1) according to CWs 1, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period and as of the filing of the June 2018 10-Q, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 12-14 months—as compared to competitors such as VMware whose average employment term was 2.2 years; (2) due to the significant sales force attrition, Nutanix was admittedly not keeping pace with the Company's internal hiring goals; (3) the purported reason that 43% of sales people were still ramping up was not due to the change in focus to Enterprise accounts (e.g., "major accounts and large deals") but because Nutanix was experiencing "massive" attrition of its sales force across all regions at all levels; and, thus (4) Nutanix's sales productivity and, the resulting sales and pipeline was substantially declining. Indeed, CW1, CW4, CW5, CW7 and CW11 confirmed that as of the filing of the June 2018 10-Q, Nutanix had high sales force attrition and/or insufficient sales staff throughout the Class Period:

- CW1—stated there was an unusually large amount of turnover throughout CW1's employment at Nutanix (12/16-6/18) and approximately 20% to 50% of sales personnel were leaving after only six to twelve months of employment.
- CW4—stated that throughout CW4's tenure (1/18-5/19) the marketing department did not have enough personnel in the digital marketing group to spend even the smaller amount of money that was allocated to it during CW4's employment.
- CW5—stated that throughout CW5's employment (12/17-6/19), Nutanix did not properly invest in the development of sales accounts in terms of team sizes where a Global account team at Nutanix typically included CW5 and one engineer as compared to Cisco or Dell who staffed their global accounts with eight to twelve people.
- CW7—stated throughout CW7's tenure at Nutanix (9/15-8/18), turnover was chronic and systemic throughout the Nutanix organization, at every level from senior leadership down to sales engineer where there were three different VPs in charge of the Bay Area from December 2017 to August 2018 and during CW7's three-year tenure at Nutanix, CW7 experienced "two generations" of sales personnel. CW7 stated the average tenure at Nutanix for a salesperson was approximately 14 months
- CW11—stated that throughout CW11's employment (3/18-2/19) Nutanix had "massive turnover" in the salesforce, which required it to have to increase beyond the norm its sales hiring all at once.

66

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

281.    With respect to revenue, Defendants falsely claimed in the June 2018 10-Q that the Company's increased revenue was the direct result of purported increased demand resulting from purported increased sales and marketing activities:

**The increase in product revenue for the three and nine months ended April 30, 2018 reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities**. **Our total end customer count increased from over 6,100 as of April 30, 2017 to over 9,600 as of April 30, 2018**.

282.    The statements above were materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to engineering. Thus, Nutanix had not "*increased*" its "sales and marketing activities" as Defendants represented. CWs 3, 4, and 5 all confirmed that throughout their employment during the Class Period and as of the filing of the June 2018 10-Q, Nutanix's spending on lead generation was inadequate and CW2 confirmed that Nutanix was overinvested in R&D. Given that lead generation activities comprised approximately 70% of marketing, a reasonable investor would have understood a purported increase in marketing activities to be synonymous with an increase in lead generation activities. Moreover, Defendants' statements specifically correlate their false "increase" in "marketing activities" to "increased domestic and international *demand*[.]" As stated above, at all relevant times Defendants equated "leads" with "demand," thus, a reasonable investor would understand that Defendants' statements above concerning "marketing activities" are explicitly referring to activities designed to generate new leads.

283.    The above statements were also materially false and misleading because, according to CW1, CW2, CW7, and CW8 Nutanix was employing the unsustainable practice of pulling in every quarter sales from future quarters, predicated on extreme discounting, which cannibalized future sales. Thus, Nutanix was not experiencing "increased …demand for [its] solutions" as Defendants claimed. Rather, demand had been declining over the Class Period such that, according to CWs, by March or April of 2018, the sales pipeline was so depleted it was at least 20-30% below the Company's internal targets:

- CW1—stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline was at least 25-30% below the Company's targets as at least half of the salesforce missed its sales quotas prompting Defendants to state at the 2018 SKO that Nutanix would implement programs to help replenish the pipeline.

- CW3—stated that by May 2018, the pipeline was "pretty dry."
- CW8—stated the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.

284.    In addition, Defendants' statement above touting the purported increase in "end-customers" was materially misleading because, when read in context with the statements regarding "*increased* domestic and international *demand*," "*penetrat*[ing] and *expand*[ing] into global markets" and "*increased*" lead generation activities, it gives the false impression that Nutanix was adding *new* customers when, in fact, according to CW1 and CW5, most of Nutanix's sales were driven from *existing* accounts. Nutanix was unable to obtain new customers due to Defendants' "decision" to keep lead generation "flat" and salesforce attrition.

285.    Upon the news, Nutanix stock increased from a closing price of $60.65 per share on June 12, 2018 to a close of $63.50 per share on June 13, 2018. Many of the above misstatements in the June 2018 10-Q also confirmed nearly identical misstatements made in the December 2017 10-Q and March 2018 10-Q and served to maintain the artificial inflation in Nutanix's stock price.

**I.    Materially False and Misleading Statements on the August 30, 2018 Conference Call**

286.    On August 30, 2018, after market close, the Individual Defendants held an investor conference call with analysts to discuss the Company's fourth quarter 2018 financial results ("August 2018 Call"). During the August 2018 Call, Defendant Williams touted Nutanix's purported "**strong growth in spending**" and "**ramped rep sales productivity:**"

> **When we sit back and analyze our spending plans,** we take note of the following: **our strong growth in spending** will be completely self-funded by our free cash flow; **our ramped rep sales productivity has increased sequentially for the last three six-month periods ending Q4 2017, Q2 2018, and Q4 2018** and our customer repeat purchase multiples continue to increase.

287.    The statement above was materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018. CWs 3, 4, and 5 all confirmed that throughout their employment during the Class Period and as of the August 2018 Call, Nutanix's spending on lead generation was inadequate. Moreover, according to CWs 1, 7, 11, Nutanix was behind on its sales hiring because throughout the Class Period, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving

68

on average after 14 months—as compared to competitors such as VMware whose average employment term was 2.2 years.

288.    Moreover, Defendant Pandey further **_admitted_** on the February 2019 Call that Nutanix's sales force's productivity was negatively impacted in a material way because the sales force was confused by Nutanix introducing too many new products all at once in calendar 2018:

> On the product portfolio, yes, I mean, obviously, I'm a big fan of Andy Grove and the way he wrote two chapters in the book, Let Chaos Reign and then Rein in Chaos. So, we let chaos reign **_in the first half of '18 with product portfolio in terms of lack of crisp messaging_** and then obviously when we realized that we had to do a better job of messaging and classification and things of that nature.

289.    Thus, contrary to Defendants' statement, Nutanix had not implemented "strong growth in spending" relating to sales productivity and Nutanix's sales force productivity had decreased, not increased sequentially over the last few quarters as Defendants falsely represented. Indeed, for the quarter-ended January 31, 2018, Nutanix reported that "approximately 65% of our global sales team members to be fully ramped," yet for the quarter ended April 30, 2018, Defendants represented approximately 57%, or nearly 10% less, of the sales force was fully ramped.

290.    Defendant Pandey also continued to tout the purported "new" customer growth during the August 2018 Call stating Nutanix "added over 3,600 _new_ customers" that quarter:

> **[We] added over 3,600 new customers**. **In fact, our year-over-year growth accelerated from the previous year** despite a much larger base and having generated a higher free cash flow than the year before.
>
> *        *        *
>
> Coming to some color in Q4, this quarter, **we added approximately 1,000 new customers bringing our total number to 10,610**. In this last fiscal year, we added nearly as many customers as we had when we IPO-ed two years ago. We now count 710 Global 2000 companies as customers, **adding approximately 40 in Q4 2018 and 140 overall in fiscal 2018,**

291.    The above statements were also materially false and misleading because: (i) according to CW1, CW2, CW7, and CW8, Nutanix was employing the unsustainable practice of pulling in sales from future quarters predicated on extreme discounting and, thus, Nutanix was only able to report a purported "accelerated" year-over-year growth in "new" customers by engaging in the pull-in practice which cannibalized future sales; (ii) Defendants admitted that at the end of the Class Period, Nutanix had been focusing on "existing" larger customers, rather than "new" customers, as represented, because those

"dollars are easier to get" and Nutanix " probably underspent a little bit on new customers;" and (iii) it gave the misleading impression that Nutanix's pipeline was increasing when, in fact, it had been decreasing in FY2018 because Defendants had diverted critical lead generation spending to R&D, Nutanix was experiencing significant undisclosed salesforce attrition and Dell was providing the Company with fewer new sales leads. Indeed, according to confidential witnesses, by August 2018, the pipeline was at least 20-30% below the Company's internal targets and woefully inadequate:

- CW1—stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline was at least 25-30% below the Company's targets as at least half of the salesforce missed its sales quotas prompting Defendants to state at the 2018 SKO that Nutanix would implement programs to help replenish the pipeline.
- CW3—stated that by May 2018, the pipeline was "pretty dry."
- CW8—stated the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.

292.    Analysts understood Defendants' positive statements about Nutanix's purported "accelerated" and "record" new customer growth were substantially contributing to the Company's sales pipeline. For example, on February 27, 2019, J.P. Morgan released a report, "Partner Feedback Underscores Consistent Year-End Demand Environment; FQ2(Jan) Setup Not Ideal Due To Tough Comp" stating that after speaking with "a few key partners in Nutanix's ecosystem:" (i) "We are seeing a ton of demand for [Nutanix platform] and in almost all of our districts"; and (ii) "[Pipeline is] definitely fairly strong to where we were last year."

293.    The above statements in the August 2018 Press Release and the August 2018 Call confirmed prior misstatements concerning, among others, Nutanix's purported sales productivity and served to maintain the artificial inflation in Nutanix's stock price.

**J.      Materially False and Misleading Statements in the September 24, 2018 Form 10-K**

294.    On September 24, 2018, Nutanix filed its Annual Report on Form 10-K for the year-ended July 31, 2018 ("2018 10-K"), signed by Defendants Pandey and Williams. The 2018 10-K contained the same materially false and misleading statements as the August 30, 2018 Press Release.

295.    In addition, the 2018 10-K falsely claimed that Nutanix was purportedly increasing its marketing activities related to lead generation activities when, in fact, the opposite was true and the Company admittedly had kept those activities flat:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> Additionally, as part of our efforts to penetrate and expand in global markets, **we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs**.

296.    The statement above was materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to R&D. Thus, Nutanix had not "continually *increased*" the self-described lead generation activities, as Defendants represented. CWs 3, 4 and 5 confirmed that throughout their employment during the Class Period as of the filing of the 2018 10K, Nutanix's spending on lead generation was inadequate.

297.    A reasonable investor would have understood the stated marketing activities—brand awareness, promotions, trade shows and partner programs—were lead generation activities because they are the same marketing activities Nutanix described as lead generation in its public filings and what Pandey described during the February 2019 Call as lead generation activities stating "pipeline generation" includes "all sorts of events" and "meetings." CWs 1, 4, 9 and 10 confirmed the stated activities were understood at Nutanix to be lead generation activities and were recorded as lead generation activities within the Sales and Marketing Expense line item in the Company's financial statements.  Analysts too understand these activities were lead generation activities. As JMP Securities analysts stated: "Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars have been underfunded." Further, a common sense understanding of the terminology lead and generation, as defined by well-known websites such as Investopedia and Wikipedia, consider such activities as lead generation activities.

298.    In the 2018 10-K, Defendants represented that Nutanix was "significantly" increasing its hiring of sales and marketing personnel, giving the false impression that the Company was on track to meet its necessary hiring goals:

> We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000. **We have significantly increased our sales and marketing personnel, which grew by approximately 42% from July 31, 2017 to July 31, 2018**. We estimate, based on past experience, that sales team members typically become fully ramped up around the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of July 31, 2018, we considered approximately 59% of our global sales team members to be fully ramped, **while the remaining approximately 41% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing**

**sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team**. We are focused on actively managing this realignment and **expect continuing improvement over the coming quarters**. We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers

299.    The above statements touting the purported increase in sales personnel were materially misleading when made because they gave the false impression that the Company was on track to meet its internal sales hiring goals needed to achieve the Company's internal pipeline and revenue goals when, in fact, as Defendants *admitted* on February 28, 2019, "*over the past few quarters*, we have not kept pace with our bullish sales hiring goals."

300.    The above statements were also materially misleading because they failed to disclose that: (1) according to CWs 1, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period and as of the filing of the 2018 10-K, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 12-14 months—just as they were becoming fully productive—as compared to competitors such as VMware whose average employment term was 2.2 years; (2) due to the significant sales force attrition, Nutanix was admittedly not keeping pace with the Company's internal hiring goals; (3) the purported reason that 41% of sales people were still ramping up was not due to the change in focus to Enterprise accounts (e.g., "major accounts and large deals") but because Nutanix was experiencing "massive" attrition of its sales force across all regions amongst all levels; and, thus (4) Nutanix's sales productivity and, the resulting sales and pipeline was substantially declining. Indeed, CW1, CW4, CW5, CW7 and CW11 confirmed that as of the filing of the 2018 10-K, Nutanix had high sales force attrition and/or insufficient sales staff throughout the Class Period.

301.    With respect to revenue, Defendants falsely claimed in the 2018 10-K that the Company's increased revenue was the direct result of purported increased demand resulting from purported increased sales and marketing activities:

**Product revenue increased year-over-year for both fiscal 2017 and fiscal 2018. The increase in product revenue reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities**. **Our total end customer count increased from over 3,700 as of July 31, 2016 to over 7,000 as of July 31, 2017 and to over 10,600 as of July 31, 2018**.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

302.   The statements above were materially false and misleading when made because Defendants admitted that "during our planning process" for FY2018 Nutanix "kept lead generation spend flat" for FY2018 and reallocated lead generation spending to R&D. Thus, Nutanix had not "*increased*" its "sales and marketing activities" as Defendants represented. CWs 3, 4, and 5 all confirmed that throughout their employment during the Class Period and as of the filing of the 2018 10-K, Nutanix's spending on lead generation was inadequate. Given that lead generation activities comprised approximately 70% of marketing, a reasonable investor would have understood a purported increase in marketing activities to be synonymous with an increase in lead generation activities. Moreover, Defendants' statements specifically correlate their false "increase" in "marketing activities" to "increased domestic and international *demand*[.]" As stated above, at all relevant times Defendants equated "leads" with "demand," thus, a reasonable investor would understand that Defendants' statements above concerning "marketing activities" are explicitly referring to activities designed to generate new leads.

303.   The above statements were also materially false and misleading because, according to CW1, CW2, CW7, and CW8 Nutanix was employing the unsustainable practice of pulling in every quarter sales from future quarters, predicated on extreme discounting, which cannibalized future sales. Thus, Nutanix was not experiencing "increased …demand for [its] solutions" as Defendants claimed. Rather, demand had been decreasing over the Class Period such that, according to CWs, by March or April of 2018, the sales pipeline was so depleted it was at least 20-30% below the Company's internal targets:

- CW1—stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline was at least 25-30% below the Company's targets as at least half of the salesforce missed its sales quotas prompting Defendants to state at the 2018 SKO that Nutanix would implement programs to help replenish the pipeline.
- CW3—stated that by May 2018, the pipeline was "pretty dry."
- CW8—stated the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.

304.   In addition, Defendants' statement above touting the purported increase in "end-customers" was materially misleading when made because, when read in context with the statements regarding "*increased* domestic and international *demand*," "*penetrat*[ing] and *expand*[ing] into global markets" and "*increased*" lead generation activities, it gives the false impression that Nutanix was

adding *new* customers when, in fact, according to CW1, by August 2018 approximately 80% of Nutanix's sales came from 15% of its customers who were all existing customers and according to CW5 most of Nutanix's sales were driven from *existing* accounts. Nutanix was unable to obtain new customers due to Defendants' "decision" to keep lead generation "flat" and salesforce attrition.

305.    On this news, Nutanix's stock price increased from a close of $42.40 per share on September 24, 2018 to a close of $43.12 per share on September 25, 2018. Many of the above misstatements in the 2018 10-K also confirmed nearly identical misstatements made in the December 2017 10-Q, March 2018 10-Q and the June 2018 10-Q and served to maintain the artificial inflation in Nutanix's stock price.

**K.    Materially False and Misleading Statements in the December 10, 2018 Form 10-Q**

306.    On December 10, 2018, Nutanix filed its quarterly report on Form 10-Q for the period ended October 31, 2018 (the "December 2018 10-Q") with the SEC, signed by Defendants Pandey and Williams.

307.    In the December 2018 10-Q, Defendants represented that Nutanix was purportedly increasing its marketing activities related to lead generation when, in fact, the opposite was true and the Company kept lead generation activities flat:

> Additionally, as part of our efforts to penetrate and expand in global markets, **we continue to increase our marketing activities related to brand awareness, promotions, trade shows and partner programs**.

308.    The statement above was materially false and misleading when made because Defendants admitted that "during our planning process" for FY2019 Nutanix "kept lead generation spend flat" for FY2019 and reallocated lead generation spending to R&D. Thus, Nutanix had not "continually *increased*" the self-described lead generation activities, as Defendants represented. CWs 3, 4, and 5 confirmed that throughout their employment during the Class Period and as of the filing of the December 2018 10-Q, Nutanix's spending on lead generation was inadequate. CW9 similarly confirmed that during CW9's employment, demand generation spending had been reduced, resulting in fewer sales leads being available for the sales team.

309.    A reasonable investor would have understood the stated marketing activities—brand awareness, promotions, trade shows and partner programs—were lead generation activities because they

are the same marketing activities Nutanix described as lead generation in its public filings and what Pandey described during the February 2019 Call as lead generation activities stating "pipeline generation" includes "all sorts of events" and "meetings." CWs 1, 4, 9 and 10 confirmed the stated activities were understood at Nutanix to be lead generation activities and were recorded as lead generation activities within the Sales and Marketing Expense line item in the Company's financial statements. Analysts too understand these activities were lead generation activities. As JMP Securities analysts stated: "Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars have been underfunded." Further, a common sense understanding of the terminology lead and generation, as defined by well-known websites such as Investopedia and Wikipedia, consider such activities as lead generation activities.

310.   Defendants further claimed in the December 2018 10-Q that Nutanix was "significantly" increasing its hiring of sales and marketing personnel, giving the false impression that the Company was on track to meet its necessary hiring goals:

> We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000. **We have significantly increased our sales and marketing personnel, which grew by approximately 40% from October 31, 2017 to October 31, 2018**. We estimate, based on past experience, that sales team members typically become fully ramped up around the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of October 31, 2018, we considered approximately 58% of our global sales team members to be fully ramped, **while the remaining approximately 42% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team**. We are focused on actively managing this realignment **and expect continuing improvement over the coming quarters**. We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers.

311.   The above statements touting the purported increase in sales personnel were materially misleading when made because they gave the false impression that the Company was on track to meet its internal sales hiring goals needed to achieve the Company's internal pipeline and revenue goals when, in fact, as Defendants *admitted* on February 28, 2019, "*over the past few quarters*, we have not kept pace with our bullish sales hiring goals."

312.    The above statements were also materially misleading when made because they failed to disclose that: (1) according to CWs 1, 7, and 11, Nutanix was behind on its sales hiring because throughout the Class Period and as of the filing of the December 2018 10-Q, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after 12-14 months—as compared to competitors such as VMware whose average employment term was 2.2 years; (2) due to the significant sales force attrition, Nutanix was admittedly not keeping pace with the Company's internal hiring goals; (3) the purported reason that 42% of sales people were still ramping up was not due to the change in focus to Enterprise accounts (e.g., "major accounts and large deals") but because Nutanix was experiencing "massive" attrition of its sales force across all regions amongst all levels; and, thus (4) Nutanix's sales productivity and, the resulting sales and pipeline was substantially declining. Indeed, CW1, CW4, CW5, CW7 and CW11 confirmed that as of the filing of the 2018 10-K, Nutanix had high sales force attrition and/or insufficient sales staff throughout the Class Period. CW9 similarly recalled that Nutanix was experiencing lots of turnover, including numerous Director-level and above sales personnel over the course of CW9's tenure where in the five quarters that CW9 worked at Nutanix, CW9 had two different direct reports and there was at least one change in CW9's reporting hierarchy every quarter.

313.    With respect to revenue, Defendants falsely claimed in the December 2018 10-Q that the Company's increased revenue was the direct result of purported increased demand resulting from purported increased sales and marketing activities:

> **The increase in product revenue for the three months ended October 31, 2018 reflects increased demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities**. **Our total end customer count increased from approximately 7,810 as of October 31, 2017 to approximately 11,490 as of October 31, 2018**.

314.    The statements above were materially false and misleading when made because Defendants admitted that "during our planning process" for FY2019 Nutanix "kept lead generation spend flat" for FY2019 and reallocated lead generation spending to R&D. Thus, Nutanix had not "*increased*" its "sales and marketing activities" as Defendants represented. CWs 3, 4, and 5 all confirmed that throughout their employment during the Class Period and as of the filing of the December 2018 10-Q, Nutanix's spending on lead generation was inadequate. Given that lead generation activities

comprised approximately 70% of marketing, a reasonable investor would have understood a purported increase in marketing activities to be synonymous with an increase in lead generation activities.

315.    The above statements were also materially false and misleading because, according to CW1, CW2, CW7, and CW8, Nutanix was employing the unsustainable practice of pulling in every quarter sales from future quarters, predicated on extreme discounting, which cannibalized future sales. Thus, Nutanix was not experiencing "increased …demand for [its] solutions" as Defendants claimed. Rather, demand had been declining over the Class Period such that, according to CWs, by March or April of 2018, the sales pipeline was so depleted it was at least 20-30% below the Company's internal targets:

- CW1—stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline was at least 25-30% below the Company's targets as at least half of the salesforce missed its sales quotas prompting Defendants to state at the 2018 SKO that Nutanix would implement programs to help replenish the pipeline.
- CW3—stated that by May 2018, the pipeline was "pretty dry."
- CW8—stated the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.
- CW11—stated that by November 2018, the pipeline "would have looked bad."

316.    Defendant Pandey, himself, *admitted* that he knew Nutanix's pipeline was in trouble by at least December 2018 (the same time Attanasio dumped all of his Nutanix stock) stating at a William Blair 2019 Growth Stock Conference on June 5, 2019:

And then in ***December of this last year***, ***we realized that we actually have a pipeline problem that we've not focused enough***. And doing these large deals and these large customers is actually a double-edged sword. That's why in January, we started to really focus on the pipeline, the culture of the company. Both from sales and marketing point of view, we've had to change.

317.    In addition, Defendants' statement above touting the purported increase in "end-customers" was materially misleading because, when read in context with the statements regarding "*increased* domestic and international *demand*," "*penetrat*[ing] and *expand*[ing] into global markets" and "*increased*" lead generation activities, it gives the false impression that Nutanix was adding *new* customers when, in fact, according to CW1, by August 2018 approximately 80% of Nutanix's sales came from 15% of its customers who were all existing customers and according to CW5 most of Nutanix's sales were driven from *existing* accounts. Nutanix was unable to obtain new customers due to Defendants' "decision" to keep lead generation "flat" and salesforce attrition.

77

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

318.   The above misstatements in the December 2018 10-Q confirmed nearly identical misstatements made in the December 2017 10-Q, March 2018 10-Q, June 2018 10-Q and 2018 10-K and served to maintain the artificial inflation in Nutanix's stock price.

## VII.   THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES

### A.   The February 28, 2019 Press Release Partially Disclosing the Truth

319.   On February 28, 2019, after the market closed, Nutanix shocked the market when it issued a press release, entitled "Nutanix Reports Second Quarter Fiscal 2019 Financial Results," announcing the Company's second quarter fiscal 2019 financial results and lower than expected guidance for Q3 FY2019 (the "February 2019 Press Release"). In direct contradiction of Defendants' Class Period statements that Nutanix was increasing its investment in lead generation activities and keeping up with sales force hiring goals resulting in increased revenue quarter-over-quarter, Defendants announced that Nutanix had actually been ***underspending*** on lead generation and ***under hiring*** sales personnel:

> "We were pleased with our large deal activity and our progress in moving toward a subscription model," said Duston Williams, CFO of Nutanix. "***Looking ahead, our third quarter guidance reflects the impact of inadequate marketing spending for pipeline generation and slower than expected sales hiring. We took a critical look at these areas and have taken actions to address them***."

320.   With respect to lower than expected Q3 fiscal 2019 guidance, Defendants disclosed:

**Q3 Fiscal 2019 Financial Outlook**

For the third quarter of fiscal 2019, Nutanix expects:

- Revenue between $290 million and $300 million;
- Billings between $360 million and $370 million;
- Non-GAAP gross margin between 75% and 76%;
- Non-GAAP operating expenses between $330 million and $340 million; and
- Non-GAAP net loss per share of approximately $0.60, using approximately 183 million weighted shares outstanding

321.   In the February 2019 Press Release, Defendants admitted that the lower than expected Q3 FY2019 guidance was the direct result of underspending on lead generation and sales hiring, stating: "[l]ooking ahead, our third quarter guidance reflects the impact of ***inadequate marketing spending for pipeline generation and slower than expected sales hiring***. We took a critical look at these areas and have taken actions to address them."

322.    On February 28, 2019, also after market close, the Individual Defendants held an investor conference call with analysts to discuss the Company's second fiscal quarter 2019 results ("February 2019 Call"). During the February 2019 Call, Defendant Pandey revealed that Nutanix had been facing difficulties with "sales execution," stating, in relevant part:

. . . I would like to take you through three key areas of our business where we are making adjustments to maximize our strong market opportunity. First*, we recently identified some imbalances in our lead generation spending that were beginning to impact our sales pipeline. We recognized these imbalances in Q2* and have adjusted our lead generation spend accordingly. Despite these, these actions will take some time to take effect and therefore our Q3 guidance reflects the short-term impact of these imbalances. The changes we implemented are already showing early positive signs at the top of the funnel and we expect to see increasing traction in our sales pipeline over the coming quarters. Duston will provide more details on these imbalances and our actions taken later in the call.

Second, *over the past few quarters, we have not kept pace with our bullish sales hiring goals. This plays a role in our sales pipeline development.* Hiring at this scale is a norm and there is an ebb and flow to the process. We have been putting more focus on this aspect of our execution as we don't foresee any macro weakness in the horizon. *Finally, we are in the process of addressing a few opportunities to improve our sales execution in the Americas region. To address this, we have promoted Chris Kaddaras, our current Head of EMEA sales to lead both the Americas and EMEA sales organizations*. . . .

323.    Defendant Williams confirmed that the imbalances in Nutanix's lead generation spend was the cause for the Company missing its pipeline targets, stating:

. . .*In Q2,* while we were pleased with our progress with moving toward recurring subscription business as well as with our large deals in EMEA performance, *we were disappointed to miss our pipeline targets. Generally speaking, our Q2 was a quarter that should afford us to build backlog and that did not happen this year*.

*As Dheeraj discussed at the beginning of the call, we recently identified some imbalances in our lead generation spending that were beginning to impact our sales pipeline. Lead generation spending is a key component to building pipeline, which ultimately significantly impacts bookings, billings and revenue*. In fiscal 2018 I'm sorry, in fiscal 2017 we had increased lead generation spend by 75% over the prior year. This increase drove strong pipeline generation of fiscal 2017 and fiscal 2018, as well as improved efficiencies within the lead generation spend during fiscal 2018. Encouraged by our overall company performance, *in fiscal 2018, we reallocated some of our lead generation spending to other priorities. As a result, there was a fourth quarter period from Q4 2017 to Q3 2018 that we basically kept lead generation spend flat,* all while the company continued to perform quite well.

*Based on the lead generation spend efficiencies we experienced in FY 2018, we assumed further efficiencies would take place in FY 2019 and we again reallocated capital away from lead generation spend during our planning process. In Q2, we noticed a pattern that some of our lead generation efficiencies that we had planned for were not being realized. We began taking actions to reallocate capital back to lead generation spending, while at the same time, dialing back on non-sales hiring. We have continued these actions into Q3. Our quota-carrying sales reps also contributed to pipeline build and our pipeline targets were further impacted by a shortage of sales reps in the first half of the fiscal year, resulting in an under-spend by several million dollars. It's important to note*

79

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*that all this shifting of spend back to lead generation is not an insignificant amount. The magnitude of the shift is in a few tens of millions.*

Although we started making this adjustment in Q2, we expect it to take a couple of quarters to show meaningful results. In the meantime, we will double down on driving further business from within our large existing enterprise customer base, while the augmented lead generation spending works its way into the pipeline. This brings us to our guidance for Q3, where we expect significant impact from imbalance and lead generation spending earlier in the year, and slower-than-expected sales hiring. Expect the following, billings between $360 million and $370 million, revenue between $290 million and $300 million, gross margins between 75% and 76%, operating expenses between $330 million and $340 million, and a per-share loss of approximately $0.60, using weighted average shares outstanding of 183 million.

324.    These revelations shocked the market and analysts. In response to an analyst question about whether Nutanix introduced too many new products in 2018, Defendant Pandey responded unequivocally "yes" and equated Nutanix's business operations to a book, "Let Chaos Reign and then Rein in Chaos."

**Jason Ader**

Yes, thank you. Guys, I wanted to – I know that lead-gen is going to dominate the conversation here. But, I wanted to understand a little bit more about whether you think number 1, you may have over rotated a little bit much to the – too much to the large enterprise, and also *whether you think it took too much on in terms of new products in 2018*, which may have affected the demand gen just from the standpoint of maybe the sales force in the channel being a little bit confused with all of these new products?

**Dheeraj Pandey**

. . . On the product portfolio, yes, I mean, obviously, I'm a big fan of Andy Grove and the way he wrote two chapters in the book, Let Chaos Reign and then Rein in Chaos. *So, we let chaos reign in the first half of '18 with product portfolio in terms of lack of crisp messaging and then obviously when we realized that we had to do a better job of messaging and classification and things of that nature*.    I think the Core, Essentials, Enterprise has been a great sort of storytelling methodology for everybody and people need to realize that they can't just sell things because Beam is a thing and IoT is a thing and Calm is a thing, but they have to really think about the customer journey. And really empathize on behalf of the customer to say look, start with Core, then Essentials, then Enterprise. So, I think it's helped a lot in the last 4 months, 5 months. But yes, it comes up. *We are a high velocity company and sometimes we let chaos reign and then we go and rein in the chaos*. But I think the most important sort of – at least in my head is how our sales force has actually gone through two big transformations in the last 18 months, 24 months.

325.    In response to an analyst question regarding the cause for the purported lead generation inefficiencies, Defendants admitted that in addition to underspending on lead generation, *Nutanix also underspent on obtaining new customers and headcount for sales*:

80

**Rod Hall**

Yes, hi guys. Thanks for the question. I guess I wanted to go back to this lead generation issue, as I'm sure you expected to get a few questions on it. I'd just ask, if you could give us a little bit more color on why that efficiency deteriorated so much in this past quarter and maybe a little bit of an example of where these leads are coming from and have you changed the source of leads, anything like that? Then I have a follow-up to that.

**Duston Williams**

Yes, why don't I start, Rod and then I'm sure Dheeraj will want to pitch in here also. Let me just again kind of reiterate a few things that I had said in the script, and maybe a few more things, but if you back up again back to FY 2017, where we increased spending 75% year-over-year, effectively allowed us to build some pretty good backlog, pretty good pipeline in FY 2017 and into FY 2018. And then in 2018, we started to see some pretty good efficiencies within that spend. We talked about efficiencies as how much pipeline we build and ultimately how much bookings we get out of a demand dollar spent. And we saw some pretty good efficiencies there in 2018.

***Now, looking back at it, we probably over rotated a bit to the existing customer base and large customers there, where those efficiency dollars are easier to get and probably underspent a little bit on new customers, which those efficiencies are little tougher to get on new customers.***

**Dheeraj Pandey**

I think one other thing I'd also add to this is that, it's like building this business is like building a software. There is who'd would market it like an operating system and things emerge, ***like in the last three months, we saw the aspect of the business around how we needed to have actually spent on demand gen in 2018 to have made these new customers as existing customers of 2019.*** And as you know from the last 2 years of a lot of our go-to-market has been around, making our existing customers even more successful, and ***it camouflaged some of the things that we needed to do, in terms of adding to the cohort of existing every year, so that next year you can go, reap that customer base itself.***

**Duston Williams**

So, ***we took some action in December and we reallocated dollars in December. We did the same thing in January, and we're doing the same thing now in Q3 and we'll repeat that in Q4, reallocating more dollars to demand gen and some away from non-sales hiring***.

326.    Defendant Pandey also admitted that Defendants had slowed demand spend in the past and knew that it resulted in adverse results from a dry sales pipeline, yet consciously made the decision to do it again a year later:

**Rod Hall**

Okay, okay. And then, my follow-up to that thanks for that and I wanted to, I guess, follow-up and see NetApp called out this weakness in January. And I'm wondering if you if there is any possibility in your mind that this lead generation deficiency as you perceive it, might

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

be due to external factors like competition or maybe demand disruption as a result of the trading the other issues, the government shutdown etcetera, do you think that there's any external forces that might be affecting what you're seeing?

**Dheeraj Pandey**

Yes, I mean obviously, the things that we don't know that we don't know, but based on everything that we analyze in this business. We first look internally and it's about inputs and outputs, and *we ended up focusing too much on outputs in 2018, based on what we are getting from our existing customers*. So, we went back and did some first principles thinking to say, hey, why was 2017 like that, *because in 2016 we had slowed down quite a bit in demand spending too*, because of those three quarters of macro issues with China and oil crisis and Brexit and everything. So, 2016 with a slow year for us *and then we woke up in 2017 and said, we got to do this thing around demand as well, and that really helped us in 2017 and 2018.*

**Duston Williams**

*I think* ultimately*, Rod, we squeeze too hard on lead generation spend and we shouldn't have done that*, and we've corrected *that*.

327.    When asked where the Company reallocated the lead generation spend, Defendants responded that it went to engineering for new products:

**Matt Hedberg**

Great, thanks. I want to dig in a little bit more on the sort of the questions that were just asked. I'm curious what areas did you reallocate capital to versus lead-gen? And is the plan sort of beyond this Q3 to increase the overall level of spending or is it just reallocating back? And then maybe secondarily, is this primarily a U.S. issue, given your comments on EMEA, and the sales commentary as well, the sales head commentary?

*    *    *

**Duston Williams**

On the expenses, *we reallocate clearly to headcount, a lot went to engineering, some new products and things like that.* . . .

328.    Defendant Pandey explained when questioned about sales representatives' productivity that "one thing I would like also like to add is that, productivity is still a derived variable, Alex. It's not the real input. *The inputs are salespeople and pipeline spend, the demand gen spend that we talked about a little while ago.*" Later in the call, Defendant Pandey reiterated this, stating:

Yes, I think you know it starts with – as I said, two simple inputs, *it's time and money and time is what sales force actually puts in, and money is what we give them to go and do all sorts of events and how do you set up meetings*. So, we start looking at these different tiers of the funnel starting from marketing qualified leads to meeting setup to opportunities created to things below that in the funnel itself. And in that sense, I don't think the methodology has changed. It's just that the input which is the most basic input is dollars and that has to be the certain formula to that how those dollars convert to leads and to meetings and to opportunities and things of that nature. So, I think we are dispersing a lot

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  of this stuff across the world in like 17 different regions of the world and it's very similar
2  to what we did almost 18 months ago.

329.   As a result of the dissemination of this previously undisclosed information, the price of Nutanix common stock declined from a closing price of $50.09 per share on February 28, 2019 to a close of $33.70 per share on March 1, 2019, a change of 32.7%, on exceptionally heavy trading volume of over 45 million shares.

330.   Reacting to this news, on February 28, 2019 Wells Fargo downgraded Nutanix, "following the company's disappointing outlook reflective of sales under-investment" and noting that "the productivity ramp of new sales hires take time (4-8+ quarters)."

331.   One financial analyst noted that "*the magnitude* of the near-term revenue reset and the associated negative leverage on margins and cash flow is *alarming*" and the "impact of underinvesting in demand generation activities and under hiring is *severe*."

332.   Wells Fargo would later summarize that "Nutanix [ ] highlighted execution issues related to (1) lead generation spending, and (2) sales hiring and sales execution issues in Americas as resulting a forward pipeline decline."[28]

333.   Analysts did not buy Defendants' story that Nutanix's sales execution issues just popped up out of nowhere in the second quarter, concluding that the Company's issues must have "been building up for several quarters" and finally "came to a head" in Q2 FY2019. Indeed, William Blair stated in its March 1, 2019 report that "we believe these events have to some extent *overwhelmed the salesforce*, *impacting productivity and efficiency and impairing new customer acquisition*. *We believe these issues must have been* <u>*building up for several quarters*</u>, and in this past quarter they came to a head, as seen by the dramatically reduced pipeline."

334.   In a March 1, 2019 Company Note, Jefferies highlighted an "imbalanced spending on lead generation earlier in the year as well as slower than expected sales hiring," which "impacted the sales pipeline."

335.   In a March 1, 2019 report by JMP, JMP repeated that the money that should have been spent on lead generation was deflected to product development:

---

[28] NTNX: Disappointing Results/ Guide As Subscription Transition Accelerates, WELLS FARGO (May 30, 2019).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Management under invested in new account lead generation, as the company directed spending to other areas, such as product development. ***Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars*** have been ***underfunded***, as greater priority was placed on other business segments. Management suggested it believed it was achieving greater efficiency with expanding the company's brand awareness, as well as greater awareness of HCI (hyper converged infrastructure) in general.

336.    Following this announcement, on March 11, 2019, Nutanix disclosed that Louis J. Attanasio, the Chief Revenue Officer of Nutanix, notified the Company that he was leaving, effective March 8, 2019.  Commenting on Attanasio's departure, RBC Capital Markets noted in a March 11, 2019 Report that "***Mr. Attanasio's departure shouldn't be a surprise*** and was a further fallout from last quarter's poor execution."[29] RBC further commented that ***Defendant Pandey's appointment to interim CRO "makes a lot of sense given how active he is in the sales process***."[30]

**B.    Continued Materially False and Misleading Statements in the February 28 Call**

337.    Despite conceding that Nutanix had significantly underinvested in key marketing and sales activities and personnel, Defendants continued to mislead investors.  During the February 2019 Call, Defendant Pandey assured investors that the lack of lead generation spending only **"pushed things a quarter or two"** when, in fact, Nutanix had been observing setbacks and the depletion of its sales pipeline since fiscal 2017. According to Defendant Pandey:

In fiscal 2018 I'm sorry, in fiscal 2017 we had increased lead generation spend by 75% over the prior year. **This increase drove strong pipeline generation** of fiscal 2017 and **fiscal 2018, as well as improved efficiencies within the lead generation spend during fiscal 2018**.

338.    Defendants also falsely claimed Nutanix did not see any issues with its lead generation spend or sales pipeline until Q2 fiscal 2019:

**But the company was doing fine in FY 2018 and then we go into FY 2019 and we have a lot of spending demands and a lot of pressure on spending and a lot of people looking for leverage, and we made a decision at that point that we figured those efficiencies would not only continue, but increase in FY 2019** and we reallocated spending away from demand gen to a certain degree into headcount.

---

[29] Matthew Hedberg, Nutanix Inc. Thoughts on Nutanix's CRO departure, RBC CAPITAL MARKETS (Mar. 11, 2019).
[30] *Id.*

339.    The statements above were materially false and misleading when made because, the pipeline had been declining throughout the Class Period such that, according to CWs, by March or April of 2018, the sales pipeline was so depleted it was at least 20-30% below the Company's internal targets:

- CW1—stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline was at least 25-30% below the Company's targets as at least half of the salesforce missed its sales quotas prompting Defendants to state at the 2018 SKO that Nutanix would implement programs to help replenish the pipeline.
- CW3—stated that by May 2018, the pipeline was "pretty dry."
- CW8—stated the sales pipeline as reported in Salesforce.com was at least 20-30% below the Company's targets as of March or April 2018.

Thus, Nutanix was not experiencing purported efficiencies in the lead generation spending, as Defendants falsely claimed.

340.    Moreover, according to CWs 1, 7, 9 and 11, Nutanix had been experiencing "massive" turnover throughout the Class Period. Thus, Nutanix had not kept pace with its hiring goals, sales productivity was suffering, and the Company had not experienced the efficiencies it claimed it had in FY2018 and Defendants lacked any reasonable basis for claiming any purported efficiencies would continue in FY2019.

341.    On April 22, 2019, Nutanix's Vice President of Global Channel Sales, Rodney Foreman, resigned, after only being at the Company for 15 months.

**C.    Second Partial Disclosure in the May 30, 2019 Press Release**

342.    On May 30, 2019, after market close, Nutanix issued a press release announcing its financial results for third quarter fiscal 2019 ("May 2019 Press Release").  The Company shocked the market when it revealed that, despite its representations that the lack of lead generation spend and sales hiring would not impact the Company, Nutanix again failed to meet its revenue targets as a result of these issues. Specifically, Nutanix reported:

**Q3 Fiscal 2019 Financial Highlights**

- ***Revenue: $287.6 million (at 77.1% non-GAAP gross margin), down from $289.4 million (at 68.4% non-GAAP gross margin) in the third quarter of fiscal 2018***
- **Billings:** $346.0 million, down from $351.2 million in the third quarter of fiscal 2018
- **Net Loss:** GAAP net loss of $209.8 million, compared to a GAAP net loss of $85.7 million in the third quarter of fiscal 2018; Non-GAAP net loss of $103.0 million, compared to a non-GAAP net loss of $34.6 million in the third quarter of fiscal 2018

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- **Net Loss Per Share:** GAAP net loss per share of $1.15, compared to a GAAP net loss per share of $0.51 in the third quarter of fiscal 2018; Non-GAAP net loss per share of $0.56, compared to a non-GAAP net loss per share of $0.21 in the third quarter of fiscal 2018

343.    The fiscal third quarter 2019 results of $287.6 million in revenue fell well short of Nutanix's revenue target of $290 to $300 million set just one quarter before.

344.    On May 30, 2019, also after market close, the Individual Defendants held a conference call with analysts to discuss the Company's third quarter 2019 financial results ("May 2019 Call").

345.    During the May 2019 Call, Defendant Pandey admitted that the Company's troubles relating to underspending on sales hiring and lead generation were far from over:

Looking back, Q3 was a mixed quarter for us as we delivered better-than-expected gross margins and EPS and strong growth in our subscription-based revenues indicating an acceleration of our business model transition, while also delivering billings and revenue below our guidance range. *As you may recall our guidance last quarter was less than expected as we needed to rebuild our pipeline by doubling down on lead generation and increasing our focus on sales hiring and execution, especially in the Americas*.

\*          \*          \*

During Q3, we executed well on our strong plan to ramp lead generation and thus improve sales execution.

346.    When questioned about the cause of the quarter's disappointing results, Defendant Williams stumbled during his answer, revealing that, despite the Company's representations that it was actively increasing lead and hiring headcount, not much progress had been made:

**Alex Kurtz**

Yes, thanks, guys for taking a clarification and a question. Just looking back at the quarter, Duston, do you feel like -- you gave a bunch of reasons about what impacted the top-line and billings from the subscription change, I just want to be really clear. Where you guys on plan for the quarter as far as what you expected to hit just from a transaction perspective outside of all these changes that we are doing to subscription.

**Duston Williams**

Well, *clearly the quarter should've been better overall*, some of this again was impacted. We on the software or the subscription transition, we outperformed what we originally thought by well over 25%. So that clearly had some impacts there. *But clearly, we've got some issues we're working through and the pipeline we said we're going to work on that*. That's up 40% quarter-over-quarter, we said we're going to work on sales hiring. That's improved substantially quarter-over-quarter, we've got some leadership changes we're working through and that's clearly impacted the Q3 and it will, as I said, impact also Q4.

86

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

347. On this news, Nutanix's stock dropped from a closing price of $32.67 per share on May 30, 2019 to $28.07 per share on May 31, 2019, a change of 14.1%, on exceptionally heavy trading volume of almost 22 million shares.

348. Reacting to Nutanix's lower than expected third fiscal quarter earnings, Morgan Stanley downgraded Nutanix from "overweight" to "equal weight" and cut the Company's price target from $53 to $37 per share.

349. Andrew Nowinski of Piper Jaffray downgraded Nutanix stock from overweight to neutral from $47 to $28, noting that "***It is clear this model is unsustainable, requiring massive amounts of spending just to support modest revenue growth***, which ***we believe is attributable to competition***." Nowinski further commented that "[t]he company continues to struggle with execution issues." Brad Reback from Stifel commented that "[c]haos still reigns."

350. On May 30, 2019, Nutanix's Chief Product Development Officer, Sunil Potti, resigned.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A. The Individual Defendants' Knowledge and/or Recklessness

#### 1. Defendants' Admissions That Nutanix Secretly Decided to Keep Lead Generation Spending Flat and Divert Monies to R&D and New Product Development for Six Quarters

351. Defendant Williams expressly admitted in the Company's February 28, 2019 fiscal Q2 quarterly earnings release and during the fiscal Q2 2019 conference call with investors on February 28, 2019 that "***[I]n fiscal 2018, we reallocated some of our lead generation spending to other priorities. As a result, there was a four quarter period from Q4 2017 to Q3 2018 that we basically kept lead generation spend flat"*** and in FY2019 "***we again reallocated capital away from lead generation spend during our planning process***." Defendant Williams further admitted that the amount of spend reallocated was material, stating: "all this shifting of spend to lead generation is ***not an insignificant amount***. The magnitude of the shift is ***in the few tens of millions***."

352. Defendants' decision to keep lead generation spending flat is in stark contrast to its own public statements about the critical importance of "increasing" such spending. As Defendant Williams admits, "[l]ead generation spending is a ***key*** component to building pipeline, which ultimately significantly impacts bookings, billings and revenue." In other words, the Company's lead generation

spend was known by Defendants to be a fact likely to affect the total mix of information that would have been pertinent to Nutanix investors.

353.    Yet Defendants did not disclose to investors the Company's decision to keep lead generation spending flat or the materially negative impact that decision was having on Nutanix's sales and pipeline throughout the Class Period.

354.    Defendants' express admissions demonstrate their statements that, among others, "we have continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs" were materially false and misleading when made, and/or were rendered materially misleading by omission, and support a strong inference of scienter.

### 2.    Defendants' Admissions That Nutanix Had Not Kept Pace with the Company's Internal Sales Hiring Goals "For Several Quarters"

355.    During the February 2019 Call, Defendants admitted that the Company had not kept up with its internal hiring goals for "*the past few quarters," stating:* "over the past few quarters, we have not kept pace with our bullish sales hiring goals. This plays a role in our sales pipeline development." According to Defendants, with respect to sales hiring, Nutanix had "an under-spend by several million dollars" that also adversely impacted sales and lead generation.

356.    This startling admission is in stark contrast to Defendants' public statements such as, for example, Nutanix had "significantly increased our sales and marketing personnel" and purported "strong success in our hiring in the quarter that positions us to deliver on our future growth plans.

357.    Defendants' failure to keep up with the Company's internal sales hiring goals admittedly resulted in "an under-spend by several million dollars" that also adversely impacted sales and lead generation.

358.    Accordingly, Defendants knew that Nutanix was behind on its sales goals but failed to disclose that to investors and, instead, falsely assured investors the Company's hiring was on track.

1
2

**3.      Defendants' Admissions That Nutanix Sales Personnel Were Not Properly Trained to Sell the Company's Products, Resulting in a Depleting Sales Pipeline as Defendants Purposefully "*Let Chaos Reign*"**

359.      According to CW4, at the same time Nutanix was understaffed and underspending in sales and marketing, Nutanix was offering too many new software products in 2018 within a very short time period. Thus, there was not enough time or resources to educate the sales force on each new product or the new subscription model and Nutanix's sales team was simply "not built to handle the pipeline" and "general sales readiness was poor."

360.      During the Q2 fiscal 2019 earnings call, Defendant Pandey expressly *admitted* Nutanix had insufficient sales personnel to properly build the pipeline and close deals (*supra* Section VII) and "took too much on in terms of new products in 2018." Thus, Nutanix's sales force "[was] a little bit confused", which "may have affected the demand gen."

361.      According to Pandey Defendants knew about this sales execution issue for at least the "first half of '18:" "*we let chaos reign in the first half of '18 with product portfolio in terms of lack of crisp messaging* and then obviously we realized that we had to do a better job of messaging and classification and things of that nature."

362.      Defendants never disclosed to investors during the Class Period that Nutanix's sales force lacked the knowledge and capability to sell Nutanix's new products, resulting in Nutanix being unable to close sales and a depleted sales pipeline. Rather, Defendants touted purported "record sales productivity" and claimed any ramp up by the sales force was attributable solely to Defendants' focus on Enterprise customers in connection with the switch to a software-only company.

**4.      Defendants' Knowledge of Declining Sales and Sales Pipeline and Attrition Issues from Internal Company Reports and Meetings**

363.      Defendants' regular review of pipeline reports from the Salesforce.com and Clari systems and attendance at internal meetings where the depleted pipeline, declining sales and sales attrition were discussed throughout the Class Period supports a strong inference of scienter.

**Salesforce.com Pipeline Reports**:

364.      According to CW1 and CW8, the Individual Defendants had access to pipeline reports from Salesforce.com and Defendant Pandey accessed the pipeline report on Salesforce.com through the

Company's internal web browser via an icon on Pandey's computer desktop every day, which contained up-to-the minute sales pipeline data. CW8 stated that it was widely known throughout the Company that Pandey was the single-highest user of Salesforce.com and that the first Dashboard Nutanix employees see when they log into Salesforce.com is the pipeline report.

365.    According to CW1, CW3 and CW8, the Salesforce.com pipeline report would have showed Nutanix's sales pipeline declining in 2017 and throughout 2018: (i) CW1 recalled that by April or May 2018, it would have been "pretty obvious" from the pipeline reports that Nutanix's pipeline was drying up and in trouble and by August 2018, the pipeline report would have been "way too low" and approximately 25-30% below Nutanix's internal forecasts; (ii) CW3 stated that by May 2018, the pipeline was "pretty dry"; (iii) CW8 recalled that Salesforce.com reflected that the pipeline was 20-30% below target as of March or April 2018; (iv) CW11 stated that by November 2018, the pipeline "would have looked bad"; and (v) Pandey admitted that defendants knew the pipeline was in trouble by at least December 2018.

**Pipeline Reports in the Clari System**:

366.    CW1 also recalled a system called Clari to track the quality of Nutanix's sales pipeline. CW1 stated that Clari obtained its data from Salesforce.com. According to CW1, Defendants Pandey and Williams had access to pipeline reports in Clari.

**Quarterly Company All-Hands Meetings**:

367.    According to confidential witnesses, the decrease in sales pipeline, sales attrition problems and the lack of new Dell sales leads was discussed during quarterly All-Hands meetings in calendar 2018 attended by Defendants Pandey and Williams and Company employees.

368.    CW1 stated that at the quarterly All-Hands meetings in calendar 2018, Nutanix sales representatives discussed that there were not enough new deals in the Salesforce.com system, there were an inadequate number of new leads or opportunities in the system and that the new opportunities that were in Salesforce.com were not of sufficient monetary value to meet the Company's objectives and thus, these areas needed to be improved.

369.    CW1 stated that at every quarterly all-hands meeting in FY2018 and FY2019 during CW1's employment, which were always attended by Defendants Pandey and Williams, Attanasio

90

discussed open positions at Nutanix that there are "x" open sales positions and stressed that Nutanix was not filling them fast enough.

370.   CW1 stated that at the quarterly All-Hands meetings that Defendant Pandey stated the percentage of Nutanix revenue and sales leads received from Dell and the Dell alliance partners employed by Nutanix discussed that Dell was not providing any new leads and was compensating its salesforce to sell VMware instead of Nutanix products.

**Quarterly Company Revenue Meetings**:

371.   CW8 attended quarterly revenue meetings with Defendants Pandey, Williams and other executives after the quarter end where they discussed revenue targets, among other things. CW8 recalled that revenue was declining in 2018, however, not as much as the pipeline was declining because Nutanix had a backlog, which would have been discussed at these quarterly meetings.

**Annual SKO Meetings**

372.   Nutanix held annual Sales Kickoff Meetings attended by Defendants Pandey, Williams, and sales personnel. CW1 stated that at the SKO held in August 2018, Attanasio discussed the fact that 50% of Nutanix's sales representatives had not met their sales quotas and the Company's sales pipeline was in serious trouble prompting Nutanix management to implement new programs to increase the pipeline by contacting existing customers through daily "call blitz" calls to sell them more products.

373.   Thus, Defendants were aware of Nutanix's declining sales pipeline throughout the Class Period.

        **5.**     **Defendant Pandey Directed Sales Personnel to Engage in the Unsustainable Practice of "Pulling-in" Sales from Future Quarters to Make Quarterly Forecasts Throughout the Class Period**

374.   According to CW1, CW2, CW7, CW8 and CW11 Nutanix routinely "pulled in" sales orders from future periods predicated on extreme discounts in order to meet projected sales numbers for the current quarter throughout the Class Period.

375.   According to CW8, Nutanix's SVP of Sales determined the amount of sales needed to be pulled in each quarter and ***Defendant Pandey approved*** the amount. CW1 similarly confirmed that the directive to pull in sales came from Craig Bumpus and Lou Attanasio who replaced Bumpus at the end of calendar 2017 and that Defendant Pandey was "definitely aware of it."

376.    CW1 confirmed that up until Nutanix switched to become a software-only company in FY2018, Nutanix pulled in both hardware and software sales. After the Company switched to a software-only company, only software sales were pulled in. CW1 recalled that sales were pulled in for all types of customers, including Commercial, Global and Enterprise customers, and it was communicated by Nutanix that no deal was considered "too small."

377.    CW1 stated that throughout CW1's employment, every quarter prior to quarter end, sales representatives from each sales region received an email for their region from the Regional VP of Sales copying Attanasio or Lautenbach encouraging each salesperson in that region to pull in "x" amount of revenue for the quarter, so that the Company could achieve its sales target. CW1 recalled that in FY2018, the amount of "x" that each sales representative was asked to pull in for a given quarter ranged from $100k to $300k. CW1's region employed 35 to 40 sales representatives during FY2018.  Thus, sales representatives in CW1's region were asked to pull in approximately $3.5 million to $12 million in sales in any given quarter during FY2018.

378.    CW1 also recalled that prior to the end of each quarter in FY2018, Attanasio and Lautenbach sent emails to the entire sales organization at Nutanix, copying defendant Pandey, encouraging sales representatives to "get creative" and bring any deal forward to the War Room that quarter. By bringing a deal forward to the War Room that quarter, the sales representative was expected to bring the deal in as a sale for the current quarter

379.    CW11 also recalled that Nutanix routinely pulled-in sales in this witnesses' region of Southern California in order to meet sales quotas.

380.    In addition, according to CW11, potential deals were pulled in from future periods to inflate the pipeline and it would have been clear to anyone  analyzing those deals (including Defendants) that there was no way they would close in the quarter in which they were recorded as potential sales. Thus, CW11 recalled that there were many deals that senior management "absolutely had to know" had "no hope of closing in the period."

381.    Defendant Pandey's directive to pull in sales every quarter, as well as his access to Salesforce.com and Clari pipeline reports, supports Pandey's knowledge or reckless disregard that

Nutanix was engaging in the pull-in practice and that it was not a sustainable business practice because, by no later than April 2018, Nutanix's pipeline was severely depleted.

> **6.     Defendants Were Aware that Keeping Lead Generation Spending Flat Would Have a Devastating Effect on Nutanix's Pipeline and Sales Because They Had Done the Same Thing in FY2016, Which Caused the Company's Pipeline to Become Depleted**

382.     Defendants were aware that keeping lead generation spending flat would negatively impact Nutanix's sales and pipeline because this same thing admittedly happened in FY2016 when Nutanix reduced its lead generation spend:

> *[B]ecause in 2016 we had slowed down quite a bit in demand spending too*, because of those three quarters of macro issues with China and oil crisis and Brexit and everything. So, 2016 with a slow year for us *and then we woke up in 2017 and said, we got to do this thing around demand as well, and that really helped us in 2017 and 2018.*

383.     Moreover, Defendants knew the ramifications would be even worse given the known loss of Dell sales and sales leads starting by the summer of in 2017, before the Class Period, that Defendants observed in Nutanix's pipeline reports, among other sources.

384.     Defendants' prior experience of the consequences of not spending on lead generation supports scienter.

> **7.     Defendants Were Aware that Nutanix's Pipeline Was Materially Declining Throughout the Class Period Because They Closely Monitored New Customer Additions and Growth as one of their Annual Performance Goals**

385.     According to the Nutanix's 2018 Proxy Statement, the Compensation Committee to the Board adopted and approved individual Annual Bonus Targets for Defendants Pandey and Williams for FY2018. As part of their executive compensation, Defendants Pandey and Williams were entitled to earn up to 200% of their respective Annual Bonus Targets depending on whether they achieved certain weighted performance goals that were adopted and approved by the Compensation Committee. If Pandey and Williams met their FY2018 performance goals, they were entitled to receive up to $800,000 (based on a $400,000 Annual Bonus Target) and $520,000 (based on a $260,000 Annual Bonus Target), respectively.

386.     The 2018 performance goals were weighted as follows: (a) 50% for achieving an undisclosed Plan Target on software bookings; (b) 25% for achieving an undisclosed Plan Target on

bookings from Global 2000 customers; and critically (c) 25% for achieving an undisclosed Plan Target on *New Customer Adds*. Notably, if Defendants did not reach at least 90% of their New Customer Add Plan Target, the New Customer Adds component of their performance goals would not kick in at all and that component of their weighted performance goals would zero out. Defendants did not achieve their Plan Target for New Customer Adds in FY2018. Rather, Defendants achieved only 92.5% of their Plan Target. Given how close that result skirted to the absolute lowest threshold (90%) necessary to receive any New Customer Adds contribution, Defendants would have been aware throughout Fiscal 2018 of the Company's new customer additions and growth.

387.    As set forth in the 2019 Proxy Statement, Defendants Pandey and Williams were similarly entitled to receive Annual Bonus Targets in FY2019. Like in FY2018, the Annual Bonus Targets were adopted and approved by the Board's Compensation Committee. Defendants Pandey and Williams were again entitled to earn up to 200% of their respective Annual Bonus Targets depending on whether they achieved certain Compensation Committee approved weighted performance goals. If Pandey and Williams met their FY2018 performance goals, they were entitled to receive up to $1,000,000 (based on a $500,000 Annual Bonus Target) and $600,000 (based on a $300,000 Annual Bonus Target), respectively.

388.    The FY2019 performance goals were weighted as follows: (a) 50% for achieving an undisclosed Plan Target on software bookings; (b) 15% for achieving an undisclosed Plan Target on compliance with the common tech industry performance measure known as the Rule of 40; (c) 15% for achieving an undisclosed Plan Target on *New Customer* **Adds**; and (d) 20% for achieving an undisclosed and undefined "Personal Performance" Plan Target. Defendants only achieved ***67.9%*** of their New Customer Add Plan Target in FY2019.

389.    Thus, that Pandey and Williams' individual performance goals were tied directly to "new" customers added throughout the Class Period, demonstrates their knowledge of Nutanix's declining pipeline. Indeed, Pandey and Williams would have closely monitored Nutanix's sales pipeline through Salesforce.com where all new customers were tracked and through discussions with Company salespeople at the quarterly meetings described above in order to maximize their performance goals and, ultimately, their compensation.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

      **8.**    **That the Individual Defendants Spoke in Detail About the Specific Number of Customers and Sales Personnel Added Each Quarter Supports their Knowledge of Nutanix's Salesforce Attrition and Declining Sales Pipeline**

3      390.    Every quarter Nutanix reported on the exact number of purported new customers added

4 in the Company's quarter press release, during the quarterly investor call with analysts and in Nutanix's

5 SEC filings. Defendants Pandey and Williams also responded to specific questions from analysts during

6 the quarterly investor calls. *See, e.g.*, December 2017 10-Q ("Our total end-customer count increased

7 from 4,473 as of October 31, 2016 to 7,813 as of October 31, 2017"); March 2018 Call ("Q2 also saw

8 us add a record number of new customers, bringing our total number to 8,870"); May 2018 Call ("we've

9 actually had a renewed focus with the channel on new customer logos"); August 2018 Call ("[We] added

10 over 3,600 new customers. In fact, our year-over-year growth accelerated from the previous year").

11      391.    Similarly, every quarter Nutanix reported in detail on its salesforce hiring in the

12 Company's quarterly press releases, during the quarterly investor calls with analysts and in Nutanix's

13 SEC filings where they discussed the percentage increase in hiring and the number of new sales

14 personnel added. *See, e.g.*, December 2017 10-Q ("We have significantly increased our sales and

15 marketing personnel, which grew by 32% from October 31, 2016 to October 31, 2017"); March 2018

16 10-Q ("We have significantly increased our sales and marketing personnel, which grew by

17 approximately 30% from January 31, 2017 to January 31, 2018"); May 2018 Call ("During the quarter,

18 we added over 60 new sales teams, which is critical to our planned growth for future periods").

19      392.    That Defendants discussed in detail Nutanix's purported new customer and salesforce

20 additions demonstrates their knowledge of the Company's salesforce attrition and declining sales

21 pipeline.

22

23

      **9.**    **Defendant Pandey Was Aware that Nutanix's Pipeline Was Materially Declining throughout the Class Period Because He Was a Very "Hands On" CEO, As Confirmed by Nutanix Employees and the Analyst Community**

24      393.    Defendants admit in the Company's SEC filings that they "***regularly monitor billings***,

25 adjusted gross profit, adjusted gross margin, free cash flow and non-GAAP operating expenses, which

26 are non-GAAP financial measures and key performance measures, ***to help us evaluate our growth*** and

27 operational efficiencies, measure our performance and ***identify trends in our sales activity***, and establish

28 our budgets."

394.    Moreover, Defendant Pandey had a reputation among the investment community as being very active in the sales process.  For example, when Defendant Pandey was appointed interim Chief Revenue Officer, according to RBC Capital Markets analysts, this "made a lot of sense given how active [Pandey] is in the sales process."

395.    Indeed, CW1 described Defendant Pandey as a "very hands-on CEO" that undoubtedly would have been very informed about the status of Nutanix's sales pipeline, including from weekly pipeline reports. CW5 echoed this sentiment, explaining that this witness had, in fact, regularly met with Defendant Pandey about this witnesses' pipeline relating to new customers and sales leads for Global accounts. CW8, similarly described Pandey as a micro-manager and very hands on.

396.    Defendant Pandey's "hands-on" management style supports an inference of scienter.

**10.    Executive Terminations Support A Strong Inference of Scienter**

397.    The immediate departures of Nutanix's executive leadership after the truth was revealed further support a strong inference of scienter.  Indeed, during the Company's February 28, 2019 investor call, Defendant Pandey revealed that Chris Kaddaras, the head of the Company's European sales, would be taking over the Americas region to "improve our sales execution," replacing Lautenbach who had started at the Company in November 2017, just one year earlier.

398.    On March 6, 2019, Attanasio notified Nutanix that he would be leaving Nutanix effective March 8, 2019 "to pursue other opportunities." Attanasio, too, had only been with Nutanix for approximately one year before his termination.  Immediately prior to his departure, in December 2018, Attanasio *liquidated his entire holdings of Nutanix stock*—the purported same month defendant Pandey admitted Nutanix "realized that we actually have a pipeline problem" and right before the truth was revealed, selling 134,499 shares for proceeds of more than $5.5 million.

399.    Following Attanasio's departure, on April 22, 2019, just one week prior to Nutanix announcing another disastrous quarter, Nutanix's Vice President of Global Channel Sales, Rodney Foreman, resigned, after only being at the Company for fifteen months.

400.    Then, on May 30, 2019, the same day Nutanix reported disappointing fiscal Q3 2019 results, Nutanix's Chief Product Development Officer, Sunil Potti, resigned.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

**11.     Maintaining A Sufficient Pipeline Was Critical to Nutanix's Future Viability**

2     401.    According to Defendant Pandey, sales productivity is critical to revenue growth. The key

3  "inputs [of sales productivity] are salespeople and pipeline spend, the demand gen spend." Defendant

4  Williams echoed Pandey's words stating "[l]ead generation spending is a key component to building

5  pipeline, which ultimately significantly impacts bookings, billings and revenue."

6     402.    The admitted importance of Nutanix's sales pipeline to the Company's financial viability

7  supports scienter.

8     **B.     Defendants Had Motive to Make Fraudulent Representations**

9     **1.     Defendants Were Motivated to Inflate Nutanix's Stock Price to Use the
           Company's Stock as Currency for Acquisitions**

10

11    403.    Desperate to catch up with the competition, particularly in light of the lost business and

12  sales from Dell, Nutanix acquired two cloud-based companies to expand into the public cloud primarily

13  using the Company's inflated stock price as currency.

14    404.    On March 22, 2018, Nutanix completed the acquisition of Netsil to accelerate its ability

15  to deliver native multi-cloud operations with the addition of application discovery and operations

16  management. The aggregate purchase price of approximately $63.8 million consisted of approximately

17  $3.7 million in cash and 1,206,364 unregistered shares of Nutanix Class A common stock with an

18  aggregate fair value of approximately $63.8 million. The fair value of the shares of common stock issued

19  was determined to be $52.87 per share, the closing price of Nutanix stock on March 22, 2018.

20    405.    The acquisition of Netsil technology was used to launch "Flow," a software-defined

21  network solution designed to provide application-centric micro-segment security services to protect

22  against threats not protected by traditional network firewalls. The launch of Flow was announced at the

23  2018 .NEXT conference.

24    406.    Then, on August 24, 2018, while Xi was still not commercially released, Nutanix

25  completed the acquisition of Frame to provide a cloud-based Windows desktop and application delivery

26  service. The aggregate preliminary purchase price of approximately $130.0 million consisted of

27  approximately $26.7 million in cash and 1,807,576 shares of Nutanix Class A common stock, with an

28

aggregate fair value of approximately $103.0 million. The fair value of the shares of common stock issued was determined to be $56.97 per share, the closing price of Nutanix stock on August 24, 2018.

407.    Defendants were able to use inflated Nutanix stock prices to make two key acquisitions needed to compete against VMware and others.

408.    Furthermore, using stock as currency with respect to the acquisitions provided a way of limiting the Company's cash outlay which is one of a two components of the "Rule of 40"—a popular performance metric for technology startups that industry analysts would have considered material. The Rule of 40 says that the revenue growth rate of a company over a particular period, plus the company's profits as a percent of revenue over that same period should equal at least 40. Commonly, for Rule of 40 purposes, the measure of profit used by tech firms in Nutanix's space is free cash flow.

409.    Defendants knew that cash flow and the Rule of 40 were important to analysts and investors. Williams boasted about Nutanix's compliance with the Rule of 40 on the conference calls that occurred on May 25, 2018, and on August 30, 2018—i.e., the Company's earnings calls both immediately preceding and following the announcement of the Frame acquisition. Moreover, Defendants were well aware of the Company's precarious cash flow situation heading into FY2019. In fact, according to the FY2019 Proxy Statement, a portion of Defendant Pandey's and Defendant Williams' performance bonus was tied to the Company's compliance with the Rule of 40, so they were personally motivated to know what the Company's cash outlay was and minimize it.

410.    Defendants knew that for several fiscal years Nutanix's free cash flow was abysmal, and as demonstrated by the chart below, by FY2019 it was once again running negative due to the Company's depleted pipeline and lack of sales execution, so much so that Defendants failed to achieve the Rule of 40 under any method of calculation:[31]

---

[31] According to the 2019 Proxy Statement, Defendants' executive compensation bonuses were tied to a Rule of 40 calculation that prioritized what Nutanix called Imputed Software Value ("ISV") Revenue, which is calculated by subtracting all hardware revenue from the Company's total revenue. Accordingly, Nutanix calculated the Rule of 40 in 2019 by adding: (i) year-over-year percentage change in ISV Revenue from 2018 to 2019; together with (ii) yearly free cash flow as a percentage of 2019's ISV Revenue. This is an idiosyncratic methodology, and Nutanix did not disclose this calculation to the market until the fiscal year ended. Accordingly, analysts would have no reason to calculate the Company's Rule of 40 compliance this way. In any event, Nutanix even failed the Rule of 40 in FY2019 using "ISV."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Year | 2017 | 2018 | 2019 |
|---|---|---|---|
| Hardware Revenue | $236,316,000 | $257,314,000 | $105,321,000 |
| ISV Revenue | $609,587,000 | $898,143,000 | $1,130,822,000 |
| Total Revenue | $845,903,000 | $1,155,457,000 | $1,236,143,000 |
| | | | |
| ISV Y-O-Y Change: | | 47.34% | 25.91% |
| Total Y-O-Y Change: | | 36.59% | 6.98% |
| | | | |
| Free Cash Flow: | $ (35,402,000) | $ 30,168,000 | $ (76,284,000) |
| | | | |
| FCF / ISV Revenue | -5.81% | 3.36% | -6.75% |
| FCF / Total Revenue | -4.19% | 2.61% | -6.17% |
| | | | |
| ISV Rule of 40 | N/A | 50.70% | **19.16%** |
| Total Revenue Rule of 40 | N/A | **39.21%** | **0.81%** |

411.    In fact, based on Nutanix's quarterly revenue and cash flow totals, for the four quarter period ending in Q1 Fiscal 2019 (when the Frame acquisition was announced and completed), if Nutanix had paid for Netsil and Frame with cash, Nutanix would have run a negative cash flow of $108.7 million and violated the Rule of 40, with a score of only **29.82%.**

412.    By substituting stock for cash in the Class Period acquisitions, Defendants averted: (i) actually violating the Rule of 40, and/or (ii) hostile investor inquiry related to actual or potential Rule of 40 violations at a time when the pipeline had run "pretty dry."

### 2. Defendants Were Motivated to Inflate Nutanix's Securities Prices to Conduct Public Offerings of Nutanix Securities

413.    Defendants were motivated to inflate the Company's securities prices during the Class Period in order to raise desperately needed cash to continue funding operations while Nutanix scrambled to get its Xi Cloud Services and other software products on the market to be able to compete on the public cloud.

414.    In particular, in January 2018, Nutanix issued Convertible Senior Notes with a 0% interest rate for an aggregate principal amount of $575.0 million, due in 2023. The total net proceeds from this offering, after deducting the initial purchasers' discount of approximately $10.8 million, were approximately $564.2 million.

99

415.    Nutanix needed the proceeds to fund R&D so the Company could develop its public cloud product, Xi Cloud Services, which had been plagued with engineering issues causing massive delays in its launch and acquire other software products to transition Nutanix to an all software Company.  Indeed, throughout the Class Period, Nutanix was expending a significant amount of monies on new product development as demonstrated by the increase in research and development expense: Nutanix's R&D expense nearly tripled from fiscal 2016 to fiscal 2018, increasing from $116 million in fiscal 2016 to $314 million in fiscal 2018.  CW2 confirmed that during this witnesses' employment in 2018, Nutanix "overinvested" in R&D.

416.    Moreover, as discussed above, Nutanix spent $49.20 million in cash on the acquisitions of Frame on August 24, 2018 ($26.7 million), Minjar on March 16, 2018 ($18.8 million) and Netsil on March 22, 2018 ($3.7 million).

417.    Thus, Nutanix desperately needed cash at the beginning of fiscal 2018 to continue funding operations and investing in its software products to compete.  Indeed, as Andrew Nowinski of Piper Jaffray commented, "[i]t is clear this model is unsustainable, requiring massive amounts of spending just to support modest revenue growth, which we believe is attributable to competition."

## IX.    LOSS CAUSATION

418.    During the Class Period, the Individual Defendants materially misled the investing public, thereby distorting the prices for Nutanix's securities, by publicly issuing materially false and/or misleading statements and omitting to disclose material facts necessary to make their own statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about Nutanix's business, operations, and prospects as alleged herein. Plaintiff and the other members of the Class suffered substantial damages when Defendants' material misrepresentations and omissions, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed.

419.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period,

Defendants named in this Action made or caused to be made a series of materially false or misleading statements concerning Nutanix's business prospects. Defendants' statements were materially false and misleading in that the Company kept lead generation spending flat for more than a year, did not meet its internal sales hiring goals, and knowingly allowed "chaos" to "reign" over an inexperienced and understaffed salesforce, which resulted in a severely depleted pipeline and the failure to generate revenue and profits through sales, other than through an undisclosed and deceptive unsustainable pull-in scheme. These material misstatements or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's common stock to be overvalued and thereby distorted the transaction prices and strike prices for publicly traded put and call options on Nutanix common stock. The materially false or misleading statements made by Defendants during the Class Period resulted in Plaintiff and other members of the Class transacting in publicly traded put or call options of Nutanix the value of which were distorted, thus causing the damages complained of herein.

420.    As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Nutanix shares was removed, and the price of Nutanix shares fell over a series of two corrective disclosure.

421.    On February 28, 2019 after market close, Nutanix announced the Company was providing lower than expected Q3 forecasts due to an admitted underspending on lead generation and sales hiring since Q4 fiscal 2017 through Q2 fiscal 2019, as well as an admittedly disorganized sales force. Upon the news, the price of Nutanix common stock declined from a closing price of $50.09 per share on February 28, 2019 to a close of $33.70 per share on March 1, 2019.

422.    Market analysts for the Company attributed the missed forecasts to reasons directly related to the Defendants' misrepresentations. For example, in three March 1, 2019 reports:

- Oppenheimer explained that "we think Nutanix has tried to do too much (massive portfolio expansion, cloud rollout, M&A, etc.) with too little (under investment in sales/go-to-market) for too long (recent year) and this has caught up with it."

- JMP Securities stated "Management under invested in new account lead generation, as the company directed spending to other areas, such as product development. ***Pipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars*** have been ***underfunded***, as greater priority was placed on other business segments. Management suggested it believed it was achieving greater efficiency with expanding the company's brand awareness, as well as greater awareness of HCI (hyper converged infrastructure) in general

- William Blair explained that in addition to "management's explanation," i.e., the Company's admittedly insufficient pipeline investment, this analyst believed "sales execution" was a large issue during the Class Period and that such sales execution "has been disrupted by three major events: 1) the business model shift from hardware to software, 2) the model shift from license to subscription, and 3) the launch of a dozen or so new products on top of the core HCI offering. Taken together, we believe these events have to some extent *overwhelmed the salesforce, impacting productivity and efficiency and impairing new customer acquisition. We believe these issues must have been building up for several quarters*, and in this past quarter they came to a head, as seen by the dramatically reduced pipeline."

423. On May 30, 2019, Defendants issued a second corrective disclosure. The second corrective disclosure stated that Nutanix missed revenue and billing targets to a nature and extent greater than let onto after the end of Q2 2019, due to the Company's continued insufficient sales pipeline issues. On this news, Nutanix's stock dropped from a closing price of $32.67 per share on May 30, 2019 to $28.07 per share on May 31, 2019.

424. As a result of their transactions in publicly traded call options and/or put options on Nutanix common during the Class Period when Nutanix's common stock price was artificially inflated, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws when the price of Nutanix stock declined as a result of the market obtaining new Company-specific information that revealed or began to reveal to the market the falsity of the statements Plaintiff alleges were materially false and misleading. The timing and magnitude of the price decline in Nutanix common stock negates any inference that the loss suffered by Plaintiff and Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.   NO SAFE HARBOR

425. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

426. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

427.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Nutanix who knew that the statement was false when made.

## XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

428.    Plaintiff is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the markets for Nutanix's securities were efficient markets that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

> a.    Nutanix's common stock was actively traded on the NASDAQ;
>
> b.    The market price of Nutanix securities reacted promptly to the dissemination of public information regarding the Company;
>
> c.    The Company's securities were followed by financial analysts, including those cited in this Complaint;
>
> d.    As a regulated issuer, Nutanix filed with the SEC periodic public reports during the Class Period;
>
> e.    Nutanix regularly communicated with public investors via established market communication mechanisms; and
>
> f.    According to the Company's Form 10-K for the fiscal year-ended July 31, 2018, as of August 31, 2018, Nutanix had 135.14 million shares outstanding and the market capitalization of unaffiliated shares as of January 1, 2018 was approximately $3.6 billion.

429.    Throughout the Class Period, the Company was consistently followed by market participants, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Nutanix and the Individual Defendants continued to pump materially false and misleading information into the

marketplace regarding the Company's investment in lead generation, sales hiring, new customers and revenue. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's common stock.

430.    As a result of the misconduct alleged herein, including Defendants' materially false and misleading statements and omissions, the market for Nutanix's securities was distorted. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

431.    Plaintiff and the other Class members justifiably relied on the integrity of the market price for the Company's securities. Plaintiff and the other Class members were substantially damaged as a direct and proximate result of their transactions in publicly traded call and/or put options on Nutanix common stock, due to the subsequent decline in the price of Nutanix's common stock when the truth was disclosed.

432.    Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are also predicated upon omissions of material fact for which there was a duty to disclose.

433.    Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have transacted in publicly traded call and/or put options on Nutanix common stock at prices that were distorted by the artificially inflated price of Nutanix common stock.

## XII.    CLASS ACTION ALLEGATIONS

434.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all other persons or entities similarly situated who transacted in publicly traded call options and/or put options of Nutanix, during the period from November 30, 2017 and May 30, 2019, inclusive, seeking to pursue remedies under the Securities Act and Exchange Act of 1934 (the "Class"). Excluded from the Class are Nutanix and its subsidiaries and affiliates, the Individual

Defendants, and any of Defendants' or Nutanix's respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

435.    Because Nutanix had over 130 million shares of common stock actively trading on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Nutanix or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions, or by other reasonable ways as may be approved by the Court.

436.    Plaintiff's claims are typical of those of the other members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiff will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action and securities litigation.

437.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

   a.    Whether Defendants violated the federal securities laws as alleged herein;

   b.    Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Nutanix's business and operations;

   c.    Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

   d.    Whether the Individual Defendants caused Nutanix to issue materially false and misleading SEC filings and public statements during the Class Period;

   e.    Whether Defendants acted knowingly or recklessly in issuing materially false and misleading SEC filings and public statements during the Class Period;

   f.    Whether the prices of Nutanix securities during the Class Period was distorted because of the Defendants' conduct complained of herein;

105

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

g.   Whether price of Nutanix common stock declined as the market became aware of Company specific news which revealed the truth or began to reveal the truth regarding the materially false and misleading statements made by Defendants; and

h.   Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

438.   A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

439.   Plaintiff realleges each allegation as if fully set forth herein.

440.   This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Nutanix, Pandey, and Williams.

441.   The Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

442.   The Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

443.   The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, or receipt or modification of the Company's allegedly materially misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

444. The Individual Defendants, who are the senior officers or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiff and the other members of the Class.

445. As a result of the foregoing, the market prices of put and call options on Nutanix common stock (including, but not limited to, the transaction and strike prices attendant to such put and call options) were distorted during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above or the integrity of the market prices of put and call options on Nutanix common stock during the Class Period in transacting in Nutanix put or call options at prices that were distorted by the artificially inflated price of Nutanix common stock as a result of the Company's and the Individual Defendants' false and misleading statements.

446. Had Plaintiff and the other members of the Class been aware that the market prices of Nutanix's put and call options had been distorted by the artificially inflated price of Nutanix common stock by the Company's and the Individual Defendants' materially misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have transacted in put or call options on Nutanix common stock at the market prices that they did, or at all.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

447.    As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial.

448.    By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which, as fully alleged above, they suffered in connection with their transactions in Nutanix securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

449.    Plaintiff realleges each allegation as if fully set forth herein.

450.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants Pandey and Williams.

451.    The Individual Defendants, by reason of their status as senior executive officers or directors of Nutanix, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff and the Class' investments in Nutanix securities within the meaning of §20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

452.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

453.    The Individual Defendants knew or recklessly disregarded the fact that Nutanix's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Defendants did not act in good faith.

454.    By virtue of their high-level positions and their participation in and awareness of Nutanix's operations and public statements, the Individual Defendants were able to and did influence and control Nutanix's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

455.    The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

456.    As set forth herein, the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

457.    As a direct and proximate result of the Individual Defendants' wrongful conduct, and as fully alleged above, Plaintiff and the Class suffered damages in connection with their transactions in Nutanix securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as the Class representative;

B.    Against Defendants, jointly and severally, requiring Defendants to pay damages sustained by Plaintiff and other members of the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.    Granting Plaintiff leave to amend the complaint to conform to the evidence; and

E.    Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## JURY DEMAND

In accordance with Federal rule of Civil Procedure 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

109

DATED: May 28, 2021

**LEVI & KORSINSKY, LLP**

 _/s/ Adam C. McCall_
Shannon L. Hopkins
    (to be admitted *pro hac vice*)
Kristina Mentone
    (to be admitted *pro hac vice*)
Gregory Potrepka
    (to be admitted *pro hac vice*)
Andrew Rocco
    (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: kmentone@zlk.com
Email: gpotrepka@zlk.com
Email: arocco@zlk.com

Adam M. Apton (SBM 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, California 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

*Counsel for Plaintiff and the Class*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## GLOSSARY OF TERMS USED IN THE COMPLAINT

| | |
|---|---|
| Enterprise customers | Larger customers with a transaction value of greater than $500,000. |
| Lead Generation: | The action or process of identifying and cultivating potential customers for a business's products or services. Lead generation activities at Nutanix included any activity designed to get a new customer or sell additional products to existing customers. |
| Pipeline | A set of stages that a prospective customer moves through as they progress from a sales lead to a customer who purchases the product or service. The sales lead progresses through the pipeline as Nutanix's sales representatives engage in various meetings and presentations to educate the sales lead about the Company's products until it commits to a purchase and becomes a customer. The sales pipeline is vital to the company because it measures and shows what the seller's sales representatives, are doing during the entire sales process to ensure that lead clients turn into business opportunities. |
| Pipeline Report | Shows the value and quantity of all deals in each stage of the pipeline at the moment the report is run. Pipeline reports help sellers keep track of the status of every deal and understand whether they have an appropriate distribution of deals in order to meet their sales targets. |
| Pre-sales Engineer (SE) | An SE's job is to understand the customer's technical needs and provide that to the sales representative in the form of a proposed configuration that would then be included in the customer proposal. |
| Sales Lead | A person or business who may eventually become a customer and purchase the company's products or services or an existing customer who may purchase a different product. In order to obtain new customers and sell new products to existing customers, a company like Nutanix must first start by identifying sales leads. |
| Rule of 40 | The revenue growth rate of a company over a particular period, plus the company's profits as a percent of revenue over that same period should equal at least 40. For Rule of 40 purposes, the measure of profit used by tech firms in Nutanix's space is free cash flow. |
| Sales Qualified Lead (SQL) | A prospect created by the marketing department and vetted by the sales team. After initial contact from marketing, sales continues the interaction exploring their interest and capability to purchase. If sales adds them in their queue, the lead is deemed "qualified" as a viable prospect…." |
| Subject Matter Expert (SME) | A "person who is an authority in a particular area or topic. |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS